**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| FRIENDS OF ANIMALS, a non-profit corporation;<br><br>    *Plaintiff*,<br><br>v.<br><br>WILBUR ROSS, in his official capacity as Secretary of Commerce;<br><br>and<br><br>NATIONAL MARINE FISHERIES SERVICE, an agency within the United States Department of Commerce;<br><br>    *Defendants*. | Civ. No. _____<br><br><br><br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br><br><br><br><br><br>September 3, 2020 |

**INTRODUCTION**

1.     Beluga whales do not belong in captivity. They are highly social and intelligent animals who roam large distances in the wild. Captivity robs them of their most basic needs. Belugas are subject to extreme emotional and physical suffering in captivity. As marine mammal expert Hal Whitehead has noted, "We know that they are intensely social mammals with complex and lengthy migrations, and that they use a whole bunch of different habitats in different times of the year, and that they are acoustic communicators. There is no way even the best captive situation has even the slightest approximation to that."

2.     The National Marine Fisheries Service (NMFS) granted a permit (the "Permit") to Mystic Aquarium ("Mystic") in Connecticut to import five beluga whales from Marineland of Ontario, Canada ("Marineland"). The Permit violates and runs counter to the

1

purpose of, and violates multiple requirements of, the Marine Mammal Protection Act (MMPA). The Permit also violates the National Environmental Policy Act (NEPA) because the Environmental Assessment (EA) that NMFS conducted ignores or summarily dismisses the harms that the Permit will inflict on these belugas.

3.     The Permit prohibits Mystic from breeding the five belugas or using them in entertainment or to interact with Mystic's customers during the five-year term of the Permit. But the Permit leaves open the possibility that Mystic could breed these belugas, use them in entertainment, or transfer them to other aquariums in the U.S. after five years.

4.     Plaintiff, Friends of Animals, brings this action against Defendants, Wilbur Ross and NMFS, to force them to carry out their duties under the MMPA, 16 U.S.C. §§ 1361, *et seq*. and NEPA, 42 U.S.C. §§ 4321, *et seq*. By granting the Permit to Mystic, Defendants have failed to comply with their mandatory duties to protect the belugas under the MMPA and violated NEPA by failing to disclose or analyze the social, behavioral, and physical impacts of the Permit on the belugas in the EA.

5.     Defendants' failure to comply with the importation, research, and procedural requirements violates the MMPA and is arbitrary, capricious, and contrary to law within the meaning of the Administrative Procedure Act (APA). 5 U.S.C. §§ 701-06.

6.     Defendants' failure to analyze harms that the Permit would inflict on beluga whales violates NEPA, and is arbitrary, capricious, and contrary to law within the meaning of the APA. 5 U.S.C. §§ 701-06.

7.     Under NEPA, NMFS has a mandatory duty to fully evaluate and disclose all environmental impacts associated with the issuance of the Permit. This includes addressing the growing scientific evidence that the Permit will cause these belugas to suffer social, psychological, behavioral, and physical impacts for the rest of their lives.

8.     Likewise, NMFS was also obligated to examine and disclose whether large numbers of Americans may be affected by the Permit. If the Permit is issued, many

Americans will experience sadness, hurt, anger, dismay, despair, and trauma, knowing that these belugas have been and will continue to be harmed as a result of the Permit. Americans, including Friends of Animals' members and staff, will have difficulty visiting Mystic knowing that the belugas are experiencing social, psychological, behavioral, and physical harm as a result of the Permit.

9.      NMFS's failure to fully disclose or analyze the social, physiological, behavioral, and physical impacts on the belugas to be imported and the belugas remaining at Marineland was not harmless error. NEPA is intended to provide information to the agency decision-makers and the public that would be crucial to making an informed decision as to whether or not this Permit should or could be issued. Thus, the missing information might have led to a different outcome in the permitting decision. For instance, this information would be relevant to whether Mystic is suitably equipped to house and care for these belugas. Disclosure of this information might also cause Mystic to reconsider its request for the Permit.

10.     Defendants' failure to fulfill their duties under the MMPA and NEPA places the beluga whales in further peril and subjects them to human exploitation.

11.     To remedy Defendants' violation of the law, Plaintiff seeks declaratory and injunctive relief vacating the Permit and requiring Defendants to comply with the MMPA and NEPA.

### JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 5 U.S.C. §§ 701-06 (authorizing judicial review by federal district courts of agency action).

13.     This Court has authority to grant Plaintiff's requested relief pursuant to the Declaratory Judgment Act, 28 U.SC. §§ 2201-02 and the APA, 5 U.S.C. §§ 701-06.

3

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e), because a substantial part of the acts and omissions giving rise to this claim occurred in this judicial district.

## PARTIES

15.     Plaintiff FRIENDS OF ANIMALS is a non-profit international advocacy organization incorporated in the state of New York since 1957. Friends of Animals seeks to free animals from cruelty and exploitation around the world, and to promote a respectful view of non-human, free-living, and domestic animals. Friends of Animals engages in a variety of advocacy programs in support of these goals. Friends of Animals informs its members about animal advocacy issues as well as the organization's progress in addressing these issues through its magazine called *Action Line*, its website, and other reports. Friends of Animals has published articles and information advocating for the protection of wildlife species so that they can live unfettered in their natural habitats.

16.     Defendants' failure to comply with the MMPA and NEPA injures Friends of Animals' members and staff. Friends of Animals has members and staff who live in Connecticut, in close proximity to Mystic. Some of Friends of Animals' members would visit Mystic Aquarium to protest or to check on the well-being of the belugas. Friends of Animals' members and staff will have difficulty visiting Mystic Aquarium knowing that these five belugas have experienced and are continuing to experience physical, social, and behavioral distress because of the Permit.

17.     Defendant WILBUR ROSS is the Secretary of the United States Department of Commerce and is sued in his official capacity. Ross is responsible for the actions of the National Marine Fisheries Service.

18.     Defendant NATIONAL MARINE FISHERIES SERVICE (NMFS) is an agency within the National Oceanic and Atmospheric Administration (NOAA) and the United States Department of Commerce. NMFS is the federal agency responsible for federal regulation

and conservation of the nation's marine resources. NMFS is responsible for complying with all federal laws.

## LEGAL BACKGROUND

### A. The Marine Mammal Protection Act

19.  Congress passed the Marine Mammal Protection Act (MMPA) to protect marine mammals. *See* 16 U.S.C. § 1361. As one federal court has held, "[t]he interests of the marine mammals come first under the statutory scheme, and the interests of the industry, important as they are, must be served only after protection of the animals is assured." *Fed'n of Japan Salmon Fisheries Co-op. Ass'n v. Baldridge*, 679 F. Supp. 37, 46 (D.D.C. 1987).

20.  The MMPA created a strict moratorium on the take and importation of all marine mammals. 16 U.S.C. § 1371(a). The MMPA only includes a few narrow exceptions to the moratorium "for purposes of scientific research, public display, photography for educational or commercial purposes, or enhancing the survival or recovery of a species or stock." 16 U.S.C. § 1371(a)(1); *see also*, 50 C.F.R. § 216.11 *et seq*.

21.  The MMPA expressly prohibits the import of marine mammals taken in another country in violation of the laws of that country. 16 U.S.C. § 1372(c)(1)(B).

22.  In order to issue a permit, NMFS must find that the applicant's proposed activities "will not likely have a significant adverse impact on the species or stock." 50 C.F.R. § 216.34(a)(4). NMFS may only issue an import permit if the Secretary determines that the "taking will not be to the disadvantage of the animals concerned. If he cannot make that finding, he cannot issue a permit. It is that simple." *Baldridge*, 679 F. Supp. at 46; *Comm. for Humane Legislation, Inc. v. Richardson*, 414 F. Supp. 297, 310 (D.D.C. 1976), *aff'd* 540 F.2d 1141 (D.C. Cir. 1976).

23.  Furthermore, the applicant's "facilities, and resources" must be "adequate to accomplish successfully the objectives and activities stated in the application" and

"adequate for the proper care and maintenance of the marine mammal." 50 C.F.R. §

216.34(a)(5)-(6).

24.     For NMFS to issue a scientific research or enhancement permit, "the

applicant must demonstrate that . . . [t]he proposed activity furthers a bona fide scientific

or enhancement purpose." 50 C.F.R. § 216.41(b)(1).

25.     The applicant "bears the burden of showing that it satisfied the necessary

criteria for issuance under the Act and that its requested import is consistent with the

statute's protective purpose." *Ga. Aquarium, Inc. v. Pritzker*, 135 F. Supp. 3d 1280, 1286

(N.D. Ga. 2015).

26.     Under the MMPA, stocks or population stocks are designated as "depleted" if:

(A) the Secretary, after consultation with the Marine Mammal Commission and
the Committee of Scientific Advisors on Marine Mammals established under
title II of this Act, determines that a species or population stock is below its
optimum sustainable population;

(B) a State, to which authority for the conservation and management of a
species or population stock is transferred under section 109, determines that
such species or stock is below its optimum sustainable population; or

(C) a species or population stock is listed as an endangered species or a
threatened species under the Endangered Species Act of 1973 (16 U.S.C. 1531
et seq.).

16 U.S.C. § 1362(3)(1).

27.     Marine mammals held captive under a scientific research permit "shall not be

placed on public display, included in an interactive program or activity, or trained for

performance unless" the display activities are "(A) necessary to address scientific research

objectives and have been specifically authorized . . . under the scientific research permit"

and (B) [a]re conducted incidental to and do not in any way interfere with the permitted

scientific research and (C) are consistent with regulations governing public display . . ." 50

C.F.R. § 216.41(c)(1)(vi). In addition, "[a]ny activity conducted incidental to the authorized

scientific research," such as public display, "must not involve any taking of marine

mammals beyond what is necessary to conduct the research . . . ." 50 C.F.R. § 216.41(c)(1)(vii).

28.     "Special exception permits are not transferable or assignable to any other person, and a permit holder may not require any direct or indirect compensation from another person in return for requesting authorization for such person to conduct the taking, import, or export activities authorized under the subject permit." 50 C.F.R. § 216.35(i).

29.     NMFS must issue a permit no later than thirty days after a public hearing. 16 U.S.C. § 1374(d)(5).

30.     Applications for special exemption permits under Section 216 "must be signed by the applicant." 50 C.F.R. § 216.33(a).

31.     Depleted species or population stocks include Sakhalin Bay-Nikolaya Bay-Amur River beluga whales.

32.     The depleted designation applies to all members of the stock or population stock and their progeny even if they are held in captivity.

33.     The MMPA creates additional restrictions for importation of marine mammals "taken from a depleted species or stock of marine mammals" or "taken in an inhumane manner." 50 C.F.R. § 216.12(c)(4)-(5). For example, "[e]xcept pursuant to a permit for scientific research, or for enhancing the survival or recovery of a species or stock, issued under section 1374(c) of this title, it is unlawful to import into the United States any marine mammal if such mammal was . . . taken from a species or population stock which the Secretary has, by regulation published in the Federal Register, designated as a depleted species or stock . . ." 16 U.S.C. § 1372(b).

34.     To conduct research on a member of a depleted stock or population, the applicant must demonstrate that the research "cannot be accomplished using a species or stock that is not designated . . . as depleted" and "will not likely have a long-term direct or

indirect adverse impact on the species or stock." 50 C.F.R. § 216.41(b)(5)(i)-(ii). In addition, the research must either "[c]ontribute to fulfilling a research need or objective identified in a species recovery or conservation plan . . ."; "[c]ontribute significantly to understanding the basic biology or ecology of the species or stock, or to identifying, evaluating, or resolving conservation problems for the species or stock"; or "[c]ontribute significantly to fulfilling a critically important research need." 50 C.F.R. § 216.41(b)(5)(iii).

35.     Once a person obtains an import permit, that person may take, transport, export, or sell the marine mammals "without obtaining any additional permit or authorization" when minimum requirements are met. 16 U.S.C. § 1374(c)(2)(B).

**B.  The National Environmental Policy Act**

36.     NEPA, 42 U.S.C. § 4321 *et seq*., is our nation's basic charter for environmental protection. 40 C.F.R. § 1500.1(a).

37.     The fundamental purpose of NEPA is to "help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c).

38.     NEPA requires the acting agency to prepare a detailed Environmental Impact Statement (EIS) before an agency can undertake a major federal action that significantly affects the quality of the human environment. 42 U.S.C. § 4332(C).

39.     If an agency is uncertain whether a full EIS is necessary, the agency must prepare an Environmental Assessment (EA) to determine whether the proposed action will have a significant environmental effect triggering the preparation of an EIS. 40 C.F.R. § 1508.9.

40.     Council on Environmental Quality (CEQ) regulations require NMFS to "[m]ake diligent efforts to involve the public in preparing and implementing [its] NEPA procedures" and "[s]olicit appropriate information from the public." 40 C.F.R. § 1506.6.

41.     NOAA's Companion Manual for NEPA compliance requires NMFS to "provide the public with as much environmental information as is practicable under the circumstances and allow an opportunity for the public to offer their views and inform the agency's decision-making process." Policy and Procedures for Compliance with the National Environmental Policy Act and Related Authorities, Companion Manual for NOAA Administrative Order 216-6A (2017) at 13, available at https://www.nepa.noaa.gov/docs/NOAA-NAO-216-6A-Companion-Manual-03012018.pdf (the "Companion Manual").

42.     The Companion Manual encourages NMFS to provide the public with an opportunity to comment on all EAs. *Id.*

43.     In determining the appropriate level of public involvement in an EA, NMFS must consider all relevant circumstances, including "the potential for controversy" of the proposed action and whether there exists "an emergency situation or compelling need to act quickly." *Id.* at 14.

44.     It is arbitrary and capricious for NMFS to deviate from the Companion Manual without adequate explanation. *See Town of Barnstable v. FAA*, 659 F.3d 28, 34 (D.C. Cir. 2011).

## FACTUAL BACKGROUND

### A.  Beluga Whales

45.     Beluga whales are known for their white color and range of vocal sounds, earning them the title of "canary of the sea." Belugas produce many different sounds, including whistles, squeals, moos, chirps, and clicks. Belugas in captivity have been reported to mimic the speech of their human handlers.

46.     Beluga whales are found in the United States in Alaska and globally throughout the Arctic Ocean. In the wild, belugas are generally migratory and can travel as far as 3,500 miles per year. During the summer months, belugas are often found in shallow

coastal waters or near river mouths. Following summer, belugas sometimes travel over 600 miles from land. Much of the year, belugas spend their time in deeper waters, diving to depths of over 3,000 feet for periods of up to twenty-five minutes.

47.    Belugas whales lead highly social lives. They travel in pods, which range from two to twenty-five members (the average is ten). During the summer, pods join together and form massive groups numbering hundreds and even thousands. Belugas are very playful and chase each other around for fun, spit water at each other (and humans), rub against each other, call to each other, make toys out of objects they find in the water, and swim up next to boats to observe the people riding inside.

48.    Beluga whales in the wild are vulnerable to many stressors and threats, including pollution, habitat degradation, predation from killer whales, harassment, interactions with commercial and recreational fisheries, human exploitation and hunting, oil and gas exploration, disease, and other types of human disturbance such as underwater noise.

49.    Human exploitation and hunting of beluga whales for entertainment purposes has led to an estimated over 300 belugas in captivity today.

50.    Captivity has many impacts on the ability of belugas to live quality, meaningful lives.

51.    For instance, belugas extensively rely on their hearing and vocalization ability to echolocate, using sound to navigate and hunt for prey. This ability is hindered in captivity due to the concrete tanks.

52.    Similarly, belugas' social structure is disrupted in captivity. Belugas in captivity cannot form large pods, cannot interact with a wide variety of belugas, and cannot choose to avoid close physical proximity with any belugas in their tanks.

53.     Finally, the mean life expectancy in captive belugas is twenty to thirty years and they routinely die before the age of thirty, whereas in the wild belugas live between forty and eighty years.

## B. Captive Breeding of Belugas

54.     Six different aquariums in the United States that display captive belugas, including Mystic and Georgia Aquarium, are part of the North American beluga breeding cooperative, which is a cooperative between zoos and aquariums to increase the number of beluga whales born in captivity and increase the population base of captive belugas to a self-sustaining level (the "Breeding Cooperative"). The Breeding Cooperative commonly transfers whales among facilities to ensure breeding.

55.     The Breeding Cooperative has been confronted with a two-fold existential crisis in recent years. Unless the Breeding Cooperative acquires additional beluga whales, the population of captive belugas will steadily decline. Yet it has become very difficult for the Breeding Cooperative to acquire new beluga whales, and recent efforts have faced substantial obstacles.

56.     In 2012, Georgia Aquarium submitted an application to NMFS to import eighteen beluga whales captured from the wild in Russia. The stated goal of the proposed import was "to enhance the North American beluga breeding cooperative by increasing the population base of captive belugas to a self-sustaining level . . . ."

57.     However, NMFS denied the application in 2013 because Georgia Aquarium failed to meet its burden under the MMPA.

58.     Georgia Aquarium filed a lawsuit challenging NMFS's denial of its permit application. The court granted the government's motion for summary judgment in 2015, and the belugas were never imported. But American aquariums' quest to acquire more belugas did not end.

59.     No later than 2015, Mystic began exploring whether it could acquire captive beluga whales from an aquarium in Canada.

60.     As early as 2017, Mystic reached an agreement to acquire beluga whales from Marineland of Canada.

61.     Marineland, the proposed exporter of the five beluga whales at issue in this case, is a large aquarium in Niagara Falls, Canada.

62.     Marineland is likely the world's largest importer of wild-caught beluga whales in the last twenty years. It captured twenty-eight belugas from Russia between 1999 and 2005 and another eight from Russia in 2008 in order to display them to paying customers.

63.     After importing those belugas, Marineland ensured that the whales would breed baby calves that would attract more paying customers.

64.     Marineland's efforts were highly successful. Due to its unprecedented levels of wild capture of belugas and its relentless breeding of those belugas, Marineland came to have more captive belugas that any other aquarium in the world. It currently has about fifty-four belugas in captivity.

65.     The fathers and mothers of the five belugas covered by the Permit were captured by Marineland off the coast of Russia.

66.     Marineland captured the fathers and mothers of the five belugas covered by the Permit in violation of Russian and international law.

67.     Marineland's practices were highly controversial both in Canada and throughout the world. In response to Marineland's inhumane practices, the Canadian government resolved to end the captive display of marine mammals.

68.     In 2015, a Canadian senator introduced Bill S-203, the Ending the Captivity of Whales and Dolphins Act.

12

69.     The Canadian Senate passed Bill S-203 in 2018. It was then passed by Canada's House of Commons and signed into law in 2019.

70.     Bill S-203 banned the display and breeding of cetaceans in captivity and made it a criminal offense. Criminal Code, R.S.C. 1985, s445.2(2), (5). It also made it an offense to arrange, receive money for, or take part in events at which cetaceans are made to perform for human entertainment. Criminal Code, R.S.C. 1985, s445.2(4). Further, Bill S-203 amended the Fisheries Act, RSC 1985 c F-14 (Fisheries Act), making it illegal to capture wild cetaceans and take them into captivity unless the cetacean is injured or in distress and in need of assistance. Fisheries Act s28.1. Finally, the bill prohibits the export of beluga whales unless the export is in the best interests of those belugas.

71.     The Canadian senator who introduced the bill was quoted as saying that it was the country's "moral obligation" to end the captive display of whales and dolphins.

72.     Because the new law exempts marine mammals already in captivity, Marineland remains able to display the beluga whales that it has in captivity. Under the new law, however, Marineland can no longer breed its beluga whales or use them in entertainment performances.

73.     Bill S-203 changed Marineland's economic incentives of keeping its beluga whales. With so many beluga whales at its facility, Marineland has significant costs to keep, feed, and care for them. But because Marineland can no longer breed the belugas or make them perform for entertainment, in Marineland's view, the cost of keeping so many belugas is higher than the benefit of keeping them. Accordingly, Marineland began looking for ways to offload some of its beluga whales.

74.     Shortly after Canada passed Bill S-203, on June 28, 2019, Marineland announced that it had signed a ten-year partnership agreement focused on beluga whale research with Mystic's parent company, Sea Research Foundation.

13

75.     In September 2019, just three months after Canada passed Bill S-203, Marineland transferred two of its belugas to Oceanographic, which is a Spanish facility owned by Vancouver Aquarium's parent company, Ocean Wise Inc.

## C.  The Application

76.     On October 1, 2019, NMFS published notice in the Federal Register of an application by Mystic to import five beluga whales from Marineland for what Mystic claims are scientific research purposes (the "Application").

77.     Part of the scientific research that Mystic proposed in the Application was to study the reproduction, pregnancy, and birth of beluga calves.

78.     Thus, the Application expressly contemplated that these five belugas might breed.

79.     NMFS indicated in the Federal Register notice that "an initial determination has been made that the activity proposed is categorically excluded from the requirement to prepare an environmental assessment or environmental impact statement."

80.     This controversial Application led to 9,533 online public comments from a variety of stakeholders, including multiple non-profit organizations and individuals from the U.S. and Canada, biologists, the Marine Mammal Commission, U.S. Senator Cory Booker, and Canadian Parliament member Elizabeth May.

81.     The comments both opposed and supported NMFS's approval of the Permit, but thousands more comments opposed the Application than supported it.

82.     Friends of Animals submitted a comment on December 2, 2019 explaining why NMFS should deny the Permit.

83.     Although Mystic is paying Marineland to acquire the belugas, Mystic failed to disclose in its Application how much it is paying to purchase them. Marineland chose to hide this information from NMFS and the public.

84.     As recently as March 2020, Mystic advertised its display of belugas on its website. Mystic even offered a beluga encounter experience for $179 for non-members and $169 for members where individuals could get close to the belugas and even touch them.

85.     In the Application, Mystic did not state whether the belugas imported from Marineland would be subject to its beluga encounter experience.

86.     Transfer of the belugas from Canada to the United States means that the belugas would no longer be protected by the new Canadian laws that prevent them from being used for entertainment purposes or breeding and that prevent them from being exported to a destination that would allow them to be used for entertainment or breeding.

## D.  The Permit

87.     NMFS approved the Application and issued the Permit on August 27, 2020.

88.     The Permit duration is for a five-year period and allows Mystic to import five belugas: Mira, a ten-year-old female; Qila, a nine-year-old female; Kharabali, a five-year-old female; Havana, a four-year-old female; and Frankie, a seven-year-old male. All five of these belugas are considered members of the Sakhalin Bay-Nikolaya Bay-Amur River depleted species or population stock under the MMPA (the "SNA Depleted Stock").

89.     Mystic would add the five belugas to a group consisting of a sixteen-year-old male beluga and two thirty-seven-year-old female belugas.

90.     The Permit does not allow Mystic to breed the five belugas.

91.     Mystic is required to submit a plan to NMFS explaining how it will provide safe and effective contraception to the belugas or otherwise prevent breeding.

92.     The Permit prohibits Mystic from including the five belugas in any interactive program with the public.

93.     Despite its earlier determination that the Permit was categorically excluded from the requirement under NEPA to prepare an EA or EIS, NMFS determined that "preparation of an EA was appropriate in this case . . . ."

94.     NMFS acknowledged in the EA that the Permit will likely adversely affect the five belugas as well as the three belugas currently kept at Mystic Aquarium.

95.     NMFS briefly discussed that the transport from Marineland to Mystic could cause the five belugas stress.

96.     NMFS determined, without sufficient evidence, in contradiction to the evidence that it did cite, and ignoring plentiful evidence to the contrary, that "stress from transport is transient and expected to dissipate within days to weeks," and summarily concluded that any impacts from the transport from Marineland to Mystic would be "minor to moderate."

97.     NMFS did not analyze in the EA what impacts the removal of the belugas from their families and social groups at Marineland would have.

98.     NMFS did not analyze in the EA what impacts the removal of the belugas from Marineland would have on the belugas remaining at Marineland.

99.     NMFS did not analyze in the EA the economic effects of the COVID-19 pandemic on Mystic Aquarium and Georgia Aquarium.

100.     Therefore, NMFS did not have the necessary information to determine if Mystic Aquarium has the economic resources required to care for these five belugas.

101.     NMFS did not offer the public an opportunity to provide comments on the EA.

102.     After conducting the EA, NMFS made a Finding of No Significant Impact (FONSI), determining that the Permit would not significantly impact the quality of the human environment.

103.     NMFS determined that the preparation of an EIS was unnecessary.

**E.  The Transport**

104.     To transport the belugas, each beluga will be placed in a stretcher, lifted into the air, and then secured into its own transport "cradle" for thirty minutes to an hour. The

cradles will either be 16 feet (192 inches L, 60 inches W, 71 inches H) or 18 feet (216 inches L, 65 inches W, 66 inches H) depending on the size of the beluga.

105.    Adult belugas range in size from 12 to 20 feet long.

106.    Next, the belugas will be transported via flatbed truck to the Hamilton International Airport in Canada. This trip is approximately fifty-five miles and a one to one-and-a-half-hour drive. Then the belugas will be loaded on a chartered jet aircraft for an estimated two-hour flight to Bradley International Airport in Hartford, Connecticut. Once at Bradley International Airport, the transport cradle and belugas will be transferred to a flatbed truck for truck transport to Mystic. This trip is approximately sixty-eight miles and a one hour and fifteen-minute drive.

107.    Once at Mystic, the belugas will be crane lifted out of the transport cradle, placed on a beluga transport cart, wheeled into the Arctic Coast habitat, crane lifted out of the transport cart and placed into the medical pool (containing a false-bottom/beluga lift) to be released from the stretcher. The medical pool is only 32 feet long by 24 feet wide, with a depth of just seven feet. Mystic estimates that the transport time will be ten hours, assuming nothing goes wrong. The belugas will be kept in their crates for all ten hours. Mystic will not feed the whales during transport.

108.    These pictures show belugas in stretchers being lifted out of transport cradles. Mystic would use a similar approach.

 

109.    The proposed transport would traumatize and harm the belugas in a number of ways.

110.    Transporting the belugas from Marineland would forcibly remove them from members of their families and social group and from the only home that they have ever known.

111.    Because belugas are highly social animals, removal from their family members and social groups would sever lifelong bonds.

112.    Notably, the proposed transfer would be highly stressful for the belugas and would likely have lasting physiological effects on them.

113.    The proposed transport also would expose the belugas to increased risks of disease and death that they would not otherwise face.

**F.  The Research**

114.    In order to qualify for a permit to import these belugas, Mystic had to show NMFS that the purpose of the import was to conduct scientific research.

115.    Mystic claims that it needs to import these belugas to better understand belugas generally and the SNA Depleted Stock specifically.

116.    In reality, the proposed research is at best a secondary goal of the import.

117.    On information and belief, Mystic's primary purposes in importing these belugas is to introduce new and young belugas into the Breeding Cooperative and to display them to the public.

118.    Moreover, the research is flawed, will not teach researchers anything about the SNA Depleted Stock, could be accomplished using existing captive belugas in this country or at Marineland, and does not justify the harm that would be inflicted on these belugas.

119.    The research will be invasive and put the belugas at substantial risk before it would even begin, simply due to the preliminary capture, transport, removal of the belugas, and relocation to a new environment.

120.    The studies will impose varying degrees of physical and psychological stress on the belugas. The stress imposed by the studies provides all the more reason to conduct the research on belugas who are not already compromised by capture, transport, and new social and physical conditions. All of these factors layer upon each other to compromise welfare and increase chances of early mortality.

121.    Mystic claims—as it must under the MMPA—that the research requires the SNA Depleted Stock. In reality, the proposed research does not need to involve the SNA Depleted Stock.

122.    As part of the research, Mystic will use a novel telemetry device that it admits has unknown impacts.

123.    Mystic plans to display the belugas to the public. Mystic claims that any display will be "[i]ncidental to the research," but it provided no basis for NMFS to determine that Mystic's conclusory assertion was accurate. The Application includes no details about how the belugas would be displayed.

## G.  Georgia Aquarium

124.    Mystic has a formal partnership agreement with Georgia Aquarium in Atlanta, Georgia. Mystic proposes to transport one or more of the belugas to Georgia Aquarium "[i]f deemed in the best interest of an individual beluga or the US beluga population for social, health, or welfare reasons . . . ."

125.    Georgia Aquarium will own three of the five belugas and loan them to Mystic. Mystic claims that it must engage in this loan agreement with Georgia Aquarium because Mystic does not have the resources to fund the initiative alone.

126.    Mystic and Georgia Aquarium would split ownership of any beluga offspring. If belugas are born in captivity, Mystic will be the owner of all of beluga Qila's odd-numbered offspring (first, third, etc.), with the owner of the sire owning all even numbered offspring (second, fourth, etc.). For offspring of belugas Mira, Kharabali, and Havana, Georgia Aquarium will be the owner of all odd-numbered offspring, and Mystic the owner of all even-numbered offspring.

127.    Even though Georgia Aquarium will own the majority of the belugas, half of the offspring, and could ultimately house some or all of the belugas, Georgia Aquarium is not an applicant for the Permit. None of the identified research and management personnel in the Application are affiliated with Georgia Aquarium. As a result, NMFS did not evaluate Georgia Aquarium's resources and qualifications and had no basis to determine whether Georgia Aquarium was a suitable destination for these belugas.

128.    Mystic, Georgia Aquarium, and NMFS have failed to offer a suitable explanation for why Georgia Aquarium did not have to be an applicant for this Permit.

129.    In the event of a beluga transfer to Georgia Aquarium, the belugas would join the following belugas: two males ages ten and thirty-two years and three females ages eleven, fourteen, and twenty years old.

130.    Based on the partnership agreement, it is possible that some of these five belugas from Marineland or their calves will be transferred to Georgia Aquarium.

131.    Georgia Aquarium has not stated whether it intends to breed the belugas transferred to its facilities or whether and how it would display the belugas to the public.

132.    Transfer of any of the five belugas to Georgia Aquarium would deeply traumatize the belugas a second time. The transport would cause additional harm and stress on the transported belugas. It would also cause secondary social separation stress on the Marineland belugas that remain at Mystic.

## H.  Uncertain Future After the Permit

133.    The Permit does not determine what will happen with the five belugas after the expiration of the five-year term of the Permit.

134.    Mystic did not indicate in its Application what it plans to do with the belugas after the expiration of the five-year term of its Permit.

135.    The Permit imposes a condition that Mystic "shall not transport, transfer, export, or otherwise dispose of the marine mammals authorized by this permit except with the approval of the Director, Office of Protected Resources, and subject to such Terms and Conditions as the Director may prescribe."

136.    The Permit does not require the conditions to remain enforceable after the Permit expires.

137.    At the expiration of the five-year term of the Permit, Mystic could apply for permission from NMFS to display the belugas to the public, transfer them to another aquarium in the United States, or breed them. Mystic would not need a permit for any of these actions.

138.    In fact, unless Mystic sought to export the belugas or to perform additional intrusive research on them, it would not need a permit.

139.    After the five-year term of the Permit, NMFS could allow Mystic to transfer the belugas within the U.S., display them to the public, or breed them without providing the public with notice or an opportunity to comment on any of those actions.

140.    Interested third parties would be unable to challenge authorizations issued by NMFS that would allow Mystic to display, breed, or transfer the belugas within the U.S.

### FIRST CAUSE OF ACTION

### (MMPA and APA)

141.    Plaintiff herein incorporates all information and allegations contained in the preceding paragraphs.

142.    NMFS violated the APA by granting the Permit despite numerous requirements not being met under the MMPA.

143.    NMFS's conclusion that any public display of the belugas would be "incidental" to the proposed research was arbitrary and capricious. NMFS had no basis to find that any public display would be incidental, as Mystic did not explain how the public display would be incidental.

144.    NMFS acted arbitrarily and capriciously by failing to find that the import would not likely have a significant adverse impact on or disadvantage these belugas.

145.    NMFS acted arbitrarily and capriciously by determining that the research will not have a long-term direct or indirect impact on the species or stock.

146.    NMFS acted arbitrarily and capriciously by finding that the proposed research could not be accomplished using a species or stock that is not designated at depleted.

147.    It was arbitrary and capricious for NMFS to grant the Permit when these belugas were born to belugas that Marineland captured in violation of Russian and international law.

148.   It was arbitrary and capricious for NMFS to grant the Permit more than thirty days after the public hearing.

149.   It was arbitrary and capricious for NMFS to grant the Permit even though the Application was unsigned.

150.   NMFS acted arbitrarily and capriciously by failing to require Georgia Aquarium to be a named applicant and failing to properly evaluate Georgia Aquarium's resources and qualifications.

151.   Accordingly, NMFS's grant of the Permit was arbitrary and capricious.

## SECOND CAUSE OF ACTION

### (NEPA and APA)

152.   Plaintiff herein incorporates all information and allegations contained in the preceding paragraphs.

153.   The Permit is a major federal action subject to NEPA.

154.   NMFS violated the APA by failing to follow the requirements of NEPA and NOAA guidelines under NEPA.

155.   NMFS's EA and FONSI did not provide a full and fair discussion of the significant environmental impacts of the Permit and failed to respond to substantive comments it received regarding the Permit.

156.   In issuing the Permit without preparing an EIS, NMFS's actions violated the APA because they were arbitrary and capricious, an abuse of discretion, and not in accordance with law or required procedure.

## PRAYER FOR RELIEF

Friends of Animals respectfully requests that the Court enter judgment providing for the following relief:

1.   Declare that Defendants acted arbitrarily and capriciously and violated the MMPA and APA by, including but not limited to, (1) concluding that any public display of the belugas will be "incidental" to the research; (2) failing to find that the import

would disadvantage the belugas; (3) failing to find that the research will have a long-term direct or indirect impact on the species or stock; (4) finding that the proposed research could not be accomplished using a species or stock that is not designated at depleted; (5) granting the permit even though the Application was unsigned; (6) failing to issue or deny the permit within thirty days of the public hearing; and (7) failing to require Georgia Aquarium to be a named applicant and failing to evaluate Georgia Aquarium's resources and qualifications;

2. Declare that Defendants acted arbitrarily and capriciously and violated NEPA and the APA;

3. Vacate the Permit or remand the Permit and order Defendants to comply with the MMPA and NEPA;

4. Enjoin the authorizations contained in the Permit issued by the Defendants;

5. Award Plaintiff its costs of litigation, including reasonable attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

6. Grant Plaintiff such other relief as the Court deems just and proper.

Dated: September 3, 2020                                 Respectfully Submitted,

*/s/ Jessica Rubin*
Jessica Rubin (Bar No. Ct13768)
Director of Legal Practice and Animal Law Clinic
University of Connecticut School of Law
55 Elizabeth Street
Hartford, CT 06105
Tel: (860) 570-5209
Fax: (860) 570-5366
Jessica.rubin@uconn.edu

Stephen Hernick (*pro hac vice* pending)
Friends of Animals Wildlife Law Program
7500 E. Arapahoe Road, Suite 385
Centennial, CO 80112
Tel: (720) 949-7791
Fax: 888-236-3303
shernick@friendsofanimals.org