**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| FRIENDS OF ANIMALS, | ) | No. 3:20-cv-01312-AWT |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WILBUR ROSS, in his official capacity as | ) | **MEMORANDUM IN SUPPORT OF** |
| Secretary of Commerce | ) | **PLAINTIFF'S MOTION FOR A** |
| | ) | **PRELIMINARY INJUNCTION** |
| and | ) | |
| | ) | |
| NATIONAL MARINE FISHERIES SERVICE, | ) | |
| an agency within the United States | ) | |
| Department of Commerce | ) | |
| | ) | December 3, 2020 |
| Defendants. | ) | |

**ORAL ARGUMENT REQUESTED**

**TABLE OF CONTENTS**

INTRODUCTION.................................................................................................................1

FACTUAL BACKGROUND ................................................................................................3

ARGUMENT .......................................................................................................................7

   A.  Friends of Animals faces a likelihood of irreparable harm without an
      injunction...................................................................................................................9

   B.  There are sufficiently serious questions on the merits of Friends of
      Animals' claims, and the balance of hardships tips decidedly in Friends of
      Animals' favor. .......................................................................................................13

     1.   Friends of Animals is likely to succeed on its NEPA claim. ...........................15

        a.  NMFS failed to take the requisite hard look at the negative impacts of
           removal and transport on these belugas...............................................17

        b.  NMFS effectively ignored the long-term negative impacts of this Permit
           on all beluga whales. ..........................................................................18

        c.  NMFS's refusal to allow any public involvement in the EA was arbitrary
           and capricious.....................................................................................19

     2.   Friends of Animals is likely to succeed on its MMPA claim. ..........................23

        a.  The Permit violates the MMPA because it allows for public display that
           will not be "incidental" to the research...............................................23

        b.  The Permit is inconsistent with the purposes and policies of the MMPA. ............25

        c.  The Permit does not meet the narrow exceptions that allow import of a
           depleted population stock of beluga whale.........................................26

        d.  The Permit also violates additional regulations under the MMPA.........................29

     3.   The balance of hardships tips decidedly in Friends of Animals' favor. ......................30

CONCLUSION ...................................................................................................................32

**INTRODUCTION**

Plaintiff Friends of Animals moves for a preliminary injunction to prevent a harmful removal and transportation of beluga whales that could not be undone. It is often repeated that a preliminary injunction is a "drastic" action. However, this is a first-of-its-kind import of highly intelligent and social animals. It is equally certain that the consequences of this Court failing to enter a preliminary injunction would be far more drastic. These beluga whales would be forced to undergo a risky and potentially deadly transport; they would suffer physically and psychologically; and lifelong familial and social bonds would be severed with no realistic possibility of the beluga whales' return. This is irreparable harm to the whales themselves, and their suffering will in turn cause irreparable aesthetic and emotional harm to Friends of Animals' staff and members who appreciate these animals. Moreover, if these animals are moved to the United States, Plaintiff's lawsuit challenging the legality of this action would likely not be heard despite its strong arguments on the merits.

The National Marine Fisheries Service (NMFS) has granted an unprecedented permit to allow the importation of a depleted population stock of beluga whales for scientific research and public display (the "Permit"). The reason why Marineland of Canada is willing to sell five young beluga whales to Mystic Aquarium is because Canadian law now recognizes the immense suffering that marine mammals endure in captivity and prevents their public display and breeding. While Marineland is permitted under the law to continue to display its current captive beluga whales, it is not illegal for Marineland to breed them or use them in shows, significantly reducing its economic incentives to keep them.

These belugas will suffer deep and unnecessary trauma from their removal from their families and social groups and the only home they have ever known, their long and traumatic transportation to the United States, and their destination for lives spent subjected to uncertain research and public display. Additionally, Friends of Animals'

1

members will suffer harm knowing the trauma inflicted on these belugas. Friends of Animals' members stand to suffer irreparable harm in two ways: (1) deprivation of their rights to participate in a review of the environmental effects of the proposed import before it happens and (2) aesthetic harm from knowing the pain inflicted on these belugas from the import.

These harms cannot be rectified after the import. Trauma will have already been inflicted on the whales even if they were returned, and any return transport would inflict additional trauma. Moreover, the procedural injury will remain: NMFS will still have allowed an import without conducting an adequate environmental analysis. These harms also cannot be compensated through money damages. A preliminary injunction is required to prevent irreparable harm to Friends of Animals.

A preliminary injunction is warranted because Friends of Animals is likely to succeed on the merits of its claims. At the very least, Friends of Animals meets the Second Circuit's "serious questions" standard because there are sufficiently serious questions going to the merits of its claims. And the balance of hardships tips decidedly in favor of Friends of Animals. NMFS has little, if any, interest in whether the Permit that it granted to third party Mystic Aquarium is delayed pending the outcome of this litigation. Mystic Aquarium, meanwhile, will not be harmed in any meaningful way if its proposed import is delayed. If the Permit is ultimately upheld after this litigation, Mystic Aquarium can still import the belugas and conduct scientific research. In sum, no one stands to lose if NMFS's rushed and ill-informed decision to grant the Permit is paused to allow judicial review of Friends of Animals' claims that the MMPA prohibits this Permit and that NMFS's environmental assessment (EA) violated NEPA. A preliminary injunction is necessary and warranted in these circumstances.

## FACTUAL BACKGROUND

On October 1, 2019, NMFS, an agency within the National Oceanic and Atmospheric Administration (NOAA), published notice in the Federal Register that Mystic Aquarium had submitted an application to import five beluga whales from Marineland of Canada for what Mystic Aquarium claims are scientific research purposes (the "Application"). Marine Mammals; File No. 22629, 84 Fed. Reg. 52,072 (Oct. 1, 2019). The five beluga whales that Mystic Aquarium seeks to import are Mira, a ten-year-old female; Qila, a nine-year-old female; Kharabali, a five-year-old female; Havana, a four-year-old female; and Frankie, a seven-year-old male. File No. 22629 Application Take Tables.[1] All five are progeny of beluga whales that Marineland captured from the depleted Sakhalin Bay-Nikolaya Bay-Amur River stock. File No. 22629, 84 Fed. Reg. at 52,072. Under the MMPA, all five beluga whales are therefore considered part of a depleted population stock, and NMFS treated all five beluga whales as depleted. *See* Finding of No Significant Impact of a Scientific Research Permit to Mystic Aquarium for the Importation and Take of Captive Beluga Whales (*Delphinapterus leucas*) at 7 (hereinafter FONSI).

Never before has NMFS sanctioned the import of an MMPA-depleted population stock for purposes of scientific research. Yet despite the unprecedented, uncertain, and controversial nature of the Permit, NMFS originally decided that it would not undertake even the slightest environmental analysis. NMFS tersely and summarily concluded that "an initial determination has been made that the activity proposed is categorically excluded from the requirement to prepare an environmental assessment or environmental impact statement." File No. 22629, 84 Fed. Reg. at 52,072.

---

[1] Unless otherwise noted, all documents, including any documents associated with the Application or the Permit are available on NOAA's website at https://www.fisheries.noaa.gov/action/permit-application-import-5-beluga-whales-scientific-research-file-no-22629-mystic-aquarium.

Mystic's Application was controversial. NMFS received more than 9,500 public comments from scientific researchers, nongovernmental organizations, a United States Senator, and a member of Canada's House of Commons. Environmental Assessment at 10 (hereinafter EA).[2] Knowledgeable commenters expressed a host of concerns about the Application. *Id.* These included concerns that the import would greatly harm the beluga whales, that Mystic intended to display the beluga whales to the public, that Mystic intended to breed the beluga whales, that NMFS was not undertaking an environmental analysis under NEPA, and what would happen to the beluga whales after the research concluded, among others. *See* Recommendation Memorandum at 18. Despite the numerous and widespread concerns that a permit would violate both the MMPA and NEPA, NMFS issued the Permit on August 27, 2020. NMFS Permit No. 22629.

Despite its earlier determination that the Permit was categorically excluded from the requirement under NEPA to prepare an EA or EIS, NMFS determined that "preparation of an EA was appropriate in this case . . . ."  FONSI at 3. NMFS did not offer the public an opportunity to provide comments on the EA. After conducting the EA, NMFS made a Finding of No Significant Impact (FONSI), determining that the Permit would not significantly impact the quality of the human environment and concluded that the preparation of an EIS was unnecessary. FONSI at 11.

Beluga whales have been a popular attraction at U.S. aquaria and amusement parks for decades. Yet in recent years, business that display captive marine mammals have faced challenges that threaten their continued viability. Advances in scientific research and studies showing the harm that captivity inflicts on highly intelligent, sentient, and social marine mammals such as beluga whales have made the public more skeptical of the industry. Movies such as *Free Willy* and *Blackfish* have introduced millions of people to the harms of captivity. Advances in research, changes in public attitudes, and tight restrictions

---

[2] The FONSI and the EA are combined into the same document on NOAA's website.

under the MMPA have made it more difficult for U.S. aquariums to acquire new beluga whales. In 2013, NMFS denied an application by Georgia Aquarium to import eighteen beluga whales that it planned to display and use in cooperative breeding programs nationwide, a decision upheld by a federal court. *See Ga. Aquarium, Inc. v. Pritzker*, 135 F. Supp. 3d 1280, 1323, 1340 (D. Ga. 2015). In that permit application, Georgia Aquarium admitted that the population of captive belugas housed at facilities that are part of the North American beluga breeding cooperative was likely to decline in the next thirty years. *Id.* at 1323.

It is beyond dispute that the proposed import at issue here would traumatize and harm the beluga whales in numerous ways; even NMFS acknowledges that the Permit "is likely to adversely affect the five subject beluga whales to some degree . . . ." EA at 31. Moreover, a number of marine mammal experts and researchers oppose the Permit, and this Motion is supported by the Declaration of Dr. Toni Frohoff, a renowned ethologist and behavioral biologist who specializes in cetaceans. *See generally* Declaration of Toni Frohoff, Ph.D., attached hereto as Exhibit A (hereinafter "Frohoff Decl."). First, the belugas would be abruptly removed from their families, social groups, and the only home they have ever known. Frohoff Decl. ¶ 29. This harm is magnified because four of the five beluga whales that Mystic proposes to import are young females, whose deep and lifelong matrilineal bonds would be severed. *Id.* They would then endure a long and traumatic journey to a foreign place. *See* Application at 23-25.[3] If the import is allowed, the belugas would be removed from their tanks at Marineland and lifted into the air by a crane; transported on a truck for at least an hour to the airport; forced to linger in their crates at the airport for two hours; flown in a loud cargo plane for two hours to Hartford, Connecticut; unloaded from the plane; driven on a truck for more than an hour to Mystic; and finally removed from

---

[3] All citations to the Application are to the Revised Final Application.

their crates and lifted into the air by a crane and deposited into a holding pool at Mystic. *Id.* The process would take around ten hours, assuming there are no complications. *Id.* at 25.

Yet the risk of serious complications cannot be ignored. The transportation of these belugas whales to Mystic would "considerably increase[] their risks of dying prematurely." Frohoff Decl. ¶ 32. In addition, the transport "imposes extreme negative impacts on their general safety, health, and welfare" from among other things, the stresses of capture, restraint, and transport; the risk of hyperthermia; and "bearing the weight of their own bodies combined with unnatural physical compression during transport." *Id.* Specifically, one way in which the transport would negatively affect the health of the beluga whales is that it would increase their cortisol levels, a physiological measure of their stress and immune responses. *Id.* at ¶ 34.

The Permit allows for Mystic Aquarium to display these belugas immediately, and possibly to breed them in the future. While Mystic Aquarium has contended that the purpose of the import is to conduct scientific research, it admits that it will display the beluga whales to its paying customers. *See, e.g.,* Application at 23 ("Incidental to the research, display of the beluga whales in the Arctic Coast habitat at Mystic Aquarium will occur."), 66 ("While the goal of the permit is research, public display will be incidental."). In addition, Mystic Aquarium hopes to be able to use the belugas for captive breeding. *See* Application at 15-16. Notably, NMFS has prohibited the breeding of these belugas during the five-year term of the Permit. NMFS Permit No. 22629 at 5. Yet NMFS did not purport to decide what would happen to these belugas after the five-year Permit, *id.* at 6, leaving open the very real possibility that they will be displayed and bred in aquaria across the country after the Permit expires.

The Permit also allows Mystic Aquarium to transfer some or all of the belugas to Georgia Aquarium in the future "[i]f deemed in the best interest of an individual beluga or the US beluga population for social, health, or welfare reasons" and with the approval of

NMFS. Application at 1; Permit at 6. Georgia Aquarium will actually own three of the belugas, while Mystic Aquarium will own the other two. Application at 17. Mystic Aquarium planned the future breeding of these belugas in detail, splitting ownership of future calves with Georgia Aquarium, predicting that these belugas would give birth to "a maximum of two calves" during the five-year Permit, and even contemplating that these belugas would breed with "belugas not owned by either Mystic Aquarium or Georgia Aquarium." *Id.* at 15-16. Despite these facts, Mystic Aquarium was the lone applicant, and the Application contains few details about the Georgia Aquarium facilities that may house these belugas.

Finally, it should be noted that the reason why Marineland is willing to sell these belugas to Mystic Aquarium is because the Canadian government has recognized that marine mammals endure suffering in captivity. *See* Bill S-203 (Royal Assent), available at https://www.parl.ca/DocumentViewer/en/42-1/bill/S-203/royal-assent. This law now prohibits the import, public display, and breeding of cetaceans throughout Canada. *Id.*; *see also* EA at 39. Canadian law no longer allows Marineland to profit off of the capture and indiscriminate breeding of these animals. *See* EA at 26. It is especially cruel to remove these belugas from Canada just after the Canadian government has passed a law that gives them greater protections than they would have in the United States.

## ARGUMENT

A party seeking a preliminary injunction need only show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (quotation omitted). As originally formulated, the "serious questions" standard simply asks whether the party seeking an injunction "has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for

more deliberate investigation." *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953). This long-standing standard in the Second Circuit "remains valid" after the Supreme Court's opinion in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), which rejected the Ninth Circuit's "possibility of irreparable harm" standard. *Citigroup*, 598 F.3d at 38. "The 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Id.* at 35. One benefit of the serious-questions standard is that it "permits the entry of an injunction in cases where a factual dispute renders a fully reliable assessment of the merits impossible." *See id.* at 36.

**Either** the likelihood of success standard or the less rigorous "serious questions" standard can apply to a motion to enjoin government action. *See Trump v. Deutsche Bank AG*, 943 F.3d 627, 638 (2d Cir. 2019). "[T]he 'likelihood of success' prong need not always be followed merely because a movant seeks to enjoin government action." *Haitian Ctrs. Council, Inc. v. McNary*, 969 F.2d 1326, 1339 (2d Cir. 1992) (citing cases), *judgment vacated as moot sub nom. Sale v. Haitian Ctrs. Council, Inc.* 509 U.S. 918 (1993). Although some courts have declined to apply the "serious questions" standard "to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme," *Plaza Health Lab., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989), the public interest is not always on the side of the government. In *Haitian Centers*, the court explained that like in many cases seeking to enjoin government action, "no party has an exclusive claim on the public interest." 969 F.2d at 1339; *see also Carey v. Klutznick*, 637 F.2d 834, 839 (2d Cir. 1980) (holding that the public interest is not necessarily with a government agency because "the public interest also requires obedience to the Constitution and to the requirement that Congress be fairly apportioned, based on accurate census figures"). Here,

the Court may apply the "serious questions" standard because NMFS's actions are not clearly in the public interest. On the one hand, where an agency's action approving timber sales "allowed opportunities for public comment" and was "taken in the public interest," the sales would have increased government coffers, thereby benefitting the public. *Friends of the Earth v. U.S. Forest Serv.*, 95 F. Supp. 2d 206, 207-08 (D. Vt. 2000). In contrast, here there is no obvious public benefit to NMFS granting a permit to a third-party business to allow it to conduct research and display belugas to paying customers.

### A. Friends of Animals faces a likelihood of irreparable harm without an injunction.

"The showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (internal quotation omitted). "To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately addressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Id.* (internal quotations omitted).

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Impending aesthetic injury is sufficient to show irreparable harm. *See Habitat for Horses v. Salazar*, 745 F. Supp. 2d 438, 448 (S.D.N.Y. 2010). In addition, a government agency's failure to undertake the required NEPA analysis can constitute irreparable harm. "If plaintiffs succeed on the merits, then the lack of an adequate environmental consideration looms as a serious, immediate, and irreparable injury." *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 157 (D.C. Cir. 1985) (affirming injunction for failure to follow the requirements of NEPA). In sum, procedural harm from a NEPA violation

combined with the likelihood of irreparable aesthetic harm is sufficient to constitute irreparable harm. *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 222 (D.D.C. 2003) (holding that likelihood of NEPA violations "does bolster plaintiffs' case for a preliminary injunction").

Courts have held that mistreatment of animals can cause plaintiffs irreparable harm to their aesthetic interests. Indeed, courts have "found aesthetic injury based on the mere *contemplation* of a particular treatment of the animals in question" and irreparable harm "even though plaintiffs did not establish that the exact animals they regularly observed would be directly affected by the proposed action." *Id.* at 221 (emphasis in original). In addition, where plaintiffs' claims do not implicate the Endangered Species Act, they need not show harm to a species as a whole; they can establish irreparable harm by showing harm to individual animals. *Humane Soc'y of the U.S. v. Bryson*, No. 3:12-cv-00642-SI, 2012 U.S. Dist. LEXIS 74688, at *25 (D. Or. May 30, 2012) ("The loss of an individual animal that does not jeopardize the species as a whole may not offend the purpose of the ESA . . . but it may well offend the purpose of the MMPA.").

*Fund for Animals v. Espy*, 814 F. Supp. 142 (D.D.C. 1993), illustrates why treatment of animals constitutes irreparable harm. There, the court enjoined government approval of research that would have resulted in the capture, transport, study, and eventual slaughter of bison. *Id.* at 143-44. The plaintiffs had an affection for the bison and enjoyed seeing them "so that the sight, or even the contemplation, of treatment in the manner contemplated of the wild bison, which they enjoy and have seen and are likely to see captured for the program, would inflict aesthetic injury . . . ." *Id.* at 151. Plaintiffs' injuries were "not compensable in money damages because . . . aesthetic interests . . . are not ownership interests in property susceptible to monetary valuation. In addition, most states (if not all) deny damage awards for pain and suffering not accompanied by physical injury." *Id*. The government's violation of NEPA was also not compensable by money damages. *Id.* "The

harm of defendant's failure to [give adequate consideration to the environmental effects of government action] is also a harm that is serious—and obviously irreparable once the contemplated action becomes a *fait accompli*." *Id*. at 151 n.10.

Moreover, plaintiffs need not know the full extent of the environmental impacts of a proposed action in order to establish irreparable harm. *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 25 (D.D.C. 2009). "Plaintiffs have met their burden to establish a likelihood of irreparable harm by showing that the [proposed government action] will have *some* environmental impacts, even if the extent of those impacts are not fully known." *Id.* (emphasis in original).

Here, Friends of Animals would suffer irreparable harm without an injunction. Absent an injunction, there is nothing to prevent Mystic Aquarium from importing the five beluga whales. With this litigation pending, Mystic Aquarium has every incentive to import these beluga whales as soon as possible to avoid the risk of not being able to import them later if the permit approval is vacated as a result of this case.

Once the beluga whales are transported to Mystic Aquarium, Friends of Animals— and the animals themselves—are harmed. Friends of Animals' members will be harmed if the belugas are imported to Mystic Aquarium. They know the harm that the belugas would incur, so they themselves would be pained and suffer harm on future visits to Mystic Aquarium if the belugas are transferred. Declaration of Nicole Rivard ¶¶ 22-24, attached hereto as Exhibit B (hereinafter "Rivard Decl."); Declaration of David Brensilver ¶¶ 10, 13, 18-21, attached hereto as Exhibit C (hereinafter "Brensilver Decl."). Friends of Animals and its members are also harmed by NMFS robbing them of the opportunity to fully participate and comment on the EA and on the environmental impact statement that NMFS should have prepared. The only chance for these injuries to be prevented is if this Court enjoins the proposed import.

Friends of Animals' members would suffer aesthetic injury from the harms that they know the beluga whales are suffering. They know that sudden removal from their families and social groups will deeply traumatize them. Rivard Decl. ¶¶ 19-20. They know that the long and foreign transport to Mystic will negatively impact the belugas in a number of ways: it will scare them, it will damage their stress hormones, and it will cause lasting psychological damage. *Id.*; Frohoff Decl. ¶¶ 31-34. This harm to the belugas, once they are transported, cannot be undone. *See supra* pp. 5-6.

Once the belugas are imported, Friends of Animals' harm cannot be reversed or remedied by money damages. Friends of Animals' members visit Mystic Aquarium, both to check on the welfare of the beluga whales held there and to protest against Mystic Aquarium keeping marine mammals captive. Rivard Decl. ¶¶ 6-7, 11; Brensilver Decl. ¶¶ 4-6, 10. These members plan to return in the future, and they would suffer emotional trauma and aesthetic injuries when they return to Mystic Aquarium in the future, knowing the harms that these beluga whales would have suffered and would continue to suffer. Rivard Decl. ¶¶ 22-24. Plaintiff's members' aesthetic injuries cannot be adequately compensated by money damages. *See Fund for Animals v. Espy*, 814 F. Supp. at 151. And even if the Permit were vacated and the belugas were ordered to be returned to Canada, that would not cure the harm that had already occurred from their transport. Indeed, it would lead to even more harm—another transport back to Canada.

Likewise, Plaintiff and its members would be irreparably harmed by NMFS allowing the import to go through without conducting a thorough NEPA analysis. Plaintiff and its members have been deprived of the right to participate and provide comments on NMFS's EA, a right that is granted to them by federal law. Money damages could not adequately compensate these injuries. The only way that this harm can be remedied is for NMFS to conduct the rigorous and open-minded environmental analysis that NEPA requires.

**B.  There are sufficiently serious questions on the merits of Friends of Animals' claims, and the balance of hardships tips decidedly in Friends of Animals' favor.**

The serious questions standard typically "refers to those *factual* disputes that can be resolved at trial only after investigation of the facts. . . . *and thus* [call] *for more deliberate investigation*." *Trump*, 943 F.3d at 673 (emphases in original) (internal quotation omitted). This is not a high bar. Indeed, caselaw makes clear that the serious questions standard is satisfied simply when the parties have differing accounts of the circumstances of the case. *Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 126 (2d Cir. 1984) ("That there are serious questions is clear from the parties' conflicting stories of the reasons Coca-Cola had for ending Roso-Lino's distributorship; therefore, the test for a preliminary injunction is met."). The serious questions standard is also met where "there exists a triable issue of fact." *See Kelly v. Honeywell Int'l, Inc.*, No. 3:16-cv-00543 (VLB), 2017 U.S. Dist. LEXIS 99419, at *8 (D. Conn. June 27, 2017). A plaintiff also met the serious questions standard when both parties "articulated colorable textual arguments" about the meaning of a contractual provision. *See XL Specialty Ins. Co. v. Level Global Investors, L.P.*, 874 F. Supp. 2d 263, 284 (S.D.N.Y. 2012). Even though the party opposing the injunction "advanced a reasonable argument in favor of its" interpretation, the court was "not prepared to say that it [was] the only reasonable one." *Id.* ("The Court is mindful that, at this early stage, it has not yet received in-depth briefing on this point, the parties have not engaged in discovery, and . . . the parties have not had the opportunity to bring [extrinsic evidence] to bear.").

Purely legal questions can constitute serious questions. *See Haitian Ctrs. Council*, 969 F.2d at 1344 (holding that the issue of whether the Constitution applied to aliens detained at Guantanamo Bay meant that "there exist serious questions going to the merits"); *see also Merced v. Koch*, 574 F. Supp. 498, 499-500 (S.D.N.Y. 1983) (holding that plaintiffs had shown "sufficiently serious questions going to the merits as to the legal issues

raised in this case"); *Hadley v. Rush Henrietta Cent. Sch. Dist.*, 409 F. Supp. 2d 164, 168

(W.D.N.Y. 2006) (granting injunction where plaintiffs "raised serious legal questions" under

state law and the Fourteenth Amendment).

Under Second Circuit precedent, Friends of Animals need not show a likelihood of

success to obtain an injunction; it need only show serious questions going to the merits.

But Friends of Animals will explain in what follows why it is likely to succeed on both its

NEPA and MMPA claims. If Friends of Animals meets the higher bar of likelihood of success,

that claim necessarily meets the lower bar of serious questions going to the merits. In case

the Court should find that Friends of Animals has shown only serious questions and not

likelihood of success, Friends of Animals will finally explain why the balance of hardships

tips decidedly in its favor.

While there is no private right of action under NEPA or the MMPA, NMFS's

application of those statutes must comply with the APA. *Humane Soc'y of the U.S. v. Locke*,

626 F.3d 1040, 1048 (9th Cir. 2010). Under the APA, agency action that is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law" must be

overturned. 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious when the

agency "relied on factors which Congress has not intended it to consider, entirely failed to

consider an important aspect of the problem, offered an explanation for its decision that

runs counter to the evidence before the agency, or is so implausible that it could not be

ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs.*

*Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). It is beyond dispute that an

agency must follow its own regulations. *Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954

F.3d 118, 130 (2d Cir. 2020). An agency's decision must reveal "a 'rational connection

between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

14

**1.   Friends of Animals is likely to succeed on its NEPA claim.**

NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA "places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action" and "ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision making process." *Baltimore Gas & Elec. Co. v. Nat. Resources Def. Council*, 462 U.S. 87, 97 (1983) (internal quotation omitted).

NEPA requires that a government agency prepare a detailed Environmental Impact Statement (EIS) before the agency can undertake a major federal action that significantly affects the quality of the human environment. 42 U.S.C. § 4332(C). An EIS forces an agency "to face those stubborn, difficult-to-answer objections without ignoring them or sweeping them under the rug" and allows the public to "weigh a project's benefits against its environmental costs." *Sierra Club v. U.S. Army Corps of Eng'rs*, 772 F.2d 1043, 1049 (2d Cir. 1985). Harm to the environmental may be presumed when an agency fails to comply with NEPA. *Davis v. Mineta*, 302 F.3d 1104, 1115 (10th Cir. 2002).

The Council on Environmental Quality ("CEQ") implements NEPA and has promulgated regulations detailing how agencies must comply with the statute. *Fund for Animals v. Babbitt*, 89 F.3d 128, 130 (2d Cir. 1996). If an agency is uncertain whether a full EIS is necessary, the agency must prepare an Environmental Assessment (EA) to determine whether the proposed action will have a significant environmental effect that would require the preparation of an EIS. 40 C.F.R. § 1508.9.

A court's role under NEPA is to review whether an agency has taken the requisite "hard look at environmental consequences." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976) (internal quotation omitted). While a court should defer to an agency's scientific judgments and technical analyses, it need not forgive an agency's "clear error of judgment." *Marsh v. Oregon Nat. Resources Council*, 490 U.S. 360, 378 (1989) (quotation omitted).

When a court determines that an "agency did not make a reasonably adequate compilation of relevant information and that the EIS sets forth statements that are materially false or inaccurate . . . the EIS does not satisfy the requirements of NEPA, in that it cannot provide the basis for an informed evaluation or a reasoned decision." *Sierra Club v. U.S. Army Corps of Eng'rs*, 701 F.2d 1011, 1030 (2d Cir. 1983).

> [A]llegations that an EIS has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept stubborn problems or serious criticism under the rug, raise issues sufficiently important to permit the introduction of new evidence in the district court, including expert testimony with respect to technical matters, both in challenges to the sufficiency of an environmental impact statement and in suits attacking an agency determination that no such statement is necessary.

*Cnty of Suffolk v. Sec'y of Interior*, 562 F.2d 1368, 1384-85 (2d Cir. 1976) (internal quotation and citation omitted). "Where comments from responsible experts or sister agencies disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project and its alternatives, these comments cannot simply be ignored. There must be good faith, reasoned analysis in response." *Sierra Club*, 701 F.2d at 1030 (quotation omitted).

Further, "[a]n agency cannot . . . avoid its statutory responsibilities under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant effect on the environment." *Jones v. Gordon*, 792 F.2d 821, 828 (9th Cir. 1986) (internal quotation omitted). "Instead, an agency must provide a reasoned explanation of its decision." *Id.* In *Jones*, the court held that NMFS unreasonably decided not to prepare an EIS for the import of ten killer whales to Sea World despite the apparent applicability of exceptions to a categorical exclusion, namely the arguable existence of a public controversy and uncertain environmental impacts of the transfer of the whales. *Id.* at 828-29.

The EA that NMFS prepared violates NEPA in numerous ways, and this Court need only determine that one of these ways could have been or was likely arbitrary and

capricious to find that Friends of Animals has shown serious questions or is likely to succeed on the merits.

> **a. NMFS failed to take the requisite hard look at the negative impacts of removal and transport on these belugas.**

Beluga whales are universally recognized as highly social animals. *See* Frohoff Decl. ¶ 42. "The vital importance of the quality of social bonds to the wellbeing of beluga whales cannot be underestimated. There is clearly a strong and persistent drive in belugas to seek and maintain close and complex social relationships with particular individuals." *Id.* at ¶ 19. The EA expressly acknowledges that "beluga whales typically live in large social groups . . . ." EA at 37. Perhaps the greatest harm that the Permit would inflict on these beluga whales is that it would sever the strong matrilineal and companion bonds that they have developed with the other whales at Marineland. *See* Frohoff Decl. ¶ 29. This emotional and social harm was an area of concern in the public comments that NMFS received in response to the Application. *See* Friends of Animals Comment at 3-4, available at https://www.regulations.gov/document?D=NOAA-NMFS-2019-0113-9093. Despite this harm being well-documented in scientific literature, it is one that NMFS entirely failed to consider in the EA. Frohoff Decl. ¶ 42. The EA simply ignored "the immense social harms" that this Permit would inflict on the five beluga whales as well as those left behind at Marineland from "the severing of long-term social bonds." *Id.* at ¶¶ 41-42. NMFS "failed to consider an important aspect of the problem," namely the social impacts of the removal on beluga whales. *State Farm*, 463 U.S. at 43. NMFS's inexplicable failure to address these harms in the EA was arbitrary and capricious.

While NMFS purports to address in the EA the harms that the transportation will inflict on the five beluga whales, its analysis was conclusory, contrary to the evidence it cited, and ignored a host of additional evidence that contradicts its conclusions. NMFS found that the transport "is likely to adversely affect the five subject beluga whales to some

degree . . . potentially resulting in minor to moderate impacts to the individuals." EA at 31.

Yet, NMFS concluded that the beluga whales "would be expected to **fully recover** from

effects of transport **within the first week** of arrival at their final destination." *Id.* at 33

(emphases added). This conclusion is plainly contradicted by the evidence before NMFS.

For instance, one of the studies used to support this section of the EA, only studied the

recovery of belugas one month after transport and then again 5-6 months after transport.[4]

Frohoff Decl. ¶ 38. Indeed, NMFS noted elsewhere in the EA that stress from the transport

was "expected to dissipate within days to weeks" and cited studies noting that "most"

stress would normalize within the first week. EA at 33; Frohoff Decl. ¶ 37. In fact, a wide

body of research and evidence suggests that "these belugas would take far longer than a

week or two (more likely months or years, if ever, depending on individual adaptability and

social compatibility) to fully recover from the capture, transport, and reintroduction to a

new social and biological environment." *Id.* at ¶ 40. NMFS failed to consider this research at

all. NMFS's conclusory, contradictory, and skewed analysis of the harms that the transport

will inflict on these beluga whales was arbitrary and capricious.

### b.  NMFS effectively ignored the long-term negative impacts of this Permit on all beluga whales.

This Permit is the first of its kind: never before has NMFS allowed the import of a

depleted population stock for purposes of scientific research. In granting this Permit, NMFS

is effectively giving a green light to aquaria throughout the United States to import beluga

whales—including members of a depleted stock—as long as they do so for what they claim

are the purposes of scientific research. Given the difficulty that aquaria have had in

importing beluga whales and maintaining a sustainable captive breeding population, *see*

*Ga. Aquarium*, 135 F. Supp. at 1323, 1340, other aquaria may now use similar methods to

---

[4] It is curious that this study, one of the principal studies that NMFS chose to rely on in this section of the EA, was authored by two researchers affiliated with Mystic Aquarium, one of whom is the Principal Investigator under the Permit. Frohoff Decl. ¶ 38; Permit at 8.

increase their captive beluga populations. These aquaria may exploit this loophole to import belugas in order to display them to the public and maintain their commercial operation for years to come.

As a result, the Permit is likely to lead to the import of additional beluga whales. The Permit could easily incentivize foreign operators to increase the number of wild beluga whales that they capture, including from depleted stocks, knowing that they can likely later sell these belugas or their progeny to U.S. aquaria that can import them for alleged scientific research. NMFS acknowledges these concerns in the EA, noting that other U.S. aquaria could apply for similar permits and observing that some believe that "any trade in live beluga whales could potentially increase the demand for beluga whales around the world." EA at 39. Yet, NMFS summarily dismisses these negative effects, simply concluding without additional analysis that "it is difficult to quantify supply-and-demand factors" and lamenting that "there is no available scientific literature." *Id.* NMFS is in effect confronting "stubborn, difficult-to-answer objections" and "ignoring them or sweeping them under the rug," which the Second Circuit has expressly warned against. *Sierra Club*, 772 F.2d at 1049. NEPA obligates NMFS to study what effects this Permit may have on beluga whales as a species before granting the Permit.

### c. NMFS's refusal to allow any public involvement in the EA was arbitrary and capricious.

CEQ regulations require agencies to "[m]ake diligent efforts to involve the public in preparing and implementing [its] NEPA procedures" and "[s]olicit appropriate information from the public." 40 C.F.R. § 1506.6(a), (d). The agency must involve the public in preparing an EA, to the extent practicable. *Id.* § 1501.5(e). NOAA Administrative Order NAO 216-6A ("NAO") establishes NOAA's policies and procedures for compliance with NEPA. The NAO also authorized the development of a "Companion Manual to provide additional, specific policies pursuant to NEPA and related authorities." Companion Manual for NOAA

19

Administrative Order NAO 216-6A, *available at* https://www.nepa.noaa.gov/docs/NOAA-NAO-216-6A-Companion-Manual-01132017.pdf. The Companion Manual requires NMFS to "provide the public with as much environmental information as is practicable under the circumstances and allow an opportunity for the public to offer their views and inform the agency's decision-making process." *Id.* at 13. The Companion Manual encourages NMFS to provide the public with an opportunity to comment on all EAs. *Id.* In determining the appropriate level of public involvement in an EA, NMFS must consider all relevant circumstances, including "the potential for controversy" of the proposed action and whether there exists "an emergency situation or compelling need to act quickly." *Id.* at 14. While the Second Circuit has not gone so far as to establish a categorical rule about requiring public comment for an EA, it has acknowledged that the Ninth Circuit "has held that a 'complete failure to involve or even inform the public about an agency's preparation of an EA and a [finding of no significant impact (FONSI)] violated NEPA's public participation regulations." *Brodsky v. U.S. NRC*, 704 F.3d 113, 124 (2d Cir. 2013) (quoting *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 970 (9th Cir. 2003)).

If, after conducting an EA, the agency determines not to prepare an EIS, it must make a FONSI available to the public. 40 C.F.R. § 1501.6(a). Where "[t]he nature of the proposed action is one without precedent," the agency shall make the FONSI available for public review for thirty days before it makes a final determination of whether to prepare an EIS. *Id.* § 1501.6(a)(2).

Defendants violated NEPA by failing to allow any public participation in the EA. NMFS's refusal to allow the public to submit comments on the EA essentially stripped away the rights of Plaintiff, its members, and the public to participate in the decision-making process. *See* 40 C.F.R. §§ 1500.1(b), 1500.2(d). Public participation would have allowed knowledgeable researchers to highlight the problems with the EA discussed above. NMFS did not offer any explanation for why it deviated from the CEQ regulations and NOAA's own

procedures that urge the agency to involve the public in the EA process. *See FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515-16 (2009) ("An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books. . . . a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.").

Because NMFS was aware that this Permit was highly controversial, NOAA procedures obligated it to allow public input on the EA. *See* Companion Manual at 14. Simply as a general matter, keeping beluga whales in captivity at all is a subject of great public debate. *Haw. Cnty. Green Party v. Evans*, No. C-03-0078 SC, 2003 WL 25289318, at *6-8 (N.D. Cal. Jan 24, 2003) (holding that it is "exceptionally clear" that the impacts of the scientific research permits for whales are controversial because "[i]t is common knowledge that a significant number of people have, for years, worked hard to protect marine mammals from potentially harmful actions of humans); *see, e.g.*, Kenneth Brower, *The Great Whale Fight*, National Geographic (June 1, 2013), https://www.nationalgeographic.com/news/2013/6/130531-beluga-whale-dolphin-marine-mammal-georgia-aquarium-capture-free-willie-narwhal/. Notably, legislators in Connecticut have recently introduced a bill that would prohibit the public display of all cetaceans. *See* Eliza Fawcett, *Mystic Aquarium urges lawmakers to reject bill prohibiting whales, dolphins from being kept in captivity*, Hartford Courant (Mar. 9, 2020), https://www.courant.com/politics/hc-pol-cetacean-bill-20200309-c3inp4v6kncxndgshrdsxdq3oi-story.html; Lee Elci, *Mystic Aquarium should end beluga whale exhibit*, The Day (Mar. 12, 2020), https://www.theday.com/article/20200312/OP04/200319792. This Permit, the first one allowing the import of a depleted population stock of beluga whales for research and public display, is especially controversial. The more than 9,500 public comments received by NMFS, both against and in support of this Permit, demonstrate that the impacts of the

Permit are controversial. *See* Federal e-Rulemaking Portal, NOAA-NMFS-2019-0113, https://www.regulations.gov/docket?D=NOAA-NMFS-2019-0113. There have been numerous articles in the national and local press highlighting the controversial nature of the impacts of this Permit.[5] In addition, the Permit amounts to a tacit endorsement of the actions of Marineland in taking dozens of belugas from the wild in the last twenty years. Effectively rewarding Marineland's conduct, which is antithetical to the purpose of the MMPA, is enormously controversial. The controversial nature of the Permit required NMFS to involve the public in its EA.

Furthermore, there was no urgency associated with the Permit that would have made public participation impracticable. *See* Companion Manual at 14*.* There was no emergency or compelling need for NMFS to issue the EA and Permit on an expedited basis; indeed, more than eight months passed between the close of the public comment period and the release of the EA and more than three months have now passed since the EA was released. NMFS's flouting of public participation regulations and guidelines is highlighted not only by its refusal to allow comments on the EA, but also by its failure to notify the public at all in the eleven months that passed between its announcement that an EA was unnecessary and the sudden publication of a final EA. In sum, it was arbitrary and capricious of NMFS not to allow public involvement in the EA.

A permit to import a depleted population stock of beluga whales for purposes of research and public display is the first of its kind and "one without precedent." 40 C.F.R. § 1501.6(a)(2). For that reason, in the event that NMFS made a FONSI (as it did here), CEQ regulations required the agency to make the FONSI available for public review for thirty

---

[5] *See, e.g.,* Patrick Whittle, *Animal defenders, Mystic Aquarium tussle over beluga importation,* Hartford Courant (Nov. 25, 2019), https://www.courant.com/news/connecticut/hc-news-mystic-aquarium-beluga-whales-20191125-wfzvsqcyczbkrlm6xw7z4p5vby-story.html; Patrick Whittle, *Animal defenders, Mystic Aquarium tussle over beluga importation,* ABC News (Nov. 23, 2019), https://abcnews.go.com/US/wireStory/animal-defenders-aquarium-tussle-beluga-importation-67254346.

days before it made a final determination whether to prepare an EIS. *Id.* NMFS failed to do so, instead determining that an EIS was unnecessary before making the FONSI available for public review. *See* EA. NMFS's violation of CEQ regulations was arbitrary and capricious.

## 2. Friends of Animals is likely to succeed on its MMPA claim.

Congress passed the MMPA for the express goal of protecting "certain species and population stocks of marine mammals [who] are, or may be, in danger of extinction or depletion as a result of man's activities" from "diminish[ing] beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part . . . ." 16 U.S.C. § 1361(1)-(2). The MMPA "generally prohibits any individual from 'taking' a marine mammal, defined as harassing, hunting, capturing, or killing it." *Winter*, 555 U.S. at 15. The statute "imposes a strict burden of proof on each applicant seeking to take or import marine mammals." *Comm. for Humane Legis., Inc. v. Richardson*, 414 F. Supp. 297, 310 (D.D.C. 1976), *aff'd* 540 F.2d 1141 (D.C. Cir. 1976). "If that burden is not carried—and it is by no means a light burden—the permit may not be issued. The effect of this set of requirements is to insist that the management of the animal populations be carried out **with the interests of the animals as the prime consideration**." *Comm. for Humane Legis., Inc. v. Richardson*, 540 F.2d 1141, 1151 (D.C. Cir. 1976) (quoting H.R. Rep. No. 92-707, Committee on Merchant Marine and Fisheries, 92d Cong., 1st Sess. 22 at 18 (Dec. 4, 1971)) (emphasis added). Hence, the MMPA requires that "the animals must be managed for their benefit and not for the benefit of commercial exploitation." *Comm. for Humane Legis.*, 540 F.2d at 1148 n.27 (quoting H.R. Rep. No. 92-707).

### a. The Permit violates the MMPA because it allows for public display that will not be "incidental" to the research.

It was arbitrary and capricious for NMFS to conclude that any public display will be "incidental" to the research. The regulations implementing the MMPA expressly prohibit public display of marine mammals taken pursuant to a scientific research permit: "Marine

mammals held under a permit for scientific research shall not be placed on public display . . . ." 50 C.F.R. § 216.41(c)(1)(vi). The regulations do allow for a narrow exception if public display is "conducted incidental to" the research. *Id.* § 216.41(c)(1)(vi)(B). "Incidental" is defined in the MMPA as "with respect to an act, **a non-intentional or accidental act** that results from, but is not the purpose of, carrying out an otherwise lawful action." *Id.* § 229.2 (emphasis added). While this section of definitions is contained in a part of the MMPA dealing with commercial fisheries, the section is clear that "unless otherwise defined in this chapter, the terms in this chapter have the following meaning." *Id.* "Incidental" (certainly in the context of public display) is not otherwise defined in the MMPA. Therefore, the definition in section 229.2 applies to "incidental" as used in section 216.41, and public display of marine mammals held pursuant to a scientific research permit is only permissible if it is "non-intentional or accidental."

There was no evidence before NMFS that allowed it to determine that Mystic Aquarium's display of the belugas would be "incidental." The only mentions about public display in the Application were Mystic Aquarium's unsworn recitations of the language from the regulation that any display would be "incidental." *See, e.g.*, Application at 23, 64 ("While the goal of the permit is research, public display will be incidental."). Mystic Aquarium made no attempt to explain why or how public display would be incidental. Mystic Aquarium provided no explanation to NMFS that public display would even be secondary to the research, much less that public display would be accidental or unintentional. When would Mystic Aquarium first display these belugas? Would it display them regularly? How often? For how long? What times of the year? Would it advertise the public's ability to see them? How much additional revenue does it expect to earn by displaying these belugas? Mystic Aquarium makes no effort to answer any of these questions in its Application. Accordingly, NMFS had no basis to know any details of what the public display of these belugas would look like.

In fact, Mystic Aquarium provided NMFS with conclusive evidence that public display would not be "incidental." In responses to public comments, Mystic Aquarium asserted that its "research occurs in our habitats which are visible to the public. There is no other location where this research can be conducted." Mystic Responses – Issuance Criteria at 31. This is hardly "non-intentional or accidental." 50 C.F.R. § 229.2. Instead, public display of the belugas would be entirely foreseeable, intentional, and unavoidable. As a result, it was arbitrary and capricious for NMFS to nevertheless conclude that any display would be "incidental." This failure alone is sufficient reason for the Court to find that the Permit violates the MMPA, but it is far from the only reason why the Permit violates the MMPA.

### b. The Permit is inconsistent with the purposes and policies of the MMPA.

NMFS may only grant a permit to import beluga whales if the permit "is consistent with the purposes and policies" of the MMPA. 16 U.S.C. § 1371(a)(1). "The applicant for any permit under this section must demonstrate to the Secretary that the taking or importation of any marine mammal under such permit will be consistent with the purposes of this Act and the applicable regulations established under section 103 of this title." *Id.* § 1374(d)(3). That purpose is "to ensure the well-being of porpoise and other marine mammals." *Comm. for Humane Legis.*, 414 F. Supp. at 309. "[T]he Act was not intended as a balancing act between the interests of industry and the animals." *Ga. Aquarium*, 135 F. Supp. 3d at1292. "The interests of the marine mammals come first under the statutory scheme, and the interests of the industry, important as they are, must be served only after protection of the animals is assured." *Id.* (quoting *Fed'n of Japan Salmon Fisheries Cooperative Ass'n v. Baldridge*, 679 F. Supp. 37, 46-47 (D.D.C. 1987)). Therefore, an import cannot go ahead if it "would be to the 'disadvantage' of the animals involved." *Comm. for Humane Legis.*, 414 F. Supp. at 310 (holding that the district court "correctly interpreted the law as written"). The

Secretary must find "that taking will not be to the disadvantage of the animals concerned. *If he cannot make that finding, he cannot issue a permit. It is that simple." Id.* at 310 (quoting 118 Cong. Rec. 7686 (1972)) (emphasis in original).

Here, NMFS could not issue the Permit because there was no basis to conclude that this import is consistent with the purposes and policies of the MMPA. NMFS made no finding that the proposed import of these beluga whales would not disadvantage these beluga whales or their depleted population stock. *See generally* EA at 31-38. In fact, NMFS actually set forth in the EA that the import **would disadvantage these belugas**: "the proposed action is likely to adversely affect the five subject beluga whales to some degree . . . ." EA at 31. And NMFS's conclusion is amply buttressed by the conclusions of Dr. Toni Frohoff. Frohoff Decl. ¶¶ 28-48, 59, 61. Mystic provided no basis for NMFS to conclude that any benefits of the Permit to beluga whales would outweigh the harms, both to these beluga whales and to beluga whales more generally from the increased incentives to capture them from the wild. *See* Part B.1.b, *supra*. Thus, it was arbitrary and capricious for NMFS to conclude that the Permit was consistent with the purposes of the MMPA.

### c. The Permit does not meet the narrow exceptions that allow import of a depleted population stock of beluga whale.

The MMPA imposes additional restrictions on the taking of any marine mammals that come from what has been designated as a depleted species or population stock, as the five beluga whales at issue here have been. The MMPA "is clear that no importation may be made of any depleted species except in specified . . . . narrow exceptions." *In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig.*, 818 F. Supp. 2d 240, 252-53 (D.D.C. 2011) (quoting 16 U.S.C. § 1371(a)(3)(B)). These additional restrictions limit research on a depleted population stock to projects that "cannot be accomplished using a species or stock

that is not designated . . . as depleted" and that "will not likely have a long-term direct or indirect adverse impact on the species or stock." 50 C.F.R. § 216.41(b)(5)(i)-(ii).

Because Mystic Aquarium seeks to import beluga whales that are members of a depleted population stock, it had the obligation to demonstrate to NMFS that the proposed research "cannot be accomplished using a species or stock that is not designated . . . as depleted . . . ." *Id.* § 216.41(b)(5)(i). It was arbitrary and capricious for NMFS to issue the Permit because Mystic Aquarium made no such showing. In fact, it does not appear that NMFS even made a determination that the research could not be accomplished using a stock that is not designated as depleted. Instead, NMFS simply observed that the research "has the potential to indirectly benefit the conservation and management of wild beluga whale populations, including . . . the depleted Sakhalin Bay-Nikolaya Bay-Amur River beluga whale stock." EA at 11. NMFS summarily concluded that "the applicant has demonstrated they have met the statutory and regulatory issuance criteria for conducting scientific research on depleted marine mammals . . . ." FONSI at 7.

Mystic Aquarium did not meet its burden of showing that the research could not be accomplished using a stock of beluga whales that is not designated as depleted. The proposed research is intended to "contribute significantly to understanding the basic biology of belugas." Application at 4. Such research could be accomplished using any belugas. There is no reason why the proposed research could not be accomplished using belugas that are not members of a depleted population stock. Mystic Aquarium's contention that the research "**may** offer more direct insight into basic biology helpful in restoring the wild stock" Application at 20 (emphasis added), is nothing more than speculation.

Moreover, there is ample reason to conclude that the research could be accomplished using any beluga whales. Dr. Toni Frohoff concludes that "[t]here is no reason of which I am aware that Mystic Aquarium cannot conduct this research on one or

27

more of the roughly thirty beluga whales who are currently held in captive facilities in the U.S." Frohoff Decl. ¶ 51. The research does not require the use of a depleted stock. Frohoff Decl. ¶ 52. While Mystic Aquarium has claimed that the research could help understanding of the depleted stock, there are significant reasons to doubt this. As an initial matter, all five of these beluga whales were born in captivity, which "causes physical, psychological, and emotional changes to beluga whales that make transferring results and findings to wild populations difficult and uncertain." Frohoff Decl. ¶ 57. In addition, four of the five beluga whales are genetic hybrids, meaning only one of their parents is a member of the depleted stock, which "minimizes the genetic value they could offer to the research . . . ." Frohoff Decl. ¶ 56. Because the research could be accomplished using a stock that is not designated as depleted, Mystic Aquarium could not meet a requirement under the MMPA's regulations, and it was arbitrary and capricious for NMFS to grant the Permit despite that requirement not being met.

NMFS also had to find that the import "will not likely have a long-term direct or indirect adverse impact on the species or stock." 50 C.F.R. § 216.41(b)(5)(ii). Mystic Aquarium made no such showing, and NMFS made no such finding. Instead, Mystic Aquarium contends that the research can be used "to study the MMPA-depleted belugas from the Sakhalin Bay-Nikolaya Bay-Amur River in addition to beluga populations world-wide." Application at 6. That Mystic Aquarium will use the beluga whales in research is not enough to show that the import will also not have an adverse impact. As described above, the research will have an adverse impact on members of a depleted stock and could easily lead to the import and capture of additional members of the depleted stock. *See* Part B.1.b, *supra*. In one MMPA case, the court concluded that it was "by statutory definition, **impossible** for a [member of a depleted stock] to be taken without disadvantaging the stock." *Fed'n of Japan Salmon Fisheries Cooperative Ass'n*, 679 F. Supp. at 46-47 (emphasis added). "Under the plain language of the MMPA . . . the Secretary is not

28

given discretion to determine that a taking will not disadvantage a stock unless the specifically required statutory finding regarding optimum sustainable population has been made." *Id.* at 47. While NMFS is free to petition Congress to change the MMPA to allow imports of a depleted stock, it "is not free, however, to implement that change by adopting an interpretation of the MMPA which conflicts with the language and intent of the statute." *Id.* at 48. Moreover, as in *Baldridge*, the import will necessarily disadvantage the stock. *Id.* at 46-47. Therefore, it was arbitrary and capricious for NMFS to conclude that the Permit will likely not have a long-term adverse impact on this depleted stock.

### d. The Permit also violates additional regulations under the MMPA.

The regulations also require that a permit applicant demonstrate that its "resources are adequate to accomplish successfully the objectives and activities stated in the application." 50 C.F.R. § 216.34(a)(5). It does not appear that Mystic Aquarium ever demonstrated this. Records publicly available at the time of the Application showed that Mystic Aquarium operated at a $2.5 million loss in 2017. Form 990, Sea Research Foundation, Inc., *available at* https://www.mysticaquarium.org/wp-content/uploads/2018/12/2017-SRF-Public-990.pdf. Mystic Aquarium's financial situation has dramatically worsened since its Application and since the COVID-19 pandemic began. Mystic Aquarium was closed for more than two months beginning in March and has been running at a reduced capacity since May. Joe Wojtas, *Mystic Aquarium to reopen to public on Friday*, The Day (May 19, 2020), https://www.theday.com/article/20200519/NWS01/200519436. Reports in May noted that Mystic Aquarium needed an additional $5 million in state funding "to remain in operation" due to COVID-related revenue declines. Joe Wojtas, *UPDATED: Legislators ask state for $5 million so Mystic Aquarium can 'remain in operation',* The Day (May 20, 2020),https://www.theday.com/article/20200520/BIZ02/200529929#:~:text=Mystic%2

[0%E2%80%94%20Sixteen%20state%20legislators%20from,can%20%E2%80%9Cremain%20in%20operation.%E2%80%9D](0%E2%80%94%20Sixteen%20state%20legislators%20from,can%20%E2%80%9Cremain%20in%20operation.%E2%80%9D). One state legislator said she thought Mystic Aquarium would need closer to $7 million. *Id.* It was arbitrary and capricious for NMFS to issue the Permit without a showing and finding that Mystic Aquarium has the financial resources to adequately care for these belugas.

NMFS also violated a statutory requirement by granting the Permit so long after holding a hearing. By holding a public hearing on November 18, 2019, NMFS was required to issue or deny the Permit no later than December 18, 2019. *See* 16 U.S.C. § 1374(d)(5). By waiting until August 27, 2020 to issue the Permit, NMFS violated the law.

In sum, NMFS's approval of the permit in contravention of the MMPA and its regulations was arbitrary, capricious, and in violation of the law for a number of reasons. This Court need only find merit with one of these reasons to find that Friends of Animals' MMPA claim raises serious questions or is likely to succeed. For that reason, Friends of Animals is likely to succeed on its claim that NMFS violated the MMPA. At the very least, it has shown serious questions going to the merits on this claim.

### 3. The balance of hardships tips decidedly in Friends of Animals' favor.

If the Court, as it should, applies the serious questions standard, the balance of hardships tips decidedly in favor of Friends of Animals. As discussed above, without an injunction, Friends of Animals faces imminent harms that cannot be remedied. *See* Part A, *supra*. NMFS has little—if any—vested interest in whether the import of the belugas to a private facility is stayed. The federal government does not stand to gain anything from the Permit, the import, or the proposed scientific research. *See Born Free USA v. Norton*, 278 F. Supp. 2d 5, 26 (D.D.C. 2003) (holding that federal agencies are "detached government bodies that do not, as a practical matter, stand to gain or lose based on [whether elephants

were allowed to be transported to zoos] as a result of the Court's preliminary injunction decision").

Moreover, the issuance of the Permit is not intended to benefit the public—it is intended to benefit a specific third party. The public interest was frustrated by NMFS's failure to comply with NEPA and MMPA, laws passed by the public's elected representatives. Therefore, the public interest would be well served by NMFS complying with the law and conducting a full environmental analysis of the Permit. *See Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 15 (D.D.C. 1998). Thus, the interest of the public is in favor of an injunction that would likely result in NMFS conducting an appropriate environmental analysis under NEPA and properly applying the requirements of the MMPA.

It is not clear that Mystic Aquarium would suffer any real hardship from the issuance of a preliminary injunction. For sure, Mystic Aquarium presumably would like to import the beluga whales as soon as possible to start its research and to begin displaying them to the public. But under the MMPA, any public display can only be "incidental" to the research and cannot be a consideration on this Motion. In terms of the research, there is no indication in the Application that it is in any way time sensitive.[6] If it turns out that the import is ultimately allowed despite the earlier issuance of a preliminary injunction, Mystic Aquarium can still import the five belugas and perform the desired research. Even if this harms Mystic Aquarium financially, "the purely economic harm suffered by [businesses] as a result of the enforcement of the MMPA is outweighed by" the public interest "in carrying out Congress' will in protecting the marine mammals . . . ." *Earth Island Inst. v. Mosbacher*, 746 F. Supp. 964, 975 (N.D. Cal. 1990).

---

[6] Although the Permit has an expiration date of August 31, 2025, there is no reason why Mystic Aquarium could not apply to NMFS for an extension of the research permit in the event a preliminary injunction is granted, but Friends of Animals does not prevail on the merits, and Mystic eventually imports the belugas.

In sum, the balance of hardships tips decidedly in Friends of Animals' favor because its harms cannot be remedied without an injunction, the public interest favors an injunction, NMFS has little interest, and any harm to Mystic Aquarium would be minimal and temporary.

## CONCLUSION

Friends of Animals has established that it is likely to succeed on the merits of its claims (and at the very least has shown serious questions going to the merits) and that it will suffer irreparable harm if Mystic Aquarium is allowed to import these beluga whales. Accordingly, Friends of Animals requests that the Court grant a preliminary injunction to prevent an import while this litigation is pending and before the Court decides the merits of the underlying claims.

Respectfully submitted,

*/s/ Stephen R. Hernick*
Stephen R. Hernick (phv10846)
Friends of Animals, Wildlife Law Program
7500 E. Arapahoe Rd., Suite 385
Centennial, CO 80112
Tel: 720-749-7791
Fax: 888-236-3303
SHernick@friendsofanimals.org

Jessica Rubin (Bar No. Ct13768)
Director of Legal Practice and Animal Law Clinic
University of Connecticut School of Law
55 Elizabeth Street
Hartford, CT 06105
Tel: (860) 570-5209
Fax: (860) 570-5366
Jessica.rubin@uconn.edu

*Attorneys for Plaintiff Friends of Animals*