## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| FRIENDS OF ANIMALS, | ) | No. 3:20-cv-01312-AWT |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WILBUR ROSS, in his official capacity as | ) | **REPLY MEMORANDUM IN** |
| Secretary of Commerce | ) | **SUPPORT OF PLAINTIFF'S** |
| | ) | **MOTION FOR A PRELIMINARY** |
| and | ) | **INJUNCTION** |
| | ) | |
| NATIONAL MARINE FISHERIES SERVICE, | ) | |
| an agency within the United States | ) | |
| Department of Commerce | ) | |
| | ) | December 15, 2020 |
| Defendants. | ) | |

**TABLE OF CONTENTS**

INTRODUCTION..................................................................................................................... 1

ARGUMENT .......................................................................................................................... 2

   A. Friends of Animals and its members will likely suffer irreparable harm if a
      preliminary injunction is not granted and the beluga whales are imported. ................... 2

   B. Friends of Animals has shown serious questions going to the merits and a
      likelihood of success on both its NEPA and MMPA claims. ...................................... 6

     1. Friends of Animals is likely to succeed on its NEPA claim. ................................ 7

        a. The Environmental Assessment is impermissibly minimalist and
          flawed.................................................................................................... 7

        b. It was arbitrary and capricious for NMFS to exclude the public from the
          NEPA process. ....................................................................................... 9

     2. Friends of Animals is likely to succeed on its MMPA claim for several
        reasons. .............................................................................................................. 12

        a. NMFS's finding that Mystic's application met the narrow exceptions
          that allow import of a depleted population stock was erroneous............................ 12

        b. NMFS's finding that public display of the belugas will be "incidental" to
          the research was erroneous. ................................................................. 15

        c. NMFS failed to find that Mystic has adequate resources. ........................... 16

        d. NMFS failed to issue the Permit within thirty days of the hearing. ......... 16

   C. The balance of hardships tips decidedly in Friends of Animals' favor, and
      the public interest favors the issuance of a preliminary injunction. .............................. 18

CONCLUSION ...................................................................................................................... 20

**INTRODUCTION**

The facts and circumstances of this case make it particularly appropriate for a preliminary injunction. Defendant National Marine Fisheries Service (NMFS) is poised to grant final authorization to Mystic Aquarium to import five beluga whales from Canada under a permit (the "Permit"). Once that occurs, the belugas will be harmed. Their harm and import would be irreversible. In granting the Permit, NMFS failed to take into account the capabilities of beluga whales as highly sentient, social, and intelligent animals. Defendants have identified no reason why this import cannot wait and have not argued that a single person, entity, or animal would be harmed by the issuance of a preliminary injunction.

A preliminary injunction in these circumstances is not nearly as "drastic" as it might be under different facts. A preliminary injunction would also allow Plaintiff Friends of Animals and the Court to have the benefit of the administrative record—the documents underlying and explaining NMFS's actions here—before arguing and deciding, respectively, the merits. To the extent the Defendants believe that a preliminary injunction would unduly delay a final decision on this Permit, Friends of Animals is certainly willing to work with them and the Court to advance this litigation as expeditiously as is reasonable.

Defendants repeatedly argue that the belugas will be transported consistent with standard practices and will be treated humanely at Mystic Aquarium. *See, e.g.*, Defendants' Memorandum in Opposition at 1-2 (hereinafter Defs.' Mem.). Defendants' emphasis on the standard of care that the belugas will be afforded misses the point. Even the absolute best treatment by Mystic Aquarium does not indicate that the belugas will not be immensely harmed by the import. As a result, Friends of Animals' members will still suffer irreparable harm. In addition, the Permit violates the National Environmental Policy Act (NEPA) and the Marine Mammal Protection Act (MMPA). The public interest also weighs in favor of allowing a brief pause to ensure that NMFS complies with the law. Friends of Animals

respectfully requests that the Court issue a preliminary injunction to enjoin Defendants from taking further action on the Permit.

## ARGUMENT

The parties disagree about which of the Second Circuit's preliminary injunction standards ought to apply. *See* Defs.' Mem. at 13-14. Yet under either party's formula, Friends of Animals has met all requirements for the issuance of a preliminary injunction. While certain agency scientific findings are entitled to deference in the context of judicial review of an agency decision, *see* Defs.' Mem. at 2, Defendants are entitled to no deference as to the equities of entering a preliminary injunction, including as to irreparable harm, balance of hardships, and the public interest. *See Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1186 (9th Cir. 2011) ("If the federal government's experts were always entitled to deference concerning the equities of an injunction, substantive relief against federal government policies would be nearly unattainable . . . . We hold that the district court abused its discretion by deferring to agency views concerning the equitable prerequisites for an injunction.").

### A. Friends of Animals and its members will likely suffer irreparable harm if a preliminary injunction is not granted and the beluga whales are imported.

Defendants do not dispute that Friends of Animals' members will suffer irreparable harm if the belugas are harmed by the import. *See* Defs.' Mem. at 35. While Defendants attempt to minimize the harm that Friends of Animals' members would suffer by dismissing their "sensitivities," Defs.' Mem. at 40, Defendants do not contest the accuracy of Plaintiff's members' declarations or the sincerity of their beliefs and emotions. Defendants also do not—and cannot—contest that the aesthetic and emotional harm that Plaintiff's members would suffer is both legally cognizable and sufficient to constitute irreparable harm. Indeed, the fact that harm to the belugas would cause irreparable harm to Friends of Animals' members is amply supported by caselaw. *See* Plaintiff's Memorandum in Support

2

at 9-12 (hereinafter Pl.'s Mem.). Defendants instead contend that Friends of Animals does not face irreparable harm because the belugas themselves will not be irreparably harmed by the import. *See* Defs.' Mem. at 36. Defendants are wrong both legally and factually.

As an initial matter, Defendants are wrong to focus the irreparable harm inquiry solely on the belugas, ignoring Friends of Animals' members. Defendants also misstate what constitutes irreparable harm when they characterize it as only injury that is "lasting" and "significant, permanent harm." Defs.' Mem. at 35-36. Instead, "[i]rreparable harm means injury for which a monetary award cannot be adequate compensation." *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995) (internal quotation omitted). Defendants do not even contend—much less demonstrate—that Friends of Animals' injuries can be adequately compensated by a monetary award. As discussed below, Defendants are wrong that the harm to the belugas will not be long-lasting or permanent, but even if they were right, this would not mean that the harm to Friends of Animals and its members—the aesthetic and emotional injury in knowing that these animals have been harmed—is not irreparable. If these beluga whales are imported, they will be removed from their families and social groups and be harmed by the transport—even NMFS acknowledges as much. Pl.'s Mem. at 17-18. The harms to the belugas and to Friends of Animals are irreversible and irreparable: there is no way to erase the import, eliminate the belugas' harms, or to compensate Friends of Animals' members for their injuries.

Factually, Defendants are wrong to minimize the harm that the belugas will suffer if they are imported. Defendants do not contest the accuracy of any of the opinions of Dr. Toni Frohoff that the import would severely harm these five belugas and those remaining at Marineland. *See* Pl.'s Mem. at 5-6; Declaration of Toni Frohoff, Ph.D. ¶¶ 28-48, 59-61 (hereinafter Frohoff Decl.). In addition, Defendants do not contest that these harms are irreversible once the belugas are imported. *See* Pl.'s Mem. at 12.

Defendants rely on the new declaration of Dr. Deborah Fauquier. Defs.' Mem. at 36-37. It is notable that although Dr. Fauquier attests that she reviewed the Declaration of Dr. Frohoff, she does not criticize or claim that any of the facts or opinions in Dr. Frohoff's lengthy declaration are inaccurate. Dr. Fauquier's opinions fail to address the effects of the removal and transport on the belugas' mental and psychological welfare. *See* Supplemental Declaration of Toni Frohoff, Ph.D., at ¶ 4, attached hereto as Exhibit A (hereinafter Frohoff Supp. Decl.). In general, Dr. Fauquier's opinions minimizing the effects of the import on the belugas omit critical information and are misleading in a number of respects. *See* Frohoff Supp. Decl. ¶¶ 4-9. Three times in her declaration, Dr. Fauquier concludes that the Permit will not "cause irreparable harm" to the belugas, Declaration of Deborah Fauquier at ¶¶ 12, 19, 21, although she is not a lawyer and does not purport to define what she means by this term. *See id.* at ¶¶ 1-3; Frohoff Supp. Decl. ¶ 10. Such ultimate issue testimony will not "help the [Court] to understand the evidence or to determine a fact in issue," and the Court should not consider it. Fed. R. Evid. 702; *see also Jackson v. Harsch*, No. 96-7749, 1997 U.S. App. LEXIS 14977, at *5 (2d Cir. June 20, 1997).

Later, Defendants selectively quote from one sentence of Dr. Frohoff's declaration, alleging that Dr. Frohoff opined that "the amount and quantity of 'social space' '*could be*' worse for these belugas at Mystic . . . ." Defs.' Mem. at 38-39 (quoting Frohoff Decl. ¶ 48) (emphasis in Defs.' Mem.). Defendants' fixation with this phrase is misplaced given that what Dr. Frohoff actually opined is that "the amount and quality of social space could be **severely** worsened for these belugas." Frohoff Decl. ¶ 48 (emphasis added). Notably, Dr. Frohoff ends that paragraph of her declaration by concluding that "the negative impacts of captivity and crowding at Mystic or Georgia Aquariums **would likely** be a net negative and further harm these belugas." *Id.* (emphasis added).

While noting that "the relative merits of facilities holding marine mammals" is not a pertinent factor in issuing a research permit, Defendants proceed to argue that the

conditions at Mystic Aquarium could be better than those at Marineland. Defs.' Mem. at 38-40. Defendants' argument is particularly curious because Friends of Animals has never claimed that Mystic Aquarium's facilities or care would be worse than Marineland's. Of course, even if Mystic Aquarium's facilities and care are better for the belugas than those at Marineland, this would not negate the myriad harms that the belugas would suffer from the removal from their families and social groups and the transport to Mystic Aquarium. *See* Pl.'s Mem. at 5-6, 12; Frohoff Decl. ¶¶ 31-34.

Indeed, it is notable that despite observing that Marineland has "myriad problems," including "overcrowding," Dr. Frohoff still concludes that the proposed import to Mystic Aquarium would harm the belugas. *See, e.g.*, Frohoff Decl. ¶ 59. The fact that Dr. Frohoff believes that the current conditions for these belugas are problematic should lend additional credence to her opinion that their removal from Marineland would nevertheless harm them. In no way is Dr. Frohoff's opinion about the conditions at Marineland "alone . . . a basis to reject Plaintiff's" argument that the import would irreparably harm the belugas and Friends of Animals' members. *See* Defs.' Mem. at 38. Defendants' argument that the belugas cannot be irreparably harmed because they are in less-than-ideal conditions at Marineland is no different than an argument that a prisoner cannot be irreparably harmed by unconstitutional treatment at a jail because he or she is already incarcerated. Defendants also cite to critical comments that Dr. Naomi Rose made about Marineland, Defs.' Mem. at 38, but they fail to note that Dr. Rose was a prominent public critic of Mystic Aquarium's application. Defs.' Mem. Ex. 4 (Transcript) at 83 ("AWI firmly opposes this proposed import of five belugas from Canada to Mystic Aquarium. . . . [T]he laws in both Canada and the United States do not allow for this importation as others have explained.").

## B. Friends of Animals has shown serious questions going to the merits and a likelihood of success on both its NEPA and MMPA claims.

Defendants accuse Friends of Animals of "ignor[ing]" Second Circuit precedent "that the likelihood-of-success-on-the-merits standard must be applied when a party seeks to enjoin government action taken pursuant to a statute or regulatory scheme." Defs.' Mem. at 16. But Defendants misrepresent both Friends of Animals' argument and Second Circuit law. Friends of Animals explained that "**[e]ither** the likelihood of success standard or the less rigorous 'serious questions' standard can apply to a motion to enjoin government action." Pl.'s Mem. at 8 (emphasis in original). That is because Defendants are wrong that the likelihood of success standard "must" apply: "[T]he 'likelihood of success' prong need not always be followed merely because a movant seeks to enjoin government action." *Haitian Ctrs. Council, Inc. v. McNary*, 969 F.2d 1326, 1339 (2d Cir. 1992), *judgment vacated as moot sub nom. Sale v. Haitian Ctrs. Council*, *Inc.*, 509 U.S. 918 (1993). In their discussion of caselaw, Defendants do not disclose that the court in *Haitian Centers Council* applied the serious questions standard even though the government agencies argued that the challenged conduct was "plainly taken pursuant to Congress' broad grant of authority in the [Immigration and Nationality Act]." *Id.* (quotation omitted).

Defendants rely heavily on *Able v. United States*, 44 F.3d 128 (2d Cir. 1995), quoting language from that case purporting to hold that "it is inappropriate for a court to substitute its own determination of the public interest for that arrived at by the public branches, whether or not there may be doubt regarding the wisdom of their conclusion." Defs.' Mem. at 15. Defendants neglect to discuss the full context of the *Able* case, where plaintiffs challenged the constitutionality of the "Don't Ask, Don't Tell" law passed by both houses of Congress and signed by the President. *Able*, 44 F.3d at 130-132. Whatever the wisdom of that legislation, it nevertheless was the result of a "lengthy public debate" and "the full play of the democratic process involving both the legislative and executive branches." *Id.* at 131. Here, NMFS's approval of the Permit is not entitled to the same type of deference as the

"Don't Ask, Don't Tell" law passed by Congress and signed by the President in *Able* because the Permit was issued by a single agency in contravention of statutes and rules.

Friends of Animals is not challenging the MMPA or the regulations promulgated by NMFS under that statute. Rather, Friends of Animals is arguing that NMFS's action in approving the Permit was arbitrary and capricious and violated the APA because NMFS ignored provisions in the MMPA and the regulatory scheme it itself and Congress put into place. Indeed, Defendants concede that the Permit violates at least one provision of the MMPA. *See* Defs.' Mem. at 30. Because circumstances such as these are more analogous to *Haitian Centers Council* than to any case cited by Defendants, the serious questions standard is more appropriate. In any event, Friends of Animals has demonstrated that it meets the requirements of either standard, and it will proceed to explain why its claims satisfy even the more rigorous likelihood of success standard.

**1. Friends of Animals is likely to succeed on its NEPA claim.**

Defendants curiously dismiss Friends of Animals' NEPA arguments by claiming they "largely duplicate its arguments under the MMPA." Defs.' Mem. at 30. This is simply wrong, as any casual review of the two claims would reveal. Defendants' violations of NEPA are unique from their violations of the MMPA. In any event, NMFS violated NEPA in multiple ways, and this Court need only find merit in one of the following arguments in order to find that Friends of Animals is likely to succeed on its NEPA claim.

**a. The Environmental Assessment is impermissibly minimalist and flawed.**

Friends of Animals has previously explained that NMFS failed to take a "hard look" at the full impacts of the Permit on the beluga whales because it entirely "failed to consider an important aspect of the problem," specifically the social harms the Permit would inflict on these five belugas as well as those remaining at Marineland by removing belugas from their families and social groups, severing strong and long-lasting social bonds. Pl.'s Mem. at

17. Defendants do not dispute that the Environmental Assessment (EA) completely ignores these impacts. Elsewhere, however, Defendants acknowledge that "belugas generally develop bonds with other 'conspecifics' . . . ." Defs.' Mem. at 36 (citing Rec. Mem. at 19-20). Defendants try to obscure the issue by noting that the EA did analyze how the belugas would be introduced to a new social group at Mystic. *See* Defs.' Mem. at 32. The fact that NMFS considered it necessary to analyze how these belugas would interact with the existing belugas at Mystic Aquarium merely emphasizes how inexcusable—and arbitrary and capricious—it was for NMFS to completely ignore the social harms that removal would inflict on these five belugas and those remaining at Marineland.

Defendants also defend the EA by arguing—without citation to any authority—that the EA "is additionally supported by the agency's analysis in the Recommendation Memorandum." Defs.' Mem. at 32. Defendants are wrong: the only agency document that the Court may consider in determining whether the EA complies with NEPA is the EA itself. *See Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998) (finding that support for the agency's decision cannot just come from the administrative record, rather the agency's "defense of its position must be found [in the EA]"). Regardless, Defendants do not even point to any section of the Recommendation Memorandum that did analyze the social harms.

Another way in which NMFS's EA was arbitrary and capricious is that it ignored evidence, and contradicted evidence that it did cite, in concluding that the belugas "would be expected to fully recover from effects of transport within the first week of arrival at their final destination." Pl.'s Mem. at 17-18. Defendants do not dispute that the EA contradicts the studies cited and ignores a host of other evidence that the effects of the transport on the belugas would be long-lasting. Compare *id.* and Defs.' Mem. at 31-32. Instead, Defendants contend that the Court cannot consider Dr. Frohoff's opinions about the sufficiency and accuracy of the scientific analysis in the EA to help it determine whether

NMFS complied with its NEPA obligations. Defs.' Mem. at 32. Defendants cite no authority for their argument that the Court cannot consider an expert's analysis of an agency's EA, and they are wrong. Courts allow the use of extra-record evidence "in cases where relief is at issue, especially at the preliminary injunction stage." *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (quotation omitted). "[T]he consideration of extra-record evidence may be appropriate in the NEPA context to enable a reviewing court to determine that the information available to the decisionmaker included a complete discussion of environmental effects and alternatives." *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14-15 (2d Cir. 1997) ("[W]hether the agency's analysis has satisfied this duty often requires a court to look at evidence outside the administrative record. To limit the judicial inquiry regarding the completeness of that record to that record would, in some circumstances, make judicial review meaningless and eviscerate the very purposes of NEPA.").

Friends of Animals properly uses Dr. Frohoff's declaration to support its arguments that NMFS has failed to satisfy its duty under NEPA to include a complete discussion of the environmental effects. *Id.* Since the administrative record has not yet been produced and because Defendants did not allow Friends of Animals to provide comments on the EA, consideration of Dr. Frohoff's declaration is especially necessary.

**b. It was arbitrary and capricious for NMFS to exclude the public from the NEPA process.**

Defendants do not dispute that NMFS did not involve the public in its preparation of the EA or the Finding of No Significant Impact (FONSI). Yet they argue that NMFS's failure to allow public participation in the EA is excused because NMFS took public comments on Mystic Aquarium's application and held a public hearing before the close of that comment period. *See* Defs.' Mem. at 33-34. This argument is problematic for a number of reasons. As an initial matter, if public comments on an application obviated the need for public participation in an EA, it stands to reason that Council on Environmental Quality (CEQ)

regulations or the National Oceanic and Atmospheric Administration's (NOAA) guidelines would say that. They do not: there is no exception in CEQ regulations or in NOAA's guidelines exempting an agency from involving the public in an EA if it took comments on a permit application. Instead, CEQ regulations require agencies to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures," 40 C.F.R. § 1506.6(a),[1] and to "[s]olicit appropriate information from the public." *Id.* at § 1506.6(d). Likewise, while the NOAA Companion Manual does not require public comment on EAs in all circumstances, it does "encourage[]" NMFS to take public comments on EAs and requires that NMFS **must** "provide the public with as much environmental information as is practicable under the circumstances and allow an opportunity for the public to offer their views and inform the agency's decision-making process." *See* Pl.'s Mem. at 19-20. The Companion Manual requires NMFS to consider all relevant circumstances in determining the level of involvement in an EA, and the controversial nature of the Permit and the fact that there was no compelling need to act quickly, both made NMFS's utter failure to involve the public arbitrary and capricious. Pl.'s Mem. at 20-22. Defendants do not even address NOAA's Companion Manual or attempt to explain why NMFS deviated from its guidance.

NMFS's failure to involve the public in the EA is significant. The public would have been able to identify the failures in the EA noted above (and possibly others), allowing NMFS an opportunity to undertake better analysis. Second, the Permit that NMFS eventually issued was different than what the public commented on in a few respects. At the close of the comment period, the public had no reason to suspect that NMFS would not allow breeding during the term of the Permit, that NMFS would allow its Office Director to allow Mystic Aquarium to transfer the belugas after the termination of the research, or that

---

[1] Defendants are correct in noting that the CEQ recently revised the NEPA regulations, effective September 14, 2020. *See* Defs.' Mem. at 7 n.4. In an effort to avoid confusion, in this brief and its earlier brief, Friends of Animals has cited to the current sections of the Code of Federal Regulations. To clarify, the current regulation at 40 C.F.R. § 1501.5(e) was formerly at § 1501.4(b), and the current § 1501.6(a) was formerly at § 1501.4(e).

NMFS would set limited restrictions for Mystic Aquarium's public display of the belugas. *See* Permit at 5-6. Defendants point to NMFS's requiring a breeding prevention plan "in order to ensure consistency with the additional permit issuance criteria for marine mammals from a depleted stock," *see, e.g.*, Defs.' Mem. at 10, but neglect to mention that the public has never even seen, much less provided input on, the breeding prevention plan that Mystic has submitted. The public also had no inkling at the close of the comment period that the COVID-19 pandemic would devastate Mystic Aquarium financially. *See* Pl.'s Mem. at 29-30. Involving the public in development of the EA would have allowed the public to comment on all of these issues for the first time.

Defendants attempt to excuse NMFS's violation of CEQ regulations in failing to make the FONSI available for public review for at least thirty days before making a final determination, 40 C.F.R. § 1501.6(a)(2), by arguing that the Permit is not one "without precedent." Defs.' Mem. at 34-35. These arguments are unconvincing. First, it is notable that Defendants point to no previous examples of an import of a depleted population stock of beluga whale under a research permit, but instead cite to four permits for the importation of depleted Steller sea lions, the most recent of which was nearly ten years ago. Defs.' Mem. at 35. Of course, permits to import sea lions do not offer a precedent for a permit to import beluga whales. *See* Frohoff Supp. Decl. ¶ 3. Second, Defendants argue that the MMPA and its regulations authorize these types of permits in certain circumstances. *See* Defs.' Mem. at 34-35. As an initial matter, only the MMPA regulations speak to research permits for a depleted population stock of marine mammal; the MMPA itself only authorizes research permits generally. *Compare* 50 C.F.R. § 216.41(b) and 16 U.S.C. § 1374(c)(3)(A). More importantly, even though regulations may allow for a research permit when all requirement are met, if those regulations have never been used to authorize the import of beluga whales in circumstances such as these, the action is still "one without precedent." *Cf. All. to Prot. Nantucket Sound, Inc. v. U.S. Dep't of the Army*, 398 F.3d 105, 115 (1st Cir. 2005)

(finding that an action was not one without precedent under CEQ regulations because "[b]ased on the Corps's findings about the existence of similar pile-driven structures in Martha's Vineyard and near the shore of Nantucket Sound, we can see nothing unprecedented about the way this data tower will impact the environment").

Defendants offer no justification for NMFS's failure to allow public involvement in the EA and FONSI beyond its previous solicitation of comments on the permit application nearly a year earlier. Defendants never even claim that involving the public in the EA was not "practicable." *See* Pl.'s Mem. at 19-20 (quoting NOAA Companion Manual). That is because there was no good reason for NMFS to ignore CEQ regulations and NOAA guidelines in shielding the EA and FONSI from the public. NMFS simply could not be bothered to involve the public.

**2. Friends of Animals is likely to succeed on its MMPA claim for several reasons.**

    **a. NMFS's finding that Mystic's application met the narrow exceptions that allow import of a depleted population stock was erroneous.**

Because Mystic seeks to import beluga whales that are members of a depleted population stock, it had the burden to demonstrate to NMFS that the proposed research "cannot be accomplished using a species or stock that is not designated . . . as depleted . . . ." 50 C.F.R. § 216.41(b)(5)(i). NMFS's finding that Mystic demonstrated that the proposed research cannot be accomplished using a species or stock that is not designated as depleted is arbitrary and capricious.[2]

Defendants argue, without citing to any authority, that it was improper for Friends of Animals to cite to the Permit, EA, FONSI, and other documents without specifically citing the Recommendation Memorandum. Defs.' Mem. at 17, 20, 24. However, the Permit is the agency action at issue in this case, not the Recommendation Memorandum. The

---

[2] As with the NEPA claim, the Court need only agree with one of the following arguments in order to find that Friends of Animals is likely to succeed on its MMPA claim.

Recommendation Memorandum does not provide an adequate explanation for NMFS's decision because it makes conclusory statements that do not address the specific issues raised in Friends of Animals' brief. *See* Pl.'s Mem. at 23-30.

For instance, the Recommendation Memorandum does not demonstrate, and Defendants fail to provide any citations that demonstrate that Mystic must use members from a depleted stock to conduct the proposed research.[3] Defendants' brief only demonstrates that NMFS found that using other belugas might be "impractical" because Mystic has had difficulties collaborating with other aquariums. Defs.' Mem. at 9, 24-25. Mystic itself states that the belugas it proposes to import are "the only **ideal** cohort available for the research purposes." Application at 21 (emphasis added). The fact that Mystic might have additional difficulties collaborating with other aquariums and that other belugas are not "ideal" do not prove that the research "cannot be accomplished" using non-depleted species or stock. 50 C.F.R. § 216.41(b)(5)(i). In addition, Mystic is not conducting research that is specific to the depleted stock. The standard is not, as Defendants contend, whether "belugas at other facilities" are "available or feasible for the research." Defs.' Mem. at 25. The standard is whether it is necessary to use belugas from a depleted population stock to accomplish the research. Defendants simply ignore whether Marineland houses any belugas from a non-depleted stock and if so, whether Mystic attempted to obtain those belugas. Further, as discussed above, Defendants' argument that Dr. Frohoff's declaration cannot be considered, Defs.' Mem. at 22, 25, is wrong. *Supra* at p. 8-9; *see also City of Las Vegas, Nev. v. FAA*, 570 F.3d 1109, 1116 (9th Cir. 2009) (Courts may review extra-record

---

[3] Notably, the Marine Mammal Commission (MMC) expressed concerns about this issue. Rec. Mem. at 5-8. Defendants contend that the MMC "supported issuance of the Permit . . . ." Defs.' Mem. at 18 n.5 (citing Rec. Mem. at 5-16). Nowhere in the Recommendation Memorandum or anywhere else in the public record did the MMC "support[]" issuance of the Permit. Instead, the MMC raised many concerns about Mystic Aquarium's application, and Defendants offer no evidence that the MMC was satisfied that NMFS satisfactorily addressed all of those concerns. *See* Rec. Mem. at 5-16.

evidence when "it is necessary to determine whether the agency has considered all relevant factors and explained its decision" and when it is "necessary to explain technical terms or complex subject matter.").

NMFS's finding that offspring from the depleted stock "is necessary to provide information specific to this stock" Defs.' Mem. at 25 (citing Recommendation Memorandum at 27 (hereinafter Rec. Mem.)), is without any support. Mystic has the burden to prove that the use of a depleted stock is necessary, and Mystic failed to do so. Thus, NMFS's finding that the research cannot be done without members of a depleted stock is arbitrary and capricious because it is "implausible" and "runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

NMFS cannot approve research on a depleted species or stock unless it determines that "[t]he proposed research, by itself or in combination with other activities will not likely have a long-term direct or indirect adverse impact on the species or stock." 50 C.F.R. § 216.41(b)(5)(ii). Defendants' argue that it is unlikely that **Marineland** will import more belugas from the depleted stock, but that is not the issue here. Defs.' Mem. at 26. Instead, Friends of Animals has argued that the Permit could easily incentivize foreign operators to increase the number of wild beluga whales that they capture, including from depleted stocks, knowing that they can likely later sell these belugas or their progeny to U.S. aquaria. Pl.'s Mem. at 18-19, 28-29. NMFS itself acknowledges these concerns in the EA, observing that some believe that "any trade in live beluga whales could potentially increase the demand for beluga whales around the world." EA at 39. It was arbitrary and capricious for NMFS to nevertheless issue the Permit.[4]

---

[4] Defendants argue that NMFS found that the Permit will actually benefit beluga whales as a species because the belugas would help "develop hormone analysis, calving rates, and other reproductive data to help wild belugas in Cook Inlet recover. Defs.' Mem. at 32 (citing Rec. Mem. at 11). Defendants' justification is inexplicable, as NMFS decided not to allow Mystic to perform the reproductive study or breed the belugas. Permit at 1.

### b. NMFS's finding that public display of the belugas will be "incidental" to the research was erroneous.

Defendants claim that NMFS properly found that public display of the belugas would be incidental to the research and that Friends of Animals "ignores the agency's longstanding interpretation of its own regulations and specific findings for the Permit." Defs.' Mem. at 17. However, "incidental" is defined in NMFS's regulations as "with respect to an act, **a non-intentional or accidental act** that results from, but is not the purpose of, carrying out an otherwise lawful action." 50 C.F.R. § 229.2 (emphasis added). The regulations explicitly state that "unless otherwise defined in this chapter, the terms in this chapter have the following meaning." *Id.* Defendants never address this clear language applying this definition of "incidental" to all regulations under the MMPA or explain why NMFS was allowed to deviate from this definition. Therefore, the definition in section 229.2 applies to "incidental" as used in section 216.41. NMFS's decision to interpret the regulations in a way that explicitly conflicts with the plain text of the regulations is arbitrary and capricious. *Riverkeeper, Inc. v. United States EPA*, 475 F.3d 83, 117 (2d Cir. 2007) ("Implicit in the rule that an agency cannot interpret a regulation contrary to its unambiguous meaning is the requirement that 'an agency must adhere to its own rules and regulations.'" (internal quotation omitted)), *reversed on other grounds by Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208 (2009).

Moreover, even if incidental means ancillary, as Defendants contend, NMFS's finding was still arbitrary and capricious. NMFS failed to find that the public display is secondary to the research. NMFS only found that it is possible for public display to be incidental even if the research area is open to the public. *See* Rec. Mem. at 21. However, that does not mean the public display here is incidental. Mystic provided NMFS with no details about the public display of the belugas, and NMFS failed to ask for information about it. Just as one example, NMFS had no information on how much time the belugas will be subject to research versus on public display. Mystic failed to meet its burden to demonstrate that the public display is

incidental, and thus, it was arbitrary and capricious for NMFS to conclude that the public display is incidental. *State Farm*, 463 U.S. at 43.

### c. NMFS failed to find that Mystic has adequate resources.

NMFS also failed to find that Mystic has adequate resources to care for the belugas. The issue raised by Friends of Animals is not, as Defendants suggest, whether or not Mystic actually has adequate funding, Defs.' Mem. at 27, but whether NMFS properly analyzed or addressed the issue of whether Mystic has adequate funding.

NMFS entirely ignored the impacts of the COVID-19 pandemic on Mystic's financial resources and ability to care for these animals. NMFS does not discuss COVID-19 anywhere, including in the Recommendation Memorandum. Rec. Mem. at 23-24. Defendants attempt to minimize this flaw by speculating about the prospects of COVID-19 vaccines and that "Mystic has the potential to draw on significant additional sources of revenue when necessary." Defs.' Mem. at 29. This Court should not accept counsel's speculative, post hoc rationalizations for NMFS's failure to consider the impacts of COVID-19. *State Farm*, 463 U.S. at 50. NMFS's approval of the Permit during the COVID-19 pandemic without considering its impact was arbitrary and capricious.

Defendants also claim that Friends of Animals "entirely ignores the financial commitment from Georgia Aquarium for this Permit." Defs.' Mem. at 29. However, NMFS is required to assess "**the applicant's**" resources, and Mystic is the sole applicant. 50 C.F.R. § 216.34(a)(5) (emphasis added). Mystic itself admitted that without financial support from Georgia Aquarium, it "does not have the resources to fund this initiative alone," Application at 17, which suggests that Mystic may not have sufficient resources for the Permit.

### d. NMFS failed to issue the Permit within thirty days of the hearing.

The MMPA provides that NMFS "shall" issue or deny a permit within thirty days of a hearing. 16 U.S.C. § 1374(d)(5). "The term 'shall' is usually regarded as making a provision

mandatory, and the rules of statutory construction presume that the term is used in its ordinary sense unless there is clear evidence to the contrary." *Firebaugh Canal Co. v. United States*, 203 F.3d 568, 573-74 (9th Cir. 2000) (citing *Bennett v. Spear*, 520 U.S. 154, 172 (1997)). Defendants do not dispute that NMFS failed to meet this requirement, as NMFS did not issue the Permit until over nine months after the hearing. *See* Pl.'s Mem. at 30.

Defendants do not explain why NMFS ignored this requirement from Congress. Instead, Defendants simply argue that some courts have not required strict compliance with congressional mandates in other circumstances. *See* Defs.' Mem. at 29-30. The cases that Defendants cite do not support their claim. As an initial matter, none involve the MMPA at all, much less this specific provision. *Brock v. Pierce County*, 476 U.S. 253 (1986), does not justify NMFS's failure to comply with the MMPA because NMFS's decision to hold a second public hearing is not "subject to factors beyond [its] control." *Id.* at 261-262. *Newton County Wildlife Association v. United States Forest Service*, 113 F.3d 110 (8th Cir. 1997), has no relevance because it did not even involve a statute with a specific statutorily mandated time limit. *Id.* at 112. Finally, Defendants cite two Endangered Species Act (ESA) cases, where courts found that vacating decisions for failure to meet statutory deadlines would run counter to the purpose of the ESA and harm the species. *See Ala. Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1269 (11th Cir. 2007) (refusing to vacate a listing decision because doing so "could condemn the [species] to extinction," would "make a bad situation worse, and defeat the Congressional intent behind the [ESA]"); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1401 (9th Cir. 1995).

Requiring NMFS to comply with the deadlines set in the MMPA aligns with the purpose of the MMPA. Friends of Animals is not requesting a pointless exercise in formality. Congress presumably had good reason to impose this deadline. While Defendants speculate that Congress wanted "speedy action on applications," Defs.' Mem. at 30, it is just as likely that Congress wanted permit decisions to be based on the most recent

information provided by the public. Here, the public did not have access to critical information at the public hearing: NMFS has since required Mystic to submit a breeding prevention plan; NMFS conducted an EA, after saying around the time of the hearing that an EA was unnecessary; NMFS would allow Mystic Aquarium to transfer belugas with its approval after the Permit expires; and a worldwide pandemic has impacted Mystic Aquarium, Marineland, and nearly all aspects of society. The public was never allowed to comment on any of these things, whether at the hearing or otherwise. There is no reason why this Court should allow NMFS to ignore this mandate, and Defendants have not offered any reason why NMFS should be allowed to ignore it. Requiring NMFS to hold another hearing would align with the purpose of the MMPA because it would give the public an opportunity to weigh in on these important changes and would further the MMPA's goal of protecting marine mammals. NMFS's violation of this clear provision of the MMPA is arbitrary and capricious. 5 U.S.C. § 706(2).

C. **The balance of hardships tips decidedly in Friends of Animals' favor, and the public interest favors the issuance of a preliminary injunction.**

Defendants' attempt to represent the public interest as supporting the Permit lacks merit. Defendants spend only a paragraph addressing the balance of hardships and public interest, claiming without support or citation that the proposed research would purportedly "help conserve and recover endangered and depleted populations of belugas in the wild, as Congress intended in enacting the MMPA." Defs.' Mem. at 40. Defendants' argument is similar to the one raised by a federal agency and rejected by the Second Circuit in *Haitian Centers Council* because "in litigation such as is presented herein, no party has an exclusive claim on the public interest." 969 F.2d at 1339 (rejecting agency's assumption "that the public interest rests solely with it" (quotation omitted)). Defendants attempt to buttress this argument by asserting that the public shares this view, citing a sentence in the FONSI that baldly claims that NMFS's permitting for marine mammal research "is generally

viewed by the public, scientists, and others as a beneficial action . . . ." Defs.' Mem. at 40 (quoting FONSI at 7). NMFS's unsupported claim in the FONSI is contradicted by a wealth of evidence, including in the very next paragraph, where NMFS observes that captivity of cetaceans "is controversial" and "public commenters raised concern that the intended purpose of the permit was public display and not research." FONSI at 7. Defendants also ignore that a significant number of people, including scientific researchers, a United States Senator, and a member of Canada's House of Commons, submitted comments opposing the Permit, and Defendants do not attempt to claim that the majority of public commenters supported the Permit. The Court should afford no deference to NMFS's unsupported belief that the public views the Permit favorably. *See Islander E. Pipeline Co., LLC v. Conn. Dep't of Envtl. Prot.*, 482 F.3d 79, 103 (2d Cir. 2006) ("[W]here the record directly contradicts the unsupported reasoning of the agency and the agency fails to support its pronouncements with data or evidence, we may not defer.").

Defendants argue elsewhere in their brief that "expeditiously conducting [the] research without further delay far outweighs" the harm to Friends of Animals, Defs.' Mem. at 3, and that the Motion would merely "delay the kind of research that Congress has identified as necessary." Defs.' Mem. at 13. Defendants' bare assertions are not supported by any evidence. While Congress may have authorized imports of marine mammals for scientific research provided that certain conditions are met, the MMPA does not provide that any such research is "necessary," much less that the proposed research at issue here is necessary or even worthwhile. Defendants' suggestions to the contrary are unfounded.

Moreover, Defendants' assertion that it is important to commence the research without delay is belied by the evidence and the actions of Mystic Aquarium. The Permit requires that Mystic Aquarium "[p]rior to importation . . . must submit a plan to provide safe and effective contraception or other means to prevent breeding of the five subject beluga whales, for approval by the Office Director." Permit at 5. NMFS issued the Permit on

August 27, 2020. *See* Permit. Despite this, Mystic Aquarium waited nearly three months to submit this breeding prevention plan, which NMFS has yet to approve. *See* Declaration of Stephen R. Hernick at ¶¶ 7-8, attached hereto as Exhibit B. At one point, Mystic Aquarium's failure to submit a breeding prevention plan caused NMFS to wonder whether Mystic Aquarium intended to move forward with the Permit at all. *Id.* at ¶ 6. In sum, the actions of Mystic Aquarium and NMFS contradict the argument that this research is somehow urgent.

Here, the public interest favors enjoining further action on the Permit to ensure that NMFS fully complies with the MMPA and NEPA. "[T]here is a strong public interest in ensuring that USPS complies with its NEPA obligations . . . ." *Nat'l Post Office Collaborative v. Donahoe*, No. 3:13-cv-1406-JBA, 2013 U.S. Dist. LEXIS 154679, at *54-55 (D. Conn. Oct. 28, 2013) ("Given the potential serious environmental and aesthetic effects . . . and USPS's serious deficiency in complying with NEPA, the balance of equities and public interest favors issuing a preliminary injunction.").

**CONCLUSION**

Friends of Animals has met the requirements for the issuance of a preliminary injunction—under the standard advanced by either party—and respectfully requests that this Court enter an Order enjoining Defendants from taking any further action on the Permit, including approving a breeding prevention plan or authorizing an import of the belugas.

Respectfully submitted,

*/s/ Stephen R. Hernick*
Stephen R. Hernick (phv10846)
Friends of Animals, Wildlife Law Program
7500 E. Arapahoe Rd., Suite 385
Centennial, CO 80112
Phone: (720) 949-7791
Fax: (888) 236-3303
SHernick@friendsofanimals.org

Jessica Rubin (Bar No. Ct13768)
Director of Legal Practice and Animal Law Clinic
University of Connecticut School of Law
55 Elizabeth Street
Hartford, CT 06105
Cell: (860) 995-6330
Fax: (860) 570-5366
Jessica.rubin@uconn.edu

*Attorneys for Plaintiff Friends of Animals*

**CERTIFICATE OF SERVICE**

I certify that on this 15th day of December, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Stephen Hernick*
Stephen Hernick