## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| FRIENDS OF ANIMALS, a non-profit corporation; <br><br> and <br><br> LAST CHANCE FOR ANIMALS, a non-profit corporation; <br><br> *Plaintiffs*, <br><br> v. <br><br> WYNN COGGINS, in her official capacity as acting Secretary of Commerce; <br><br> and <br><br> NATIONAL MARINE FISHERIES SERVICE, an agency within the United States Department of Commerce; <br><br> *Defendants*, <br><br> and <br><br> SEA RESEARCH FOUNDATION, INC. <br><br> *Defendant-Intervenor* | No. 3:20-cv-01312-AWT <br><br><br><br><br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** <br><br><br> February 19, 2021 |

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ...................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 3

    A.   Mystic submits a controversial permit application to import five belugas. ...................... 3

    B.   Mystic goes to great lengths to obtain a Permit to import belugas. ................................. 4

    C.   The Permit will harm beluga whales. ........................................................................ 7

    D.   Mystic plans to display and breed these belugas. ......................................................... 8

    E.   NMFS undertakes a highly irregular and flawed NEPA process. ................................... 11

ARGUMENT ........................................................................................................... 13

    A.   Plaintiffs have standing to bring their claims. ............................................................. 14

    B.   The Permit violates the MMPA. .............................................................................. 15

        1.   Stripping the whales of the protections they have under Canadian law violates
            the purpose and intent of the MMPA. ............................................................... 16

        2.   The Permit violates the MMPA because it allows for public display that would
            not be "incidental" to the research. .................................................................... 17

            a.   "Incidental" is defined to mean accidental, and it was arbitrary, capricious,
                and an abuse of discretion for NMFS to disregard this definition. ...................... 18

            b.   Even if NMFS could disregard the definition of "incidental" in the MMPA
                regulations, it was still arbitrary and capricious for NMFS to determine that
                public display would be secondary to the research. ........................................... 19

        3.   NMFS wrongly concluded that the research "cannot be accomplished" with any
            other belugas. .................................................................................................. 21

        4.   NMFS wrongly determined that the Permit will not lead to the taking of
            additional beluga whales. ................................................................................. 24

        5.   It is not humane to import these belugas for research and public display. ................. 26

        6.   NMFS failed to issue the Permit within thirty days. ................................................. 27

        7.   NMFS failed to consider Mystic's finances or the effects of COVID-19. ................. 28

    C.   NMFS violated NEPA when it conducted an incomplete EA and refused to allow
        public participation. ............................................................................................... 29

        1.   NMFS did not take a hard look at the environmental effects of the Permit. .............. 32

2.    The EA shows that NMFS failed to take a hard look at the negative impacts of removal and transport on these belugas...................................................................... 33

3.    NMFS effectively ignored the long-term negative impacts of this Permit on all beluga whales. ........................................................................................................ 37

4.    NMFS's refusal to allow any public involvement in the EA was arbitrary and capricious.............................................................................................................................. 37

CONCLUSION ............................................................................................................................. 40

# TABLE OF AUTHORITIES

**Cases**

*Alliance of Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*,
651 F.3d 218 (2d Cir. 2011) ............................................................... 15

*Baltimore Gas & Elec. Co. v. Nat. Resources Def. Council*,
462 U.S. 87 (1983) .............................................................................. 30

*Bennett v. Spear*,
520 U.S. 154 (1997) ............................................................................ 27

*Brodsky v. U.S. Nuclear Regulatory Comm'n*,
704 F.3d 113 (2d Cir. 2013) ......................................................... 13, 38

*Cal. Wilderness Coalition v. U.S. Dep't of Energy*,
631 F.3d 1072 (9th Cir. 2011) ............................................................ 13

*Camp v. Pitts*,
411 U.S. 138 (1973) ............................................................................ 14

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
341 F.3d 961 (9th Cir. 2003) .............................................................. 38

*Cnty of Suffolk v. Sec'y of Interior*,
562 F.2d 1368 (2d Cir. 1976) ......................................................... 31, 32

*Comm. for Humane Legis. v. Richardson*,
540 F.2d 1141 (D.C. Cir. 1976) .......................................................... 16

*Comm. for Humane Legislation, Inc. v. Richardson*,
414 F. Supp. 297 (D.D.C. 1976) ............................................... 14, 16, 17

*Davis v. Mineta*,
302 F.3d 1104 (10th Cir. 2002) .......................................................... 30

*Entergy Corp. v. Riverkeeper, Inc.*,
556 U.S. 208 (2009) ............................................................................ 19

*FCC v. Fox TV Stations, Inc.*,
556 U.S. 502 (2009) ............................................................................ 38

*Fed'n of Japan Salmon Fisheries Cooperative Ass'n v. Baldridge*,
679 F. Supp. 37 (D.D.C. 1987) ...................................................... 16, 24

*Friends of Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc.*,
528 U.S. 167 (2000) ...................................................................... 14, 15

*Fund for Animals v. Babbitt*,
89 F.3d 128 (2d Cir. 1996). ........................................................... 30, 33

*Ga. Aquarium, Inc. v. Pritzker*,
135 F. Supp. 3d 1280 (D. Ga. 2015) ........................................... 4, 16, 25

*Guertin v. United States*,
743 F.3d 382 (2d Cir. 2014) ............................................................... 14

*Haw. Cnty. Green Party v. Evans*,
  No. C-03-0078 SC, 2003 WL 25289318 (N.D. Cal. Jan 24, 2003) ........................................ 39

*Hunt v. Wash. State Apple Adver. Comm'n*,
  432 U.S. 333 (1977) .................................................................................................................. 14

*In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig.*,
  818 F. Supp. 2d 240 (D.D.C. 2011) ........................................................................................ 21

*Jones v. Gordon*,
  792 F.2d 821 (9th Cir. 1986) ............................................................................................... 31, 32

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*
  *Nat'l Marine Fisheries Serv.*,
  109 F. Supp. 3d 1238 (N.D. Cal. 2015) ................................................................................. 14

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976) .................................................................................................................. 30

*Marsh v. Oregon Nat. Resources Council*,
  490 U.S. 360 (1989) .................................................................................................................. 31

*Metcalf v. Daley*,
  214 F.3d 1135 (9th Cir. 2000) ................................................................................................. 31

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .................................................................................................................... 34

*Nat'l Audubon Soc'y v. Hoffman*,
  132 F.3d 7 (2d Cir. 1997) ............................................................................................. 30, 31, 33

*Riverkeeper, Inc. v. U.S. EPA*,
  475 F.3d 83 (2d Cir. 2007) ....................................................................................................... 19

*Safari Club Int'l v. Jewell*,
  No. 14-0670, 2015 U.S. Dist. LEXIS 177573 (D.D.C. Mar. 12, 2015) ................................. 15

*Salazar v. King*,
  822 F.3d 61 (2d Cir. 2016) ....................................................................................................... 27

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  701 F.2d 1011 (2d Cir. 1983) ................................................................................................... 31

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  772 F.2d 1043 (2d Cir. 1985) ............................................................................................. 30, 37

*United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. &*
  *Serv. Workers Int's Union v. Mine Safety & Health Admin.*,
  925 F.3d 1279 (D.C. Cir. 2019) ............................................................................................... 13

*Winter v. Nat. Resources Def. Council, Inc.*,
  555 U.S. 7 (2008) ...................................................................................................................... 15

**Statutes**

16 U.S.C. § 1361 ........................................................................................................................... 15

16 U.S.C. § 1371 ............................................................................ 16, 21

16 U.S.C. § 1372 ................................................................................... 17

16 U.S.C. § 1374 ............................................................................ 16, 27

16 U.S.C. § 1378 ................................................................................... 17

16 U.S.C. § 1402 ................................................................................... 10

42 U.S.C. § 4332 ................................................................................... 30

5 U.S.C. § 706 ............................................................................... 13, 28

**Regulations**

40 C.F.R. § 1500.1 ........................................................................ 29, 38

40 C.F.R. § 1501.4 ................................................................. 37, 38, 40

40 C.F.R. § 1501.6 ................................................................................ 38

40 C.F.R. § 1506.6 ................................................................................ 37

40 C.F.R. § 1508.9 ................................................................................ 30

50 C.F.R. § 216.3 ......................................................................... 18, 26

50 C.F.R. § 216.33 ............................................................................... 17

50 C.F.R. § 216.34 ................................................................... 24, 26, 28

50 C.F.R. § 216.41 ........................................................ 18, 19, 22, 23, 24

50 C.F.R. § 229.1 ................................................................................. 19

50 C.F.R. § 229.2 ......................................................................... 18, 19

**Rules**

Fed. R. Civ. P. 56 ................................................................................ 13

**Legislative History**

118 Cong. Rec. 7686 (1972) ............................................................... 17

H.R. Rep. No. 92-707, Committee on Merchant Marine and Fisheries,
    92d Cong., 1st Sess. 22 (Dec. 4, 1971) ....................................... 16

**Federal Register**

Marine Mammals; File No. 116-1843,
    71 Fed. Reg. 33,281 (June 8, 2006) ............................................. 6

Marine Mammals; File No. 22629,
    84 Fed. Reg. 52,072 (Oct. 1, 2019) ......................................... 3, 12

Update to the Regulations Implementing the Procedural Provisions of the
    National Environmental Policy Act,
    85 Fed. Reg. 43,304 (July 16, 2020) ........................................... 29

**Other Authorities**

Bill S-203 (Royal Assent)........................................................................................................... 11

Companion Manual for NOAA Administrative Order NAO 216-6A ........................ 37, 38, 39, 40

# INTRODUCTION

Through this action, Friends of Animals and Last Chance for Animals challenge the National Marine Fisheries Service's (NMFS) granting of a permit to Mystic Aquarium ("Mystic") to authorize the import of five beluga whales from Marineland of Canada (the "Permit"). These young belugas are the offspring of whales captured from a federally designated depleted population off the coast of Russia, and the Permit would remove them from the only home and family they have ever known. While Mystic and NMFS contend that the purpose of this import is scientific research, importing these whales is not required for the research. Further, this research would simply be one part of these young whales' lives. After their import they would be on public display for the rest of their lives and in only five years they could be shipped to other aquaria and bred. NMFS's decision to grant this Permit violates the Marine Mammal Protection Act (MMPA) and the National Environmental Policy Act (NEPA), and therefore it must be overturned.

There are few animals less suited to lives in captivity than beluga whales. They are highly intelligent, sentient, and social animals who suffer greatly in captivity because small concrete tanks cannot come close to mimicking their natural environments in Arctic waters. No one knowledgeable about beluga whales disputes these facts. In fact, Canadian law now recognizes the harms of captivity and expressly prohibits their exploitation through public display and breeding. Yet this Permit would enable an end-run around these protections and would expose these whales to those very same exploitations in the United States.

While Mystic intends to perform research on these whales, the evidence is clear that research is not the primary motivator for this import. No later than 2015, just after NMFS denied an application by Georgia Aquarium to import eighteen beluga whales that were captured off the coast of Russia, Mystic and Georgia Aquarium began working on importing belugas from

Marineland in Canada. Before Mystic ever mentioned the prospect of research, it told NMFS that it hoped to "rescue" these belugas and argued that thousands of children would benefit from being able to see these whales in captivity. Mystic voiced its frustration that the only thing standing in the way of its import of these belugas was "some obscure regulation." But, because these belugas are members of a depleted population, this "obscure regulation" prohibits the import of these beluga whales for public display. And so, only after realizing this did Mystic then begin discussing a potential research permit as a purported justification to import these belugas, and even then, only as one alternative, as Mystic told NMFS that it hoped for a "display or research permit." NMFS cannot bury its head into the sand, ignore the history and circumstances, and pretend that the Permit is primarily for research.

Moreover, if the research proposed is meritorious and necessary, Mystic does not need to import these whales from Canada to perform it. There are approximately thirty beluga whales already in captivity in the United States, including three at Mystic. Mystic could conduct this research on those belugas. Mystic could also perform this research on these belugas at Marineland, thereby avoiding the risks and harms of removing them from their home and transporting them to Mystic. Yet instead of pursuing these alternatives, Mystic was willing to undertake great expense, effort, and delay to import them to its public facility. There should be no doubt about why Mystic has pursued this costly and time-consuming action: Mystic stands to benefit financially if it can publicly display the whales—regardless of the harm the import may cause.

NMFS did not consider the significant harms that the whales will suffer from being uprooted, having their close social bonds forcibly severed, and suffering pain, trauma, and the risk of death, so they can be transported to another aquarium where they will be researched and

displayed to the public. NMFS ignored the interests of the whales. The MMPA and NEPA

required NMFS to consider the interests of the whales, and under the MMPA the interests of the

whales must be the primary consideration. NMFS violated these standards in issuing the Permit,

and Plaintiffs' Motion should therefore be granted.

## FACTUAL BACKGROUND

**A. Mystic submits a controversial permit application to import five belugas.**

On October 1, 2019, NMFS, an agency within the National Oceanic and Atmospheric

Administration (NOAA), published notice in the Federal Register that Mystic had submitted an

application to import five beluga whales from Marineland of Canada for, according to Mystic,

scientific research purposes (the "Application"). Marine Mammals; File No. 22629, 84 Fed. Reg.

52,072 (Oct. 1, 2019). All five are progeny of beluga whales that Marineland captured from the

depleted Sakhalin Bay-Nikolaya Bay-Amur River stock. *Id.* It is undisputed that NMFS treated

all five beluga whales as a depleted population under the MMPA. *See* AR 000036.[1]

Mystic's Application was controversial. Never before has NMFS sanctioned the import

of an MMPA-depleted population stock of cetaceans for purposes of scientific research. NMFS

received more than 9,500 public comments from scientific researchers, nongovernmental

organizations, a United States Senator, and a member of Canada's House of Commons. AR

000050. Knowledgeable commenters expressed a host of concerns about the Application. *Id.*

These included concerns that the import would greatly harm the beluga whales, that Mystic

intended to display the beluga whales to the public, that Mystic intended to breed the beluga

whales, that NMFS was not undertaking an environmental analysis under NEPA, and concerns

about what would happen to the beluga whales after the research concluded, among others. *See*

---

[1] All citations to the administrative record will be to the specific page of a document and in the format AR
XXXXXX.

AR 000109. Despite the numerous and widespread concerns that a permit would violate both the MMPA and NEPA, NMFS issued the Permit on August 27, 2020. AR 000001.

**B. Mystic goes to great lengths to obtain a Permit to import belugas.**

Beluga whales have been a popular attraction at U.S. aquaria and amusement parks for decades. Yet in recent years, businesses that display captive marine mammals have faced challenges to their continued viability. Scientific research showing the harm that captivity inflicts on highly intelligent, sentient, and social marine mammals such as beluga whales has increased public skepticism of the industry. Movies such as *Free Willy* and *Blackfish* have introduced millions of people to the harms of captivity. Advances in research, changes in public attitudes, and tight restrictions under the MMPA have made it more difficult for U.S. aquaria to acquire new beluga whales. In 2013, NMFS denied an application by Georgia Aquarium to import eighteen beluga whales that it planned to display and use in cooperative breeding programs nationwide, a decision upheld by a federal court. *See Ga. Aquarium, Inc. v. Pritzker*, 135 F. Supp. 3d 1280, 1323, 1340 (D. Ga. 2015). In that permit application, Georgia Aquarium predicted that the population of captive belugas housed at facilities within the North American beluga breeding cooperative would likely decline in the next thirty years. *Id.* at 1323.

Shortly after NMFS denied this application, Mystic began looking into acquiring beluga whales from Marineland. In July of 2015, Mystic's attorney, George Mannina, contacted NMFS to inquire about importing belugas to Mystic from Canada. AR 001074-75. Mr. Mannina asked NMFS "what would the process be to import [the Canadian belugas] into the United States." AR 001075. Mystic's Larry Rivarde and Allison Tuttle met with NMFS officials about the import in

October 2015. AR 020437-P.[2] Notably, there is nothing in the record in 2015 that suggests Mystic was interested in conducting any research on the belugas. *Id.*

Sometime in 2017, Mystic hired a lobbying firm to help influence NMFS's decision. AR 001082. In September of 2017, one of Mystic's lobbyists, Robert Dilenschneider, sent a letter to then-Secretary of Commerce Wilbur Ross (familiarly addressing the Secretary as "Wilbur") framing the proposed import as a "rescue" that will benefit everyone, including "thousands of young children who will benefit from understanding whales and their culture." AR 021362-P. Mr. Dilenschneider curiously stated that "some obscure regulation stands in the way that we know you can deal with quickly." *Id.* Mr. Dilenschneider requested that the Secretary meet with Steve Coan and "Bernie Marcus and Mike Leven, both known to you." *Id.* Mr. Leven was the CEO of Georgia Aquarium, and Mr. Coan was and still is the CEO of Mystic. Even by October 12, 2017—more than two years after Mystic first approached NMFS—there was no mention of research, and NMFS was still under the impression that Mystic intended to "rescue" the belugas from Marineland. AR 001081.

On October 18, 2017, Mr. Coan and Mr. Leven met with Secretary Ross to discuss the Permit, a startling and unprecedented step for a purported research permit. AR 001081; AR 021879-P. That same day, Mystic and Georgia Aquarium mentioned research for the first time, sending a letter to Secretary Ross requesting a "one-time display **or** research permit." AR 021894-P (emphasis added). The letter listed research as the third of three purposes and noted that the aquaria hoped to "[b]uild the population and gene pool of the existing United States

---

[2] Administrative record citations with a "-P" at the end of them are documents that the Federal Defendants made available to Plaintiffs to resolve an administrative record dispute. *See* Joint Proposed and Revised Summary Judgment Briefing Schedule, ECF No. 57 (Feb. 5, 2021). These documents have not been previously provided to the Court, and Plaintiffs are attaching them to this Motion as Exhibit E, which is a bookmarked PDF with an index of the documents.

beluga whale population which has dwindled to 29 animals for the purpose of protecting the species and continuing the powerful impact that these animals have on public engagement with marine mammal conservation." *Id.*

In November 2017, Mystic's lobbyist, Jason Reese, emailed NOAA to follow up on "a one-time display **or** research permit for the transfer of up to 10 captive-born beluga whales from an unstable facility in Canada." AR 021896-P (emphasis added). Mr. Reese was attempting to meet with Admiral Tim Gallaudet, the Deputy NOAA Administrator. Mr. Reese mentioned that both Secretary Ross and his Chief of Policy and Strategy Earl Comstock "thought a permit would be a great idea" and Mr. Reese was "hopeful that Admiral Gallaudet would be similarly supportive." *Id.* As late as 2018, Mystic referred to the proposed import as "similar to one issued in '06 to move whales in from a situation in Canada." AR 001131. Notably, this reference was to a public display permit—not a scientific research permit—issued to Sea World. *See* Marine Mammals; File No. 116-1843, 71 Fed. Reg. 33,281 (June 8, 2006).

Mystic's extensive lobbying efforts continued up until NMFS granted the Permit. In June 2018, representatives from Mystic, including its CEO and one of its lobbyists, met with NMFS to discuss the potential permit. AR 020327-P; AR 020658-P. In June 2019, before NMFS had even notified the public of Mystic's Application, Connecticut's two United States Senators wrote NMFS to voice their support for the granting of a permit. AR 003482-3483. Mystic's lobbyists continued to meet with NMFS, even during the public comment period. *See* AR 022750-P. In early March 2020, as the COVID-19 pandemic was just beginning to ravage this country, Senator Blumenthal and Congressman Joe Courtney met with NMFS "to inquire about the timeline and remaining processing steps for a final decision on the application." AR 029916-P. And Mystic's lobbyists continued putting pressure on NMFS to grant a permit after the close of

the public comment period. AR 030178-P; AR 024875-P. The record reveals through the extensive and costly efforts Mystic has undertaken, including hiring political lobbyists, that importing the belugas is clearly in Mystic's commercial interest. But the record is silent on a simple and highly relevant fact: how much Mystic is paying Marineland for these belugas.

**C. The Permit will harm beluga whales.**

It is beyond dispute that the proposed import at issue here would traumatize and harm the beluga whales in numerous ways. NMFS itself acknowledges that the Permit "is likely to adversely affect the five subject beluga whales to some degree . . . ." AR 000071. Moreover, a number of marine mammal experts and researchers oppose the Permit, *see, e.g.*, AR 000963, and this Motion is supported by the Declaration of Dr. Toni Frohoff, a renowned ethologist and behavioral biologist who specializes in cetaceans. *See generally* Declaration of Toni Frohoff, Ph.D., attached hereto as Exhibit A (hereinafter "Frohoff Decl."). First, as Dr. Frohoff explains, the belugas would be abruptly removed from their families, social groups, and the only home they have ever known. Frohoff Decl. ¶ 29; *see* AR 006121. This harm is magnified because four of the five beluga whales that Mystic proposes to import are young females, whose deep and lifelong matrilineal bonds would be severed. Frohoff Decl. ¶ 29; AR 003930-3931.

The whales would then endure a long and traumatic journey to a foreign place. *See* AR 000524–526. If the import is allowed, the belugas would be removed from their tanks at Marineland and lifted into the air by a crane; transported on a truck for at least an hour to the airport; forced to linger in their crates at the airport for two hours; flown in a loud cargo plane for two hours to Hartford, Connecticut; unloaded from the plane; driven on a truck for more than an hour to Mystic; and finally removed from their crates and lifted into the air by a crane and deposited into a holding pool at Mystic. *Id*. The process would take around ten hours, assuming there are no complications. AR 000526.

Yet the risk of serious complications from transport is significant. The transport of these belugas to Mystic would "considerably increase[] their risks of dying prematurely." Frohoff Decl. ¶ 32. In addition, the transport "imposes extreme negative impacts on their general safety, health, and welfare" from among other things, the stresses of capture, restraint, and transport, the risk of hyperthermia, and "bearing the weight of their own bodies combined with unnatural physical compression during transport." *Id.* There is also evidence that cetaceans such as belugas are susceptible to life-threatening altitude sickness when they are flown at high altitudes. AR 009122. Specifically, one way in which the transport would negatively affect the health of the beluga whales is that it would increase their cortisol levels, a physiological measure of their stress and immune responses. Frohoff Decl. at ¶ 34; AR 008815.

Indeed, the risks of the transport are demonstrated by Mystic's substitution of three of the belugas it had planned to transport on the basis of purported health concerns. AR 000712. Mystic explained that these three whales, who were also the three oldest whales it had planned to import, AR 000219, had various health conditions that "pose[] health concerns for safe and successful transport and acclimation." *Id.* In their place, Mystic requested, and NMFS approved, the import of three younger belugas. AR 000745-746. Mystic now plans to import Kharabali, a five-year-old female; Havana, a four-year-old female; Sahara, a six-year-old female; Jetta, also a six-year-old female; and Havok, a five-year-old male. *Id.*

**D. Mystic plans to display and breed these belugas.**

The Permit allows for Mystic to display these belugas immediately and would allow Mystic to breed them in the future. While Mystic has contended that the purpose of the import is to conduct scientific research, it admits that it will display the beluga whales to its paying customers. *See, e.g.,* AR 000524 ("Incidental to the research, display of the beluga whales in the

Arctic Coast habitat at Mystic Aquarium will occur."); AR 000567 ("While the goal of the permit is research, public display will be incidental.").

In addition to displaying the belugas, Mystic hopes to be able to use them for captive breeding. *See* AR 000516–517. Notably, NMFS has prohibited the breeding of these belugas during the five-year term of the Permit and required Mystic to provide a breeding prevention plan. AR 000008. Mystic was unhappy with the breeding restriction, curiously argued that complying with the restriction would require it to "disregard science, professional expertise, and law," and tried to get NMFS to remove the restriction on breeding. AR 020267-P–020268-P ("We hope that an administrative correction of the information provided will resolve the problem and seek a discussion with you to resolve the matter."). Eventually, on December 1, 2020, Mystic submitted a revised "Prevention of Breeding Plan" (the "Breeding Plan"). *See* AR 000697. Under this Breeding Plan, Mystic would monitor the beluga whales via ultrasound for reproductive development and would physically separate the females from breeding age males during periods of "peak reproductive readiness." AR 000699. Specifically, Mystic would separate female belugas once ovulatory follicles reach 1.8 cm. *Id.* NMFS expressed some concerns with the Breeding Plan, telling Mystic that "[a] more conservative approach, employing a longer period of separation to provide a sufficient buffer before and after estrous to account for uncertainty in the timing of reproductive readiness, may be more effective to ensure compliance with the requirements of the permit." AR 000705. Despite these concerns, NMFS approved the Breeding Plan on December 23, 2020. AR 000750.

Importantly, the Breeding Plan would only apply during the five-year term of the Permit. *See* AR 000008. NMFS did not purport to decide what would happen to these belugas after the five-year Permit, only that NMFS would have to approve any future transfer of the whales. AR

000009. For its part, Mystic intends to keep these belugas after the conclusion of the research. AR 000672 ("The goal is for belugas to reside at Mystic Aquarium for the duration of the proposed research permit and beyond."). Mystic even told NMFS that after five years it will "either renew the permit or replace it with a public display permit." AR 022751-P. Commenters, including the Marine Mammal Commission (MMC), expressed concerns about the post-Permit fate of the belugas. AR 001017. The MMC is a government agency established by the MMPA, and its duties include reviewing "all applications for permits for scientific research" of marine mammals and making recommendations to NMFS. *See* 16 U.S.C. § 1402. The MMC was "concerned" about this issue and whether the belugas "will become 'de facto' public display animals" at whichever U.S. facility they reside after the Permit, "presumably where they would be maintained on public display." AR 001017. For these reasons and because the MMPA prohibits the import of members of a depleted population stock for public display, the MMC concluded that "**heightened scrutiny seems warranted**" for Mystic's Application. *Id.* (emphasis added). The MMC suggested that NMFS "weigh the importance of the proposed research . . . against the diminishment of the policy against allowing the importation of depleted marine mammals for purposes of public display" or even require that the belugas "be maintained in suitable facilities, **but not on public display**." AR 001018 (emphasis added). NMFS rejected these suggestions. AR 000009. This leaves open the very real possibility—indeed, likelihood— that these belugas will be put on public display and bred in aquaria across the country for the remainder of their lives after the Permit expires. The Permit would therefore circumvent the protections under Canadian law that prohibit the display and breeding of these belugas.

The Permit also allows Mystic to transfer some or all of the belugas to Georgia Aquarium in the future "[i]f deemed in the best interest of an individual beluga or the US beluga population

for social, health, or welfare reasons" and with the approval of NMFS. AR 000502; AR 000009. The Application noted that Georgia Aquarium would actually own three of the belugas, while Mystic would own the other two. AR 000518. Mystic planned the future breeding of these belugas in detail, splitting ownership of future calves with Georgia Aquarium, predicting that these belugas would give birth to "a maximum of two calves" during the five-year Permit, and even contemplating that these belugas would breed with "belugas not owned by either Mystic Aquarium or Georgia Aquarium." AR 000516–517. After the Permit was granted, Mystic and Georgia Aquarium terminated their financial agreement, but the record is unclear about what this means and whether Georgia Aquarium would still own some of the belugas. AR 020251-P.

Importing these whales from Canada would erase a number of protections that they now enjoy under Canadian law. *See* Bill S-203 (Royal Assent), available at https://www.parl.ca/DocumentViewer/en/42-1/bill/S-203/royal-assent. This law prohibits the import, public display, use in performances for entertainment, and breeding, of cetaceans throughout Canada. *Id.*; *see also* AR 000079. Canadian law no longer allows Marineland to profit from the capture and indiscriminate breeding of these animals, *see* AR 000066, and it is likely that this is one reason why Marineland is willing to part with these belugas. Yet if the situations were reversed, NMFS would not sanction the export of belugas to a country with laws laxer than those of the MMPA. It is thus perverse for NMFS to sanction the import of these belugas, stripping the whales of the protections they now have under Canadian law.

**E. NMFS undertakes a highly irregular and flawed NEPA process.**

In order to fulfill its obligations under NEPA, NMFS began to prepare an Environmental Assessment (EA) after NMFS received Mystic's Application but before publishing notice of it in the Federal Register. But NMFS did not set out to perform this fulsome analysis with the objective good faith NEPA demands. Before it even started the EA, NMFS had decided the

result of that EA: a Finding of No Significant Impact (FONSI) instead of an Environmental

Impact Statement (EIS). On June 20, 2019, Susan Staehle wrote to Amy Sloan, Deputy Chief of

NMFS's Permits and Conservation Division, that she had "started the outline of an EA and **the**

**associated FONSI you will need later**." AR 027541-P (emphasis added). She elaborated that

Ms. Sloan "might want a starting point for the content of the EA and the template for the

associated FONSI." *Id.* The record shows that NMFS had predetermined that there would be a

FONSI at the outset of its NEPA process, even before it began working on the EA.

As late as September 11, 2019, NMFS planned to release a draft EA for public comment

when it published notice of Mystic's Application in the Federal Register. AR 024367-P; AR

028588-P. Yet, NMFS reversed course and decided not to release an EA after someone, for

reasons that the record does not reveal, recommended that the Application was categorically

excluded from the need to prepare an EA. AR 029902-P (discussing the earlier "recommendation

for a CE [categorical exclusion]"). Despite the unprecedented, uncertain, and controversial

nature of the Permit, NMFS informed the public in the Federal Register notice that "an initial

determination has been made that the activity proposed is categorically excluded from the

requirement to prepare an environmental assessment or environmental impact statement." File

No. 22629, 84 Fed. Reg. at 52,072. The record does not reveal why NMFS changed its mind and

decided that a categorical exclusion warranted not finalizing the EA. In any event, the public had

no EA to review and comment on during the public comment period.

After the close of the public comment period, NMFS reversed course yet again and

decided that "preparation of an EA was appropriate in this case . . . ." AR 000032. NMFS did not

offer the public an opportunity to provide comments on the EA. When it released the EA, NMFS

also released its FONSI, which it had been working on since June 2019, purportedly determining

that the Permit would not significantly impact the quality of the human environment and concluding that the preparation of an EIS was unnecessary. AR 000040.

## ARGUMENT

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Since the Administrative Procedure Act (APA) controls judicial review of agency action under the MMPA and NEPA, this Court must determine whether NMFS's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Brodsky v. U.S. Nuclear Regulatory Comm'n*, 704 F.3d 113, 119 (2d Cir. 2013). Courts should "review the administrative record to ensure that the agency examined the relevant data and articulated a satisfactory explanation for its action." *Brodsky*, 704 F.3d at 119 (quotation omitted). A court "may not itself supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* "[W]hen an administrative record is insufficient to permit a court to discern an agency's reasoning or to conclude that the agency has considered all relevant factors, a court may remand the matter to the agency to allow for supplementation of the record." *Id.* (quotation omitted).

When an agency violates the APA, the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions." 5 U.S.C. § 706(2)(A). "When a court determines that an agency's action failed to follow Congress's clear mandate the appropriate remedy is to vacate that action." *Cal. Wilderness Coalition v. U.S. Dep't of Energy,* 631 F.3d 1072, 1095 (9th Cir. 2011); *see also United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int's Union v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action."). If an agency finding "is not sustainable on the administrative record made, then the [agency's] decision must be vacated and

the matter remanded to [it] for further consideration." *Camp v. Pitts*, 411 U.S. 138, 143 (1973); *Guertin v. United States*, 743 F.3d 382, 388 (2d Cir. 2014) ("[W]hen an agency violates its obligations under the APA, we will vacate a judgment and remand to the agency to conduct further proceedings.").

If the Court does determine that NMFS's actions were arbitrary or capricious and in violation of the MMPA and NEPA, the Court should vacate the Permit. *See Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*, 109 F. Supp. 3d 1238, 1250 (N.D. Cal. 2015) (vacating an incidental take permit and remanding the decision back to the agencies); *Comm. for Humane Legislation, Inc. v. Richardson*, 414 F. Supp. 297, 315 (D.D.C. 1976) (declaring a permit void as contrary to the MMPA).

**A. Plaintiffs have standing to bring their claims.**

Both Friends of Animals and Last Chance for Animals have associational standing to bring their MMPA and NEPA claims. To have standing, plaintiffs must be able to show that they have suffered an injury in fact, which is fairly traceable to the challenged conduct of the defendants and which is likely to be redressed by a favorable decision. *Friends of Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). To establish associational standing to assert claims on behalf of its members, an organizational plaintiff must show that (1) the members would otherwise have standing to sue in their own right, (2) the interests the lawsuit seeks to protect are germane to the organization's purpose, and (3) the lawsuit does not require the participation of the individual members. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

As an initial matter, Plaintiffs' members and employees would have standing to sue in their own right. Some members and employees have regularly been to Marineland and visited the five beluga whales that would be transferred under the Permit. *See* Declaration of Katherine

Logan, attached hereto as Exhibit B. These members and employees are opposed to the import of these belugas and they would suffer aesthetic harm if whales they care for are harmed and they are no longer able to visit them. Other members and employees have been to Mystic and would visit these belugas there if they are transferred. *See* Declaration of Nicole Rivard, attached hereto as Exhibit C. These members and employees are opposed to the import and would suffer aesthetic harm if they see these belugas on future visits to Mystic because they will know the harms that these whales have suffered and are suffering at Mystic. *Laidlaw*, 528 U.S. at 183.

Second, protecting animals like beluga whales from harm is germane to the purpose of both Friends of Animals and Last Chance for Animals. *See Safari Club Int'l v. Jewell*, No. 14-0670, 2015 U.S. Dist. LEXIS 177573, at *11 n.2 (D.D.C. Mar. 12, 2015) (observing that "there is no dispute that protecting African elephants is germane to . . . Friends of Animals' stated purposes"); Logan Decl. ¶¶ 3-4; Rivard Decl. ¶ 4.

Finally, because Plaintiffs seek equitable relief rather than damages, and because their claims do not require individualized proof, this lawsuit does not require the participation of the individual members. *See Alliance of Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 229 (2d Cir. 2011).

**B. The Permit violates the MMPA.**

Congress passed the MMPA for the express goal of protecting "certain species and population stocks of marine mammals [who] are, or may be, in danger of extinction or depletion as a result of man's activities" from "diminish[ing] beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part . . . ." 16 U.S.C. § 1361(1)-(2). The MMPA "generally prohibits any individual from 'taking' a marine mammal, defined as harassing, hunting, capturing, or killing it." *Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 15 (2008). The statute "imposes a strict burden of proof on each applicant

seeking to take or import marine mammals." *Comm. for Humane Legis., Inc. v. Richardson*, 414 F. Supp. 297, 310 (D.D.C. 1976), *aff'd* 540 F.2d 1141 (D.C. Cir. 1976). "If that burden is not carried—and it is by no means a light burden—the permit may not be issued. The effect of this set of requirements is to insist that the management of the animal populations be carried out **with the interests of the animals as the prime consideration**." *Comm. for Humane Legis.*, 540 F.2d at 1151 (quoting H.R. Rep. No. 92-707, Committee on Merchant Marine and Fisheries, 92d Cong., 1st Sess. 22 at 18 (Dec. 4, 1971)) (emphasis added). Thus, under the MMPA, "the animals must be managed for their benefit and not for the benefit of commercial exploitation." *Comm. for Humane Legis.*, 540 F.2d at 1148 n.27 (quoting H.R. Rep. No. 92-707).

1. **Stripping the whales of the protections they have under Canadian law violates the purpose and intent of the MMPA.**

NMFS may only grant a permit to import beluga whales if the permit "is consistent with the purposes and policies" of the MMPA. 16 U.S.C. § 1371(a)(1). "The applicant for any permit under this section must demonstrate to the Secretary that the taking or importation of any marine mammal under such permit will be consistent with the purposes of this Act and the applicable regulations established under section 103 of this title." *Id.* § 1374(d)(3). That purpose is "to ensure the well-being of porpoise and other marine mammals." *Comm. for Humane Legis.*, 414 F. Supp. at 309. "[T]he Act was not intended as a balancing act between the interests of industry and the animals." *Ga. Aquarium*, 135 F. Supp. 3d at 1292. "The interests of the marine mammals come first under the statutory scheme, and the interests of the industry, important as they are, must be served only after protection of the animals is assured." *Id.* (quoting *Fed'n of Japan Salmon Fisheries Cooperative Ass'n v. Baldridge*, 679 F. Supp. 37, 46-47 (D.D.C. 1987)). The Secretary must find "that taking will not be to the disadvantage of the animals concerned. *If he cannot make that finding, he cannot issue a permit. It is that simple.*" *Comm. for Humane Legis.*,

414 F. Supp. at 310 (quoting 118 Cong. Rec. 7686 (1972)) (emphasis in original). Among the aims of the MMPA was strengthening international laws and protecting all marine mammals, including strengthening and developing treaties and agreements separate and apart from the MMPA. *See* 16 U.S.C. § 1378(a).

As noted above, if the whales are imported to the United States, they will be deprived of protections that they have under Canadian law, in contravention of the purpose and policy of the MMPA. Even worse, the Permit would set a precedent that would allow whales from a depleted stock to be exploited in ways that are expressly prohibited under Canadian law, including the public display and breeding of the whales in the United States. The MMPA requires that the interests of the whales must be the prime consideration, and yet NMFS is allowing the import of whales from this depleted stock in a manner that would strip the whales of the legal protections they have in Canada. Indeed, it is notable that if the situations were reversed, and Mystic were trying to export the whales to a country with laxer laws, the MMPA regulations would not allow the export. *See* 50 C.F.R. § 216.33(b)(2). The import is a clear violation of the purpose and intent of the MMPA, and thus it was arbitrary and capricious for NMFS to grant the Permit. This failure alone is sufficient reason for the Court to find that the Permit violates the MMPA, but it is far from the only reason why the Permit violates the MMPA.

2.  **The Permit violates the MMPA because it allows for public display that would not be "incidental" to the research.**

It was improper for NMFS to conclude that any public display would be "incidental" to the research. Because Mystic is seeking to import belugas that are part of a depleted population stock, they may only be imported pursuant to a scientific research permit or a permit to enhance the survival or recovery of the stock. 16 U.S.C. § 1372(b)(3). The regulations implementing the MMPA expressly prohibit public display of marine mammals taken pursuant to a scientific

research permit: "Marine mammals held under a permit for scientific research **shall not** be placed on public display . . . ." 50 C.F.R. § 216.41(c)(1)(vi) (emphasis added). The regulations do allow for a narrow exception if public display is "conducted incidental to" the research. *Id.* § 216.41(c)(1)(vi)(B); *but see* AR 000987 (comment from Sen. Cory Booker) ("[D]oes this not render meaningless the prohibition on public display of depleted stocks?").

> ### a. "Incidental" is defined to mean accidental, and it was arbitrary, capricious, and an abuse of discretion for NMFS to disregard this definition.

"Incidental" is defined in these regulations as "with respect to an act, **a non-intentional or accidental act** that results from, but is not the purpose of, carrying out an otherwise lawful action." *Id.* § 229.2 (emphasis added). While this section of definitions is contained in a part of the regulations dealing with commercial fisheries, the section is clear that "[i]n addition to the definitions contained in the Act and § 216.3 of this chapter, unless otherwise defined in this chapter, the terms in this chapter have the following meaning." *Id.* "Incidental" (certainly in the context of public display) is not otherwise defined in the MMPA's regulations. Therefore, the definition in § 229.2 applies to "incidental" as used in § 216.41, and public display of marine mammals held pursuant to a scientific research permit is only permissible if it is "non-intentional or accidental."

Applying this definition, there was no basis for NMFS to conclude that public display of the belugas would be accidental. In fact, Mystic provided NMFS with conclusive evidence that public display would not be accidental. In response to public comments, Mystic asserted that its "research occurs in our habitats which are visible to the public. There is no other location where this research can be conducted." AR 000680. This is the opposite of "non-intentional or accidental." 50 C.F.R. § 229.2. Instead, public display of the belugas would be entirely foreseeable, intentional, and inevitable.

The only place in the administrative record where NMFS addressed the definition of "incidental" was in its response to public comments pointing out that "incidental" is defined in the MMPA regulations as "non-intentional or accidental." AR 000121. NMFS's full response[3] was that "[t]he definition in 50 CFR §229.2 is not applicable to 50 CFR §216.41 (see 50 CFR §229.1 regarding purpose and scope of Part 229)." *Id.* NMFS did not explain why this definition was inapplicable to the use of "incidental" elsewhere in the MMPA regulations. NMFS did not address the language in § 229.2 clarifying that "unless otherwise defined in this chapter, the terms in this chapter have the following meaning." *See id.* Moreover, it would make no sense for "incidental" to be defined as one thing in one part of the regulations, but to take on a different meaning elsewhere in the regulations even though no other definition appears. NMFS's decision to ignore this definition of "incidental" was arbitrary and capricious. *See Riverkeeper, Inc. v. U.S. EPA*, 475 F.3d 83, 117 (2d Cir. 2007) ("Implicit in the rule that an agency cannot interpret a regulation contrary to its unambiguous meaning is the requirement that 'an agency must adhere to its own rules and regulations.'" (internal quotation omitted)), *reversed on other grounds by Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208 (2009).

> **b. Even if NMFS could disregard the definition of "incidental" in the MMPA regulations, it was still arbitrary and capricious for NMFS to determine that public display would be secondary to the research.**

Even if NMFS were correct that "incidental" in § 216.41(c) means "an activity ancillary to permitted scientific research," AR 000112, NMFS had no basis to conclude that public display would be ancillary, particularly when the notion of research was an afterthought for Mystic and merely a justification for the Permit. There was no evidence before NMFS that allowed it to determine that Mystic's display of the belugas would be secondary to the research. The only

---

[3] While NMFS here also cites back to Issuance Criterion 2, *id.*, that section of the Recommendation Memorandum does not address the definition in 50 C.F.R. § 229.2 at all. AR 000112.

mentions about public display in the Application were Mystic's unsworn recitations of the language from the regulation that any display would be "incidental." *See, e.g.*, AR 000524; AR 000567 ("While the goal of the permit is research, public display will be incidental."). Mystic made no attempt to explain why or how public display would be ancillary to the research. For example, Mystic did not explain in its Application how it plans to display the whales to the public when it is not conducting research. At most, NMFS determined that conducting research in areas viewable to the public does not necessarily rule out that public display **could be** ancillary to the research. *See* AR 000112. But NMFS did not have sufficient information to conclude that Mystic's public display of these whales **would be** ancillary to the research. *See* AR 000987 (comment from Sen. Cory Booker) ("When the animals will be on display during all opening hours . . . how is this incidental?").

Additionally, Mystic's political lobbying demonstrates that its real motive for importing the whales was commercial. NMFS knew that Mystic had been trying to acquire beluga whales from Marineland for purposes of public display before it ever mentioned research. Mystic first contacted NMFS about its desire to obtain belugas from Marineland in 2015. AR 001074-75. There was no mention of research. *Id.* In September 2017, Mystic's lobbyist presented the import as a "rescue" and that the public display of these whales would help "thousands of young children who will benefit from understanding whales and their culture." AR 021362-P. Mystic did not mention research until two years later, in October 2017, and even then it only mentioned it as one of the vehicles through which it could acquire whales ("[u]tilizing either a display or research permit to acquire belugas from Marineland Canada") to "[b]uild the population and gene pool of the existing United States beluga whale population . . . and continuing the powerful impact that these animals have on public engagement with marine mammal conservation." AR

021894-P. The history makes clear that acquiring beluga whales for public display, not scientific research, was Mystic's motivating force. Indeed, the belated argument that the Permit was needed for research demonstrates that research was incidental to the display of these whales, and not the other way around. Thus, it was arbitrary and capricious for NMFS to conclude that public display would be secondary to the research.

Finally, the post-research fate of these belugas shows that public display is not ancillary to the research. Mystic told NMFS its intention to keep these belugas on public display after conclusion of the research. *See* AR 000672. In fact, Mystic even discussed with NMFS that it may eventually "replace [the research permit] with a public display permit." AR 022751-P. The MMC expressed to NMFS that it was "concerned" that the belugas "will become 'de facto' public display animals" following the research. AR 001017.

The oldest of these five whales is six years old. When this research permit expires in five years, the whales will all be eleven years old or younger, but their life expectancies are 20-30 years. *See* Frohoff Decl. ¶ 24; AR 003809. Thus, the proposed research would likely last for less than one-third of their lives in the United States. Public display cannot be ancillary to research when Mystic expressly contemplates that it may hold these belugas for a longer period of time pursuant to a public display permit than it would hold them captive pursuant to a research permit. As a result, it was arbitrary and capricious for NMFS to nevertheless conclude that any display would be "incidental."

### 3. NMFS wrongly concluded that the research "cannot be accomplished" with any other belugas.

The MMPA "is clear that no importation may be made of any depleted species except in specified . . . . narrow exceptions." *In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig.*, 818 F. Supp. 2d 240, 252-53 (D.D.C. 2011) (quoting 16 U.S.C. § 1371(a)(3)(B)). Because

Mystic seeks to import beluga whales that are members of a depleted population stock, it had the obligation to demonstrate to NMFS that the proposed research "cannot be accomplished using a species or stock that is not designated . . . as depleted . . . ." 50 C.F.R. § 216.41(b)(5)(i).

NMFS wrongly issued the Permit because Mystic made no such showing. NMFS summarily concluded that Mystic "has demonstrated compliance with this requirement," citing the response to a comment from the MMC. AR 000117. This cited Mystic's response to comments and concluded that Mystic "conducted an adequate search of potentially available, non-depleted beluga whales." AR 000098-99. Of course, whether or not Mystic "conducted an adequate search" of alternatives is not the standard. The standard is whether the research "cannot be accomplished" using other belugas. 50 C.F.R. § 216.41(b)(5)(i). Moreover, Mystic's response that NMFS cited showed that Mystic had not met this standard.

In this response to public comments, Mystic first argued that "the proposed research does not involve whales from a stock designated as depleted." AR 000661. NMFS rejected this contention. *See* AR 000096. Mystic alternatively argued that even if the whales were considered members of a depleted stock, it met the heightened criteria because of its "exhaustive consideration of alternatives." AR 000663. Again, the standard in the MMPA's regulations is not how exhaustively an applicant considered alternatives; it is whether the research "cannot be accomplished" with non-depleted whales. 50 C.F.R. § 216.41(b)(5)(i). In addition, the record does not show "exhaustive" efforts to consider alternatives to this research. Instead, the record reveals Mystic's exhaustive efforts, dating back to at least 2015, to import belugas from Marineland. *See supra* pp. 4-7. In fact, there is no evidence in the record that Mystic conceived of this research proposal until years after it decided to import belugas from Marineland.

Significantly, because the research could be accomplished at Marineland or using belugas already in the U.S., Mystic did not demonstrate that the research "cannot be accomplished" without importing these belugas. Mystic claimed that it was "not required to demonstrate the impossibility of speculative alternatives," AR 000663, but this is plainly contrary to the regulation's language.

Elsewhere, Mystic noted that obtaining biological samples from animals at other facilities "has been notoriously problematic" and "is not feasible . . . due to logistical and financial constraints of travel and sampling protocols and shipping." AR 000664. Again, even if Mystic demonstrated that it would be more difficult and expensive to perform the research using other whales, that does not give NMFS a basis to determine that the research "cannot be accomplished" using non-depleted whales. 50 C.F.R. § 216.41(b)(5)(i).

NMFS did not conclude that the objectives of the research require the use of these specific depleted whales. Instead, NMFS simply observed that the research "has the potential to indirectly benefit the conservation and management of wild beluga whale populations, including . . . the depleted Sakhalin Bay-Nikolaya Bay-Amur River beluga whale stock." AR 000051. Furthermore, Mystic did not show that the research objectives require these belugas. The proposed research is intended to "contribute significantly to understanding the basic biology of belugas." AR 000505. Thus, such research could be accomplished using any belugas, including the belugas already in Mystic's custody. There is no reason why the proposed research could not be accomplished using belugas that are not members of a depleted population stock. Mystic's contention that the research "**may** offer more direct insight into basic biology helpful in restoring the wild stock," AR 000521 (emphasis added), is nothing more than speculation.

Moreover, there is ample reason to conclude that the research could be accomplished using any beluga whales. Dr. Frohoff, like others who commented on the Permit, concludes that "[t]here is no reason of which I am aware that Mystic Aquarium cannot conduct this research on one or more of the roughly thirty beluga whales who are currently held in captive facilities in the U.S." Frohoff Decl. ¶ 51; AR 000987, AR 001048 (commenters noting that Mystic had not demonstrated that it could not perform the research at Marineland). Because the research could be accomplished using a stock that is not designated as depleted, it was arbitrary and capricious for NMFS to conclude that Mystic had demonstrated that the research cannot be accomplished using non-depleted belugas.

### 4. NMFS wrongly determined that the Permit will not lead to the taking of additional beluga whales.

Plaintiffs will discuss two related requirements in this section: Mystic had to demonstrate that (1) the Permit "will not likely result in the taking of marine mammals . . . beyond those authorized by the permit, 50 C.F.R. § 216.34(a)(7), and (2) the import "will not likely have a long-term direct or indirect adverse impact on the species or stock." 50 C.F.R. § 216.41(b)(5)(ii).

Mystic failed to show that the Permit will not adversely affect this population stock of beluga whales. Instead, Mystic contends that the research can be used "to study the MMPA-depleted belugas from the Sakhalin Bay-Nikolaya Bay-Amur River in addition to beluga populations world-wide." AR 000507. That Mystic will use the beluga whales in research is not enough to show that the import will not also have an adverse impact. For example, one court concluded that it was "by statutory definition, **impossible** for a [member of a depleted stock] to be taken without disadvantaging the stock." *Fed'n of Japan Salmon Fisheries Cooperative Ass'n*, 679 F. Supp. at 46-47 (emphasis added). Here, as in that case, the import will necessarily disadvantage the stock. *Id.* at 46-47.

Indeed, the research will have an adverse impact on members of a depleted stock and could easily lead to the import and capture of additional beluga whales. This Permit is the first of its kind: never before has NMFS allowed the import of a depleted population stock for purposes of scientific research. In granting this Permit, NMFS is effectively giving a green light to aquaria throughout the United States to import beluga whales—including members of a depleted stock— as long as they invoke scientific research. *See* AR 000987 (comment from Sen. Cory Booker) ("Might any facility with any claim to a research program simply apply for an import permit for the purpose of scientific research, even if the primary purpose is public display and breeding?"). Given the difficulty that aquaria have had in importing beluga whales and maintaining a sustainable captive breeding population, *see Ga. Aquarium*, 135 F. Supp. at 1323, 1340, other aquaria may now use similar means to increase their captive beluga populations. These aquaria may exploit this loophole to import belugas in order to display them to the public and maintain their commercial operation for years to come.

As a result, the Permit will likely lead to the import of additional beluga whales. The Permit could easily incentivize foreign operators to increase the number of wild belugas that they capture, including from depleted stocks, knowing that they can likely later sell these belugas or their progeny to U.S. aquaria that can import them for purported scientific research. Commenters raised concerns about these ramifications to NMFS. *See, e.g.*, AR 001032-34. NMFS inexplicably ignored those concerns, determining that its "jurisdiction over those [foreign] actions is limited," AR 000113, and concluding simply that Marineland had provided an assurance not to import additional belugas. AR 000115-16. Importantly, though, the regulations do not limit the focus of NMFS's inquiry to the exporter; they require the applicant to show, and

NMFS to find, that the Permit will not result in additional takings **by anyone**. *See* 50 C.F.R. § 216.34(a)(7).

It was arbitrary and capricious for NMFS to conclude that Mystic demonstrated that the Permit will not result in additional takings and will likely not have a long-term adverse impact on this depleted stock.

### 5. It is not humane to import these belugas for research and public display.

Mystic also had to demonstrate that the import of these belugas "is humane and does not present any unnecessary risks to the health and welfare of [the whales]." 50 C.F.R. § 216.34(a)(1). "Humane means the method of taking, import, export, or other activity which involves the least possible degree of pain and suffering practicable to the animal involved." 50 C.F.R. § 216.3. NMFS concluded that Mystic had demonstrated this criterion because Mystic's transport plans were in accordance with "professionally recognized standards." AR 000110-111.

As previously discussed, the transport of these belugas poses risks to their health and will cause them pain and suffering. *See supra* pp. 7-8. In order for this import to cause "the least possible degree of pain and suffering practicable," 50 C.F.R. § 216.3, and not cause "unnecessary risks," 50 C.F.R. § 216.34(a)(1), Mystic had to demonstrate that the import of these belugas is essential for the research. As discussed previously, there is no reason why this research cannot be accomplished using alternative methods. *See supra* Part B.3. Specifically, Mystic could spare these belugas the harms and risks of transport by simply conducting this research at Marineland. *See* AR 000987 (Sen. Booker noting that performing the research at Marineland "seems ideal" and "eminently doable" and questioning whether Mystic "demonstrated that the import of these five whales is essential to the research"). NMFS did not address these arguments in any fashion other than to point back to its analysis of Mystic's search of alternatives that Plaintiffs addressed above. *See* AR 000663.

### 6.    NMFS failed to issue the Permit within thirty days.

The MMPA provides that NMFS "shall" issue or deny a permit "[a]s soon as practicable (but not later than thirty days) after the close of the hearing." 16 U.S.C. § 1374(d)(5). "As the Supreme Court has often explained, the use of the word 'shall' makes the action mandatory." *Salazar v. King*, 822 F.3d 61, 77 (2d Cir. 2016) ("This mandatory, non-discretionary language creates boundaries and requirements for agency action and shows that Congress has not left the decision . . . to the discretion of the agency."). "It is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decisionmaking." *Bennett v. Spear*, 520 U.S. 154, 172 (1997).

NMFS held a hearing on Mystic's Application on November 18, 2019. AR 000753. NMFS then waited more than nine months to make a decision and issue the Permit. AR 000001. Defendants therefore cannot dispute that NMFS violated the MMPA by issuing the Permit after December 18, 2019.

Presumably, Congress intended through this provision that the public have input on all relevant information to be able to make fully informed comments and that NMFS make any permit decisions based on those informed comments. *See* 15 U.S.C. § 1374(d)(5) ("[O]r, if no hearing is held, after the last day on which data, or views, may be submitted pursuant to paragraph (2) of this subsection . . . ."). Here, NMFS frustrated that objective because there were significant changes after the time that NMFS solicited public comments and decided to issue the Permit. NMFS unlawfully conducted an EA without any input from the public; NMFS approved a debatable breeding prevention plan that Mystic submitted; NMFS decided that Mystic can transfer the belugas after the Permit expires with NMFS's approval; and a worldwide pandemic imperiled Mystic's finances and made the import of the belugas even more dangerous.

Regardless, whether or not there are good reasons for this statutory provision is beside the point. The statute is what Congress has required NMFS to do. If NMFS does not like it, NMFS should petition Congress to amend the MMPA. NMFS cannot simply choose to ignore whichever MMPA provisions it does not like. In doing so, NMFS's actions were "not in accordance with the law," "in excess of statutory . . . limitations," and "without observance of procedure required by law." 5 U.S.C. § 706(2). The Permit must be vacated for this reason alone.

### 7. NMFS failed to consider Mystic's finances or the effects of COVID-19.

The regulations also require that a permit applicant demonstrate that its "resources are adequate to accomplish successfully the objectives and activities stated in the application." 50 C.F.R. § 216.34(a)(5). Mystic admitted in its Application that it "does not have the resources to fund this initiative alone." AR 000518. NMFS cited Georgia Aquarium's financial support as the first reason why Mystic had sufficient resources to care for the belugas and avoided any further analysis by claiming it is "not qualified to engage in speculation about Mystic's future economic health as an organization." *See* AR 000114-115. Publicly available records cast doubt on whether Mystic has the resources to care for these belugas. *See, e.g.*, Form 990, Sea Research Foundation, Inc., *available at* https://www.mysticaquarium.org/wp-content/uploads/2018/12/2017-SRF-Public-990.pdf (showing that Mystic incurred a $2.5 million loss in 2017). Mystic failed to provide this information to NMFS, and it appears nowhere in the administrative record, meaning NMFS did not even consider it. Furthermore, an outside economist concluded that there was "no basis" to conclude that Mystic has the resources to care for the whales. AR 020259-P. NMFS's refusal to even try to analyze Mystic's finances was arbitrary and capricious.

While NMFS's conclusion that Mystic has adequate resources—despite Mystic admitting that it did not—was arbitrary and capricious on this basis alone, subsequent events have further undermined NMFS's conclusion. First, just last month Georgia Aquarium and Mystic terminated

the financial agreement that was the primary basis for Mystic's funding. AR 020251-P. Mystic's

CEO offered only that Mystic had obtained funding from an unnamed donor. *Id.* Donna Wieting,

NMFS's Director of the Office for Protective Resources, asked whether this development

"change[s] anything for us," but the record reveals no further examination by NMFS. *See id.*

Second, Mystic's financial situation has dramatically worsened since the COVID-19

pandemic began. Commenters pointed out that Mystic had closed for more than two months

beginning in March, has been running at a reduced capacity since May, has had to lay off staff,

and requested an additional $5 million in state funding "to remain in operation" due to COVID-

related revenue declines. AR 020261-P–020264-P; AR 020003-P. NMFS did not make any

attempt to account for the impact of the COVID-19 pandemic on Mystic's finances and even told

Mystic it did "not need any additional information from you on this point." AR 020021-P. It was

arbitrary and capricious for NMFS to issue the Permit because NMFS failed to consider

important aspects of the problem, including the adequacy of Mystic's finances, the impacts of

COVID-19 and Mystic's termination of its financial agreement with Georgia Aquarium.

### C. NMFS violated NEPA when it conducted an incomplete EA and refused to allow public participation.

NEPA "is our basic national charter for protection of the environment." 40 C.F.R. §

1500.1(a).[4] NEPA "places upon an agency the obligation to consider every significant aspect of

the environmental impact of a proposed action" and "ensures that the agency will inform the

public that it has indeed considered environmental concerns in its decisionmaking process."

---

[4] All citations to NEPA's implementing regulations in this brief are to the version of those regulations that were in effect when NMFS issued the Permit. On September 14, 2020, those regulations were revised. *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020). While some of the regulations cited herein are currently the same as they were before September 14, 2020, other regulations have been slightly revised.

*Baltimore Gas & Elec. Co. v. Nat. Resources Def. Council*, 462 U.S. 87, 97 (1983) (internal

quotation omitted).

NEPA requires that a government agency prepare a detailed Environmental Impact

Statement (EIS) before the agency can undertake a major federal action that significantly affects

the quality of the human environment. 42 U.S.C. § 4332(C). An EIS forces an agency "to face

those stubborn, difficult-to-answer objections without ignoring them or sweeping them under the

rug" and allows the public to "weigh a project's benefits against its environmental costs." *Sierra

Club v. U.S. Army Corps of Eng'rs*, 772 F.2d 1043, 1049 (2d Cir. 1985). Harm to the

environment may be presumed when an agency fails to comply with NEPA. *Davis v. Mineta*,

302 F.3d 1104, 1115 (10th Cir. 2002).

NEPA is implemented by the Council on Environmental Quality ("CEQ"), which

promulgates regulations detailing how agencies must comply with the statute. *Fund for Animals

v. Babbitt*, 89 F.3d 128, 130 (2d Cir. 1996). If an agency is uncertain whether a full EIS is

necessary, the agency must prepare an EA to determine whether the proposed action will have a

significant environmental effect that would require the preparation of an EIS. 40 C.F.R. §

1508.9. "When the determination that a significant impact will or will not result from the

proposed action is a close call, an EIS should be prepared." *Nat'l Audubon Soc'y v. Hoffman*,

132 F.3d 7, 13 (2d Cir. 1997). "If, **after preparing an EA**, the agency decides that an EIS is not

needed, it must also prepare a Finding of No Significant Impact ('FONSI') . . . ." *Fund for

Animals*, 89 F.3d at 130 (emphasis added). Thus, the analysis in the EA determines whether to

prepare a FONSI; a FONSI cannot determine the content of an EA. *See id.*

A court's role under NEPA is to review whether an agency has taken the requisite "hard

look at environmental consequences." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)

(internal quotation omitted). "First, we must consider whether the agency took a 'hard look' at the possible effects of the proposed action." *Hoffman*, 132 F.3d at 14. While a court should defer to an agency's scientific judgments and technical analyses, it need not forgive an agency's "clear error of judgment." *Marsh v. Oregon Nat. Resources Council*, 490 U.S. 360, 378 (1989) (quotation omitted). And although the scope of judicial review is narrow, a court's "inquiry must be 'searching and careful.'" *Hoffman*, 132 F.3d at 14 (quoting *Marsh*, 490 U.S. at 378).

A reviewing court must determine whether the agency's NEPA analysis "was compiled in objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental factors." *Cnty of Suffolk v. Sec'y of Interior*, 562 F.2d 1368, 1384-85 (2d Cir. 1976) (quotation omitted). While an agency need not be subjectively impartial, NEPA does require that an EA "be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made." *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000). When an "agency did not make a reasonably adequate compilation of relevant information and . . . the EIS sets forth statements that are materially false or inaccurate . . . the EIS does not satisfy the requirements of NEPA, in that it cannot provide the basis for an informed evaluation or a reasoned decision." *Sierra Club v. U.S. Army Corps of Eng'rs*, 701 F.2d 1011, 1030 (2d Cir. 1983). When comments "disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project and its alternatives, these comments cannot simply be ignored. There must be good faith, reasoned analysis in response." *Id.* (quotation omitted).

Further, "[a]n agency cannot . . . avoid its statutory responsibilities under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant effect on the environment." *Jones v. Gordon*, 792 F.2d 821, 828 (9th Cir. 1986) (internal quotation omitted).

"Instead, an agency must provide a reasoned explanation of its decision." *Id.* In *Jones*, the court held that NMFS unreasonably decided not to prepare an EIS for the import of ten killer whales to Sea World despite the apparent applicability of exceptions to a categorical exclusion, namely the arguable existence of a public controversy and uncertain environmental impacts of the transfer of the whales. *Id.* at 828-29.

NMFS violated NEPA in numerous ways, and this Court need only determine that one of these ways was arbitrary and capricious to grant summary judgment to Plaintiffs on their NEPA claim and vacate and remand the Permit to NMFS.

### 1. NMFS did not take a hard look at the environmental effects of the Permit.

The record shows that NMFS never undertook the open-ended environmental analysis in objective good faith that NEPA requires. *See Cnty of Suffolk*, 562 F.2d at 1384-85. This is first exemplified in a June 20, 2019 email from Susan Staehle to Amy Sloan, Deputy Chief of NMFS's Permits Division. AR 027541-P. In her email, Ms. Staehle explains that even though she had just "started the outline of an EA," she had also begun "the associated FONSI **you will need later**." *Id.* (emphasis added). And Ms. Staehle later reiterated in the same email that although she was just providing "a starting point for the content of the EA," she was also sending "the template for the associated FONSI." *Id.* In Ms. Sloan's response, while she mentioned starting the EA using a different template, she did not address Ms. Staehle's remarks about the FONSI at all. AR 027540-P. Ms. Sloan did not express any confusion, she did not ask any questions, and she did not correct Ms. Staehle's statement about the FONSI that NMFS "will need later." *Id.* Ms. Sloan's silence shows that Ms. Staehle's comments about the FONSI cannot be dismissed as stray remarks.

To the contrary, there is no evidence in the administrative record that NMFS issuing a FONSI was ever in doubt after this date. While NMFS temporarily decided not to go forward

with publishing this EA, when it resumed work on the EA in February 2020, it picked up with the same EA that it had begun in June 2019. AR 029843-P. Again, there is no evidence in the record that NMFS reconsidered whether to prepare a FONSI once it returned to the EA.

Before NMFS had even begun the EA, it already decided what the outcome of that EA would be: NMFS would make a FONSI. The FONSI was not the end result of a careful and objective analysis of all possible environmental consequences of the Permit. *See Fund for Animals*, 89 F.3d at 130. Rather, the record shows that NMFS had pre-determined to make a FONSI before it even undertook the EA. NMFS's process was backwards: it knew the result it wanted and set about to prepare an EA that would justify the FONSI. In this sense, the EA was never meant to be an objective study of the ramifications of issuing the Permit. The EA was instead constructed to include only those details that would be consistent with the FONSI. This becomes clear when examining the incomplete analysis in the EA.

## 2. The EA shows that NMFS failed to take a hard look at the negative impacts of removal and transport on these belugas.

Beluga whales are universally recognized as highly social animals. *See* Frohoff Decl. ¶ 42.[5] "The vital importance of the quality of social bonds to the wellbeing of beluga whales cannot be underestimated. There is clearly a strong and persistent drive in belugas to seek and maintain close and complex social relationships with particular individuals." *Id.* at ¶ 19. The EA expressly acknowledges that "beluga whales typically live in large social groups . . . ." AR

---

[5] Plaintiffs are citing to Dr. Frohoff's Declaration to highlight the shortcomings of the EA and the issues that NMFS failed to take a hard look at. "[T]he consideration of extra-record evidence may be appropriate in the NEPA context to enable a reviewing court to determine that the information available to the decisionmaker included a complete discussion of environmental effects and alternatives." *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14-15 (2d Cir. 1997) ("[W]hether the agency's analysis has satisfied this duty often requires a court to look at evidence outside the administrative record. To limit the judicial inquiry regarding the completeness of that record to that record would, in some circumstances, make judicial review meaningless and eviscerate the very purposes of NEPA."). The consideration of Dr. Frohoff's Declaration is particularly appropriate in this case because evidence like this would have been in the record if not for NMFS's refusal to allow the public to comment on the EA.

000077. Perhaps the greatest harm that the Permit would inflict on these beluga whales is that it would sever the strong matrilineal and companion bonds that they have developed with the other whales at Marineland. *See* Frohoff Decl. ¶ 29. This emotional and social harm was an area of concern in the public comments that NMFS received in response to the Application. *See* AR 000981-982. Despite this harm being well-documented in scientific literature, it is one that NMFS entirely failed to consider in the EA. Frohoff Decl. ¶ 42. For instance, in the Waples and Gale 2002 study cited elsewhere by NMFS, AR 000073, all three dolphins studied became highly stressed and sick after experiencing changes in their social groups, and two of the dolphins died. AR 009048-54. The EA simply ignored "the immense social harms" that this Permit would inflict on the five beluga whales as well as those left behind at Marineland from "the severing of long-term social bonds." *Id.* at ¶¶ 41-42. NMFS "failed to consider an important aspect of the problem," namely the social impacts of the removal on beluga whales. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). NMFS's inexplicable failure to address these harms in the EA was arbitrary and capricious.

While NMFS purports to address in the EA the harms that the transportation will inflict on the five beluga whales, its analysis was conclusory, was contrary to the evidence it cited, and ignored a host of additional evidence that contradicts its conclusions. *Id.* NMFS found that the transport "is likely to adversely affect the five subject beluga whales to some degree . . . potentially resulting in minor to moderate impacts to the individuals." AR 000071. NMFS minimized the harms to the belugas by blithely suggesting that the transport "may result in some stress." AR 000073. But the studies NMFS cites in support of their conclusion suggest that the harms are both more certain and severe. For example, St. Aubin and Geraci 1988 found in a study of belugas that capture and handling cause "acute stress [that] has **profound effects** on

thyroid hormone balance" and found that "circulating levels of both hormones [T3 and T4] were **markedly affected**." AR 008820, 008824 (emphases added). Furthermore, four of the six belugas lost between 15-20% of their body weight over the course of the ten weeks of the study. AR 008821. Similarly, Noda, *et al.* 2007 found that "handling and transportation are stressful events for bottlenose dolphins and this is **clearly indicated** in serum cortisol levels and leukograms." AR 007741 (emphasis added). Small and Demaster 1995, cited by NMFS, did not study the stress of transport at all. AR 008770 (discussing the life expectancy of captive marine mammals). The Schmitt *et al.* 2010 study that NMFS cited does not support its conclusions because that study only examined belugas that were moved from a pool into a stretcher and lifted onto a pool deck for husbandry procedures. AR 008500-02. These conditions are markedly different from the long transport in trucks and a plane that these belugas would face.

NMFS concluded that the beluga whales "would be expected to **fully recover** from effects of transport **within the first week** of arrival at their final destination." AR 000073 (emphases added). This conclusion is plainly contradicted by the evidence before NMFS. For instance, one of the studies used to support this section of the EA only studied the recovery of belugas one month after transport and then again 5-6 months after transport.[6] Frohoff Decl. ¶ 38. Indeed, NMFS noted elsewhere in the EA that stress from the transport was "expected to dissipate within days to weeks" and cited studies noting that "most" stress would normalize within the first week. EA at 000073; Frohoff Decl. ¶ 37. In fact, a wide body of research and evidence suggests that "these belugas would take far longer than a week or two (more likely months or years, if ever, depending on individual adaptability and social compatibility) to fully

---

[6] This study, one of the principal studies that NMFS chose to rely on in this section of the EA, was authored by two researchers affiliated with Mystic. Frohoff Decl. ¶ 38; AR 000011.

recover from the capture, transport, and reintroduction to a new social and biological environment." *Id.* at ¶ 40.

NMFS failed to analyze the health risks to belugas from the transport. It dispensed with this issue with a single sentence in the EA: "Marine mammals are regularly transported safely and successfully between zoological parks and aquariums due, in part, to specialized transport techniques and equipment and careful monitoring of the health and welfare of individuals (Yip and Dold 2018)." AR 000073. NMFS did not analyze why the details of this transport posed no risk of serious health complications or death for these belugas. Of course, just because marine mammals are often transported safely does not mean that all transports are safe and risk-free. In fact, Yip and Dold 2018 recommends that animals like these belugas "that have never been transported before should be given the opportunity to become familiar with the transport container." AR 009122. There is no indication in the record that Mystic intends to follow this recommendation. Moreover, there are several well-known studies that suggest that transport of marine mammals can be fatal. *See* Frohoff Decl. ¶¶ 31-33. NMFS failed to consider this research at all.

Additionally, it is likely that transport of these whales right now—during a pandemic—is especially risky. Studies demonstrate that belugas are susceptible to coronaviruses, including the virus that causes COVID-19. *See* Supplemental Declaration of Dr. Toni Frohoff, attached hereto as Exhibit D (citing studies). NMFS entirely failed to consider whether transport during this pandemic posed increased risks of disease to these whales.

A hard look at the effects of the Permit would have led NMFS to conclude that an EIS was required. NMFS's incomplete, contradictory, and conclusory analysis of the harms that the removal and transport will inflict on these beluga whales was arbitrary and capricious.

**3. NMFS effectively ignored the long-term negative impacts of this Permit on all beluga whales.**

As discussed, this Permit will likely lead to the additional capture of belugas. *See* Part B.4. NMFS acknowledges these concerns in the EA, noting that other U.S. aquaria could apply for similar permits and observing that some believe that "any trade in live beluga whales could potentially increase the demand for beluga whales around the world." AR 000079. Yet, NMFS summarily dismisses these negative effects, simply concluding without analysis that "it is difficult to quantify supply-and-demand factors" and lamenting that "there is no available scientific literature." *Id.* NMFS is in effect confronting "stubborn, difficult-to-answer objections" and "ignoring them or sweeping them under the rug," which the Second Circuit has expressly warned against. *See Sierra Club*, 772 F.2d at 1049. NEPA obligates NMFS to study what effects this Permit may have on beluga whales as a species before granting the Permit.

**4. NMFS's refusal to allow any public involvement in the EA was arbitrary and capricious.**

CEQ regulations require an agency to "[m]ake diligent efforts to involve the public in preparing and implementing [its] NEPA procedures" and "[s]olicit appropriate information from the public." 40 C.F.R. § 1506.6(a), (d). Agencies must involve the public in preparing an EA, to the extent practicable. *Id.* § 1501.4(b). NOAA Administrative Order NAO 216-6A ("NAO") establishes NOAA's policies and procedures for compliance with NEPA. The NAO also authorized the development of a "Companion Manual to provide additional, specific policies pursuant to NEPA and related authorities." Companion Manual for NOAA Administrative Order NAO 216-6A, *available at* https://www.nepa.noaa.gov/docs/NOAA-NAO-216-6A-Companion-Manual-01132017.pdf. The Companion Manual requires NMFS to "provide the public with as much environmental information as is practicable under the circumstances and allow an opportunity for the public to offer their views and inform the agency's decision-making process."

*Id.* at 13. The Companion Manual encourages NMFS to provide the public with an opportunity to comment on all EAs. *Id.* In determining the appropriate level of public involvement in an EA, NMFS must consider all relevant circumstances, including "the potential for controversy" of the proposed action and whether there exists "an emergency situation or compelling need to act quickly." *Id.* at 14. While the Second Circuit has not gone so far as to establish a categorical rule about requiring public comment for an EA, it has acknowledged that the Ninth Circuit "has held that a 'complete failure to involve or even inform the public about an agency's preparation of an EA and a FONSI' violates NEPA's public participation regulations." *Brodsky v. U.S. NRC*, 704 F.3d 113, 124 (2d Cir. 2013) (quoting *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 970 (9th Cir. 2003)). If, after conducting an EA, an agency determines not to prepare an EIS, it must provide a FONSI to the public. 40 C.F.R. § 1501.6(a). Where "[t]he nature of the proposed action is one without precedent," the agency shall make the FONSI available for public review for thirty days before it makes a final determination of whether to prepare an EIS. *Id.* § 1501.4(e)(2)(ii).

Defendants violated NEPA by failing to allow any public participation in the EA or FONSI. NMFS's refusal to allow the public to submit comments on the EA essentially stripped away the rights of Plaintiffs, their members, and the public to participate in the decision-making process. *See* 40 C.F.R. §§ 1500.1(b), 1500.2(d). Public participation would have allowed knowledgeable researchers to highlight the problems with the EA discussed above. The record does not reveal any justification for why NMFS deviated from the CEQ regulations and NOAA's own procedures that urge the agency to involve the public in the EA process. *See FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515-16 (2009) ("An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books. . . . a reasoned

explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy."). To the contrary, the record reveals that NMFS had already decided the FONSI outcome, which is the clearest explanation for why it excluded the public from the EA process.

Additionally, for actions that are controversial, NOAA procedures obligate agencies to allow public input on an EA. *See* Companion Manual at 14. The record is replete with evidence that NMFS knew the impacts of the Permit were controversial. *See, e.g.*, AR 021889-P ("The general issue of importing endangered species for public display can be a lightening [sic] rod."); AR 021475-P (noting that the Application had elevated to a "political" issue). And simply as a general matter, keeping beluga whales in captivity at all is a subject of great public debate. *Haw. Cnty. Green Party v. Evans*, No. C-03-0078 SC, 2003 WL 25289318, at *6-8 (N.D. Cal. Jan 24, 2003) (holding that it is "exceptionally clear" that the impacts of scientific research permits for whales are controversial because "[i]t is common knowledge that a significant number of people have, for years, worked hard to protect marine mammals from potentially harmful actions of humans"). Moreover, Connecticut legislators recently introduced a bill that would have prohibited public display of all cetaceans. *See* AR 020263-P. The impacts of this Permit—the first one allowing the import of a depleted population stock of beluga whales for research and public display—are especially controversial. The more than 9,500 public comments received by NMFS, both against and in support of this Permit, highlight the many controversial impacts of the Permit. *See* AR 000036. In addition, the Permit amounts to a tacit endorsement of the actions of Marineland in illegally taking dozens of belugas from the wild in the last twenty years. Effectively rewarding Marineland's conduct, which is antithetical to the purpose of the MMPA,

is enormously controversial. The controversial nature of these impacts required NMFS to involve the public in its EA.

Furthermore, there was no urgency associated with the Permit that would have made public participation impracticable. *See* Companion Manual at 14. There was no emergency or compelling need for NMFS to issue the EA and Permit on an expedited basis. Indeed, more than eight months passed between the close of the public comment period and the release of the EA. Three more months then elapsed before NMFS approved Mystic's breeding prevention plan. When the Court decides this Motion, nearly seven months will have passed since the EA was first released to the public. Clearly, NMFS had sufficient time to solicit and incorporate public comments on the EA before finalizing it. NMFS simply could not be bothered to involve the public. NMFS's flouting of public participation regulations and guidelines is exacerbated by its failure to notify the public at all in the eleven months that passed between its announcement that an EA was unnecessary and the sudden publication of a final EA. In sum, it was arbitrary and capricious of NMFS not to allow public involvement in the EA.

A permit to import members of a depleted population stock of beluga whales for research and public display is the first of its kind and "one without precedent." 40 C.F.R. § 1501.4(e)(2)(ii). For that reason, in the event that NMFS made a FONSI (as it did here), CEQ regulations required the agency to make the FONSI available for public review for thirty days before it made a final determination whether to prepare an EIS. *Id.* NMFS failed to do so, instead determining that an EIS was unnecessary before making the FONSI available for public review. *See* AR 000040. NMFS's violation of CEQ regulations is sufficient reason to vacate the Permit.

## CONCLUSION

Plaintiffs respectfully request that this Court grant their Motion for Summary Judgment and vacate the Permit.

Respectfully submitted,

/s/ *Stephen R. Hernick*
Stephen R. Hernick (phv10846)
Friends of Animals, Wildlife Law Program
7500 E. Arapahoe Rd., Suite 385
Centennial, CO 80112
Tel: 720-749-7791
Fax: 888-236-3303
SHernick@friendsofanimals.org

Jessica Rubin (Bar No. ct13768)
Director of Legal Practice and Animal Law Clinic
University of Connecticut School of Law
55 Elizabeth Street
Hartford, CT 06105
Tel: (860) 570-5209
Fax: (860) 570-5366
Jessica.rubin@uconn.edu

*Attorneys for Plaintiff Friends of Animals*

/s/ *David A. Ball*
David A. Ball (Bar No. ct10154)
Cohen and Wolf, P.C.
1115 Broad Street
Bridgeport, CT 06604
Tel: (203) 337-4134
Fax: (203) 337-5534
dball@cohenandwolf.com

*Attorney for Plaintiff Last Chance for Animals*