# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| FRIENDS OF ANIMALS, a non-profit corporation; <br><br> and <br><br> LAST CHANCE FOR ANIMALS, a non-profit corporation; <br><br> *Plaintiffs*, <br><br> v. <br><br> WYNN COGGINS, in her official capacity as acting Secretary of Commerce; <br><br> and <br><br> NATIONAL MARINE FISHERIES SERVICE, an agency within the United States Department of Commerce; <br><br> *Defendants*, <br><br> and <br><br> SEA RESEARCH FOUNDATION, INC. <br><br> *Defendant-Intervenor* | No. 3:20-cv-01312-AWT <br><br><br><br><br><br> **LOCAL RULE 56(a)1 STATEMENT OF UNDISPUTED MATERIAL FACTS** <br><br><br><br> February 19, 2021 |

### A. Background

1. On October 1, 2019, the National Marine Fisheries Service (NMFS), an agency within the National Oceanic and Atmospheric Administration (NOAA), published notice in the Federal Register that Mystic had submitted an application to import five beluga whales from Marineland of Canada for, according to Mystic, scientific research purposes (the "Application"). Marine Mammals; File No. 22629, 84 Fed. Reg. 52,072 (Oct. 1, 2019).

2. NMFS issued the Permit on August 27, 2020. AR 000001.[1]

3. NMFS treated all five beluga whales as members of a depleted population under the MMPA. *See* AR 000036.

4. Never before has NMFS sanctioned the import of an MMPA-depleted population stock of cetaceans for purposes of scientific research. *See* AR 001022.

5. NMFS received more than 9,500 public comments from scientific researchers, nongovernmental organizations, a United States Senator, and a member of Canada's House of Commons. AR 000050. Knowledgeable commenters expressed concerns about the Application, including that the import would greatly harm the beluga whales, that Mystic intended to display the beluga whales to the public, that Mystic intended to breed the beluga whales, that NMFS was not undertaking an environmental analysis under the National Environmental Policy Act (NEPA), concerns about Mystic's partnership with Georgia Aquarium, and concerns about what would happen to the beluga whales after the research concluded, among others. *See* AR 000109.

6. NMFS held a public hearing on the Application on November 18, 2019. AR 000753.

7. NMFS did not issue the Permit within thirty days of the public hearing, instead waiting more than nine months after the public hearing to issue the Permit. AR 000001.

---

[1] All citations to the administrative record will be to the specific page and in the format AR XXXXXX.

### B. Mystic's and Georgia Aquarium's efforts to obtain belugas

8. In 2013, NMFS denied an application by Georgia Aquarium to import eighteen beluga whales that it planned to display and use in cooperative breeding programs nationwide, a decision upheld by a federal court. *See Ga. Aquarium, Inc. v. Pritzker*, 135 F. Supp. 3d 1280, 1323, 1340 (D. Ga. 2015).

9. In that permit application, Georgia Aquarium predicted that the population of captive belugas housed at facilities within the North American beluga breeding cooperative would likely decline in the next thirty years. *Ga. Aquarium*, 135 F. Supp. 3d at 1323.

10. By 2015, Mystic was looking into acquiring belugas from Canada. AR 001074-75.

11. In July of 2015, Mystic's attorney, George Mannina, contacted NMFS to inquire about importing belugas to Mystic from the United States and Canada. AR 001074-75.

12. In October 2015, Mystic's Larry Rivarde and Allison Tuttle met with NMFS officials about importing belugas from Marineland. AR 020437-P.

13. There is nothing in the record showing Mystic informed NMFS in 2015 that it was interested in importing belugas from Marineland for a research project. AR 001074-75.

14. Mystic hired a lobbying firm to assist with its efforts to convince NMFS to grant the Permit. AR 001082.

15. In September of 2017, Mystic lobbyist Robert Dilenschneider sent a letter to then-Secretary of Commerce Wilbur Ross framing the proposed import as a "rescue" that will benefit everyone, including "thousands of young children who will benefit from understanding whales and their culture." AR 021362-P.

16. Mr. Dilenschneider wrote then-Secretary Ross that "some obscure regulation stands in the way that we know you can deal with quickly." AR 021362-P.

17. Mr. Dilenschneider also requested that Secretary Ross meet with the CEOs of Mystic and Georgia Aquarium. AR 021362-P.

18. Even by October 12, 2017—more than two years after Mystic first approached NMFS—the record does not show that Mystic had told NMFS that it needed these belugas for a scientific research project. AR 001081.

19. On October 12, 2017, NMFS was still under the impression that Mystic intended to "rescue" the belugas from Marineland. AR 001081.

20. On October 18, 2017, the CEOs of Mystic and Georgia Aquarium met with Secretary Ross to discuss the Permit. AR 001081; 021879-P.

21. On October 18, 2017, Mystic and Georgia Aquarium sent a letter to Secretary Ross requesting a "one-time display or research permit." AR 021894-P.

22. This letter is the first mention of potentially using these belugas for research in the administrative record. *See* AR 021894-P.

23. The letter also noted that the aquaria hoped to "[b]uild the population and gene pool of the existing United States beluga whale population which has dwindled to 29 animals for the purpose of protecting the species and continuing the powerful impact that these animals have on public engagement with marine mammal conservation." AR 021894-P.

24. In November 2017, Mystic's lobbyist Jason Reese, emailed NOAA to follow up on "a one time display or research permit for the transfer of up to 10 captive-born beluga whales from an unstable facility in Canada." AR 021896-P.

25. In 2018, Mystic referred to the proposed import as "similar" to a public display permit issued in 2006 to import whales from Marineland. AR 001131; *see* Marine Mammals; File No. 116-1843, 71 Fed. Reg. 33,281 (June 8, 2006).

26. In June 2018, representatives from Mystic, including its CEO and one of its lobbyists, met with NMFS to discuss the potential permit. AR 020327-P; AR 020658-P.

27. In June 2019, before NMFS had notified the public of Mystic's Application, Connecticut's two United States Senators wrote NMFS to voice their support for the granting of a permit. AR 003482-3483.

28. Mystic's lobbyists met with NMFS in November 2019, during the public comment period. *See* AR 022750-P.

29. In early March 2020, Senator Blumenthal and Congressman Joe Courtney met with NMFS "to inquire about the timeline and remaining processing steps for a final decision on the application." AR 029916-P.

30. Mystic's lobbyists contacted NMFS and encouraged NMFS to grant a permit after the close of public comment period. AR 030178-P; AR 024875-P.

31. Importing the belugas is in Mystic's commercial interest. *See, e.g.*, AR 021362-P; AR 000524.

32. Mystic has not informed NMFS or the public about how much it is paying Marineland for these belugas. *See* AR 000502–000581.

C. **Harms of Beluga Transportation**

33. NMFS acknowledges in the Environmental Assessment (EA) that the Permit "is likely to adversely affect the five subject beluga whales to some degree . . . ." AR 000071.

34. A number of marine mammal experts and researchers opposed and continue to oppose the Permit. *See, e.g.*, AR 000963, AR 001021.

35. Importing these belugas would remove them from their families, social groups, and the only home they have ever known. Frohoff Decl. ¶ 29; *see* AR 006121.

36. This harm is magnified because four of the five beluga whales that Mystic proposes to import are young females, whose deep and lifelong matrilineal bonds would be severed. *Id.*; AR 003930-3931.

37. If the import is allowed, the transport of the belugas from Marineland to Mystic would take around ten hours, assuming there are no complications. AR 000524–526.

38. The process for removing the belugas from Marineland and transporting them to Mystic would involve the following: the belugas would be removed from their tanks at Marineland and lifted into the air by a crane; transported on a truck for at least an hour to the airport; forced to linger in their crates at the airport for up to two hours; flown in a cargo plane for two hours to Hartford, Connecticut; unloaded from the plane; driven on a truck for more than an hour to Mystic; and finally removed from their crates, lifted into the air by a crane, and deposited into a holding pool at Mystic. AR 000524–526.

39. The transportation of these beluga whales to Mystic would "considerably increase[] their risks of dying prematurely." Frohoff Decl. ¶ 32.

40. In addition, the transport "imposes extreme negative impacts on their general safety, health, and welfare" from among other things, the stresses of capture, restraint, and transport; the risk of hyperthermia; and "bearing the weight of their own bodies combined with unnatural physical compression during transport." Frohoff Decl. ¶ 32.

41. Specifically, one way in which the transport would negatively affect the health of the belugas is that it would increase their cortisol levels, a physiological measure of their stress and immune responses. Frohoff Decl. at ¶ 34; AR 008815.

42. Mystic substituted the three oldest belugas it originally planned to transport because those three belugas had health concerns. AR 000712; AR 000219.

43. Mystic told NMFS that these three whales had various health conditions that "pose[] health concerns for safe and successful transport and acclimation." AR 000712.

44. In their place, Mystic requested, and NMFS approved, the import of three younger belugas. AR 000745-746.

45. Mystic now plans to import Kharabali, a five-year-old female; Havana, a four-year-old female; Sahara, a six-year-old female; Jetta, also a six-year-old female; and Havok, a five-year-old male. AR 000745-746.

### D. Public Display and Breeding

46. Canadian law prohibits the import, public display, use in performances for entertainment, and breeding of cetaceans throughout Canada. *See* Bill S-203 (Royal Assent), available at https://www.parl.ca/DocumentViewer/en/42-1/bill/S-203/royal-assent; s*ee also* AR 000079.

47. In the United States, no laws prohibit the belugas from being displayed, used for entertainment, or bred. *See generally* 16 U.S.C. § 1361, et seq.

48. Canadian law no longer allows Marineland to import or breed belugas. *See* AR 000066.

49. NMFS would not sanction the export of beluga whales to a country with laws laxer than those of the Marine Mammal Protection Act (MMPA). *See* 50 C.F.R. § 216.33(b)(2).

50. The Permit allows for Mystic to display these belugas immediately. AR 000008.

51. Mystic has admitted that it will display the beluga whales to its paying customers. *See, e.g.,* AR 000524; AR 000567.

52. In its Application, Mystic planned to allow the belugas to breed. *See* AR 000516–517.

53. NMFS has prohibited the breeding of these belugas during the five-year term of the Permit and required Mystic to provide a breeding prevention plan. AR 000008.

6

54. On December 1, 2020, Mystic submitted a revised "Prevention of Breeding Plan" ("Breeding Plan"). *See* AR 000697.

55. Under this Breeding Plan, Mystic would monitor the beluga whales via ultrasound for reproductive development and will physically separate the females from breeding age males during periods of "peak reproductive readiness." AR 000699.

56. Mystic would separate female belugas once ovulatory follicles reach 1.8 cm. AR 000699.

57. NMFS expressed some concerns with the Breeding Plan, telling Mystic that "[a] more conservative approach, employing a longer period of separation to provide a sufficient buffer before and after estrous to account for uncertainty in the timing of reproductive readiness, may be more effective to ensure compliance with the requirements of the permit." AR 000705.

58. NMFS approved the Breeding Plan on December 23, 2020. AR 000750.

59. The Breeding Plan only applies during the five-year term of the Permit. *See* AR 000008.

60. NMFS did not decide what would happen to these belugas after the five-year Permit, only that NMFS would have to approve any future transfer of the whales. AR 000009.

61. Mystic plans to keep these belugas after the conclusion of the research. AR 000672.

62. Mystic told NMFS that after five years it will "either renew the permit or replace it with a public display permit." AR 022751-P.

63. Commenters, including the Marine Mammal Commission (MMC), expressed concerns about the post-Permit fate of the belugas. AR 001017.

64. The MMC was "concerned" about whether the belugas "will become 'de facto' public display animals" at whichever U.S. facility they reside after the Permit, "presumably where they would be maintained on public display." AR 001017.

65. The MMC concluded that the Permit warranted "heightened scrutiny." AR 001017.

66. The MMC suggested that NMFS "weigh the importance of the proposed research . . . against the diminishment of the policy against allowing the importation of depleted marine mammals for purposes of public display" or even require that the belugas "be maintained in suitable facilities, but not on public display." AR 001018.

67. NMFS rejected the MMC's suggestion that the belugas "be maintained in suitable facilities, but not on public display." AR 000009.

68. The Permit allows the belugas to be put on public display and bred in aquaria across the country for the remainder of their lives after the Permit expires. The Permit would circumvent the protections under Canadian law that prohibit the display and breeding of these belugas. *See* AR 000079.

69. The Permit allows Mystic to transfer some or all of the belugas to Georgia Aquarium in the future "[i]f deemed in the best interest of an individual beluga or the US beluga population for social, health, or welfare reasons" and with the approval of NMFS. AR 000502; AR 000009.

70. Mystic planned the future breeding of these belugas in detail, splitting ownership of future calves with Georgia Aquarium, predicting that these belugas would give birth to "a maximum of two calves" during the five-year Permit, and even contemplating that these belugas would breed with "belugas not owned by either Mystic Aquarium or Georgia Aquarium." AR 000516–17.

E. Environmental Analysis

71. NMFS began to prepare an EA after NMFS received Mystic's Application but before publishing notice of it in the Federal Register. AR 027541-P.

72. NMFS decided that it would issue a Finding of No Significant Impact (FONSI) months before it had completed the EA. AR 027541-P.

8

73. On June 20, 2019, Susan Staehle wrote to Amy Sloan that she had "started the outline of an EA and the associated FONSI you will need later." AR 027541-P.

74. She elaborated that Ms. Sloan "might want a starting point for the content of the EA and the template for the associated FONSI." AR 027541-P.

75. There is nothing in the record showing Ms. Sloan responded to Ms. Staehle's comments about the FONSI. AR 027541-P.

76. As late as September 11, 2019, NMFS planned to release a draft EA for public comment when it published notice of the Application in the Federal Register. AR 024367; AR 028588-P.

77. After preparing an EA to release to the public for comments, NMFS decided not to release an EA after someone, for reasons that the record does not reveal, recommended that the Application was categorically excluded from the need to prepare an EA. AR 029902.

78. NMFS informed the public that "an initial determination has been made that the activity proposed is categorically excluded from the requirement to prepare an environmental assessment or environmental impact statement." File No. 22629, 84 Fed. Reg. at 52,072.

79. The record does not reveal why NMFS changed its mind and decided not to finalize an EA, or when it decided that a categorical exclusion was warranted. *See* AR 029902.

80. The public had no EA to review and comment on during the public comment period. Marine Mammals; File No. 22629, 84 Fed. Reg. 52,072 (Oct. 1, 2019).

81. After the close of the public comment period, NMFS reversed course and decided that "preparation of an EA was appropriate in this case . . . ." AR 000032.

82. NMFS did not offer the public an opportunity to provide comments on the EA. *See* Marine Mammals; File No. 22629, 84 Fed. Reg. 52,072 (Oct. 1, 2019).

83. After conducting the EA, NMFS issued a FONSI, determining that the Permit would not significantly impact the quality of the human environment and concluding that the preparation of an Environmental Impact Statement (EIS) was unnecessary. AR 000040.

### F. Public Display Incidental to the Research

84. In responses to public comments, Mystic admitted that the research will occur in areas that are visible to its customers and guests. AR 000680.

85. NMFS does not explain in the administrative record why the definition of "incidental" that appears in 50 C.F.R. § 229.2 does not apply to 50 C.F.R. § 216.41. *See* AR 000121.

86. Nowhere in the administrative record does Mystic explain how or why public display of the belugas would be incidental to the research. *See, e.g.*, AR 000524, 000567.

87. NMFS knew that Mystic had been trying to acquire beluga whales from Marineland for purposes of public display before Mystic ever mentioned research. AR 001074-75.

88. Based on the ages of the belugas and their projected life expectancies in captivity, it is likely that the Permit will last for less than one-third of their lives in the United States. *See* Frohoff Decl. ¶ 24; AR 003809.

89. Mystic argued in its responses to public comments that it met the heightened criteria under the MMPA regulations for the import of members of a depleted population stock of belugas whales because of its "exhaustive consideration of alternatives." AR 000663.

90. Mystic also claimed in response to public comments about whether it had met the criteria for importing members of a depleted population stock that it was "not required to demonstrate the impossibility of speculative alternatives." AR 000663.

91. Mystic noted in response to public comments that obtaining biological samples from animals at other facilities "has been notoriously problematic" and "is not feasible . . . due to logistical and financial constraints of travel and sampling protocols and shipping." AR 000664.

92. NMFS did not conclude that the objectives of the research require the use of members of a depleted population stock of beluga whales. *See* AR 000051.

93. Mystic could perform this intended research at Marineland. Frohoff Decl. ¶ 51; AR 000987, AR 001048.

G. **Mystic Aquarium's Financial Resources and Impacts of COVID-19**

94. Mystic admitted in its Application that it "does not have the resources to fund this initiative alone." AR 000518.

95. Mystic partnered with Georgia Aquarium to help with funding. AR 000518.

96. The Application noted that Georgia Aquarium would own three of the belugas, while Mystic would own the other two. AR 000518.

97. After the Permit was granted, Mystic and Georgia Aquarium terminated their financial agreement. AR 020251-P.

98. When Mystic informed NMFS that Mystic and Georgia Aquarium had terminated their financial agreement, Mystic indicated that it had obtained funding to support the Permit from a donor but did not identify the donor or provide any other details. AR 020251-P.

99. The record does not reveal any communications from NMFS to Mystic after Mystic informed NMFS that Mystic and Georgia Aquarium had terminated their financial agreement. AR 020251-P.

100. NMFS did not consider Mystic's finances, including publicly available financial records, in determining that Mystic had adequate resources for the Permit. *See* AR 000114-115.

101. An outside economist concluded that there was "no basis" to conclude that Mystic has adequate resources to care for the whales. AR 020259-P.

102. After the COVID-19 pandemic began, Mystic closed to the public for more than two months and has operated at a reduced capacity since May 2020. AR 020261-P–020264-P.

103. During the COVID-19 pandemic, Mystic requested at least $5 million in additional state funding and claimed it needed this money to remain in operation. AR 020261-P–020264-P; AR 020003-P.

104. NMFS did not analyze the effect of the COVID-19 pandemic on Mystic's finances and informed Mystic that it did not need any additional information about its finances. AR 020021-P.

### H. Harm to Plaintiffs' Members and Employees

105. Some members and employees of Plaintiff Last Chance for Animals have regularly been to Marineland and visited the five beluga whales that would be transferred under the Permit. *See* Declaration of Katherine Logan.

106. These members and employees of Plaintiff Last Chance for Animals are opposed to the import of these belugas, and they would suffer aesthetic harm if whales they care for are harmed or if they are no longer able to visit the whales. *See* Declaration of Katherine Logan.

107. Members and employees of Plaintiff Friends of Animals have been to Mystic and would visit these belugas there if they are transferred. *See* Declaration of Nicole Rivard.

108. These members and employees of Plaintiff Friends of Animals are opposed to the import and would suffer aesthetic harm if they see these belugas on future visits to Mystic because they will know the harms that these whales have suffered and are suffering at Mystic. *See* Declaration of Nicole Rivard.

Respectfully submitted,

/s/ *Stephen R. Hernick*
Stephen R. Hernick (phv10846)
Friends of Animals, Wildlife Law Program
7500 E. Arapahoe Rd., Suite 385
Centennial, CO 80112
Tel: 720-749-7791
Fax: 888-236-3303
SHernick@friendsofanimals.org

Jessica Rubin (Bar No. ct13768)
Director of Legal Practice and Animal Law Clinic
University of Connecticut School of Law
55 Elizabeth Street
Hartford, CT 06105
Tel: (860) 570-5209
Fax: (860) 570-5366
Jessica.rubin@uconn.edu

*Attorneys for Plaintiff Friends of Animals*

/s/ *David A. Ball*
David A. Ball (Bar No. ct10154)
Cohen and Wolf, P.C.
1115 Broad Street
Bridgeport, CT 06604
Tel: (203) 337-4134
Fax: (203) 337-5534
dball@cohenandwolf.com

*Attorney for Plaintiff Last Chance for Animals*