# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| FRIENDS OF ANIMALS | ) | |
| | ) | |
| and | ) | |
| | ) | |
| LAST CHANCE FOR ANIMALS | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | No. 3:20-cv-1312-AWT |
| v. | ) | |
| | ) | March 3, 2021 |
| WYNN COGGINS, et al., | ) | |
| *Defendant*. | ) | |
| and | ) | |
| SEA RESEARCH FOUNDATION, INC. | | |
| *Defendant-Intervenor* | | |

## MYSTIC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT

Dated March 3, 2021

James H. Lister (DC 447878) and
Nicole M. Bayne (CA 328392)
Birch Horton Bittner & Cherot, P.C.
1100 Connecticut Ave., NW,
Suite 825
Washington, D.C. 20036
(202) 659-5800
jlister@dc.bhb.com
nbayne@dc.bhb.com

Jeffrey M. Sklarz (ct20938) and
Lawrence S. Grossman (ct15790)
Green & Sklarz, LLC
One Audubon Street, Third Floor
New Haven, CT 06511
(203) 285-8545
Fax: (203) 823-4546
lgrossman@gs-lawfirm.com

**TABLE OF CONTENTS**

PAGE

I.  STATEMENT OF FACTS AND PROCEDURAL HISTORY                            1

    A.  Mystic's Permit Application and the Agency Permit Proceeding      1

        1.  Mystic's Qualifications and the Specific Scientific Research
            to be Conducted                                               2

            a.  Mystic's Belugas and Beluga Facilities and Marineland's Belugas  2

            b.  Mystic's Beluga Research Experience                          3

            c.  The Specific Scientific Research Mystic Proposed              4

        2.  The Permit Proceeding, Public Comments, and the Public Hearing   8

        3.  Post-Comment Period Submissions Addressing the Pandemic
            and Financial Issues                                          10

        4.  NMFS Grants the Permit in Part, While Imposing an
            Anti-Breeding Condition                                       11

    B.  The Filing of this Lawsuit and Developments During Permit Implementation   12

II.  ARGUMENT                                                            13

    A.  Plaintiffs Lack Standing to Sue                               13

    B.  Standard of Review and Judicial Review on the Administrative Record   17

    C.  NMFS Reasonably Rejected Demands Mystic Conduct Research Differently   18

    D.  NMFS Lawfully Construed and Applied the Term "Incidental Public Display"   21

    E.  NMFS Reasonably Rejected Dire Predictions by Permit Opponents
        That Financial Disaster was Impending for Mystic               27

    F.  NMFS Diligently Addressed the Late-Arising Covid-19 Transmission Claim   31

    G.  Plaintiffs' "Delay" Arguments Misunderstand the Law            33

    H.  Plaintiffs' NEPA Claims Lack Merit                             34

        1.  When an Agency Receives Public Comment on the Issues
            Raised by a Permit Application, It Does Not Also Have to
            Seek Additional Comment on an EA                              36

2.    NMFS Was Not Required to Prepare an EIS                    37

I.    Response to Other Arguments of Plaintiffs                   40

III.  CONCLUSION                                                  40

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*Barnhart v. Peabody Coal Co.*,
  537 U.S. 149 (2003)                                           34

*Brodsky v. U.S. Nuclear Reg. Comm.*,
  704 F.3d 113 (2nd Cir. 2013)                          32, 36, 37

*Chevron v. Natural Resources Defense Council*,
  467 U.S. 837 (1984)                                           25

*Clifford v. U.S. Coast Guard*,
  915 F.Supp.2d 299 (E.D. N.Y. 2013)                            31

*DaimlerCrysler Corp. v. Cuno*,
  547 U.S. 332 (2006)                                           33

*Eco Tour Adventures, Inc. v. Zinke*,
  249 F.Supp.3d 360 (D.D.C. 2017)                               18

*Friends of Earth, Inc. v. Laidlaw Envt. Serv., Inc.,*
  528 U.S. 167 (2000)                                           15

*Jones v. Gordon*,
  621 F.Supp. 7 (D. Alaska 1985)                                39

*Jones v. Gordon,*
  792 F.2d 821 (9th Cir. 1986)                                  38

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)                            13, 14, 16, 17, 33

*National Audubon Society v. Hoffman*,
  132 F3d 7 (2nd Cir. 1997)                                 18, 31

*Natural Resources Defense Council v. U.S.E.P.A.,*
  808 F.3d 556 (2d Cir. 2015)                                   32

*Norton v. Southern Utah Wilderness Alliance*,
  542 U.S. 55, 64 (2004)                                        34

*Pogliani v. U.S. Army Corps of Engineers*, |
  306 F.3d 1235 (2nd Cir.  2002)                            36, 37

*U.S. Magnesium, LLC v. U.S. E.P.A.*,
  690 F.3d 1157 (10th Cir. 2012)                                18

**Statutes**

5 U.S.C. § 702                                                  34
5 U.S.C. § 706                                       17, 32, 33, 34
7 U.S.C. § 2131                                                  2

16 U.S.C. § 1362     25
16 U.S.C. § 1371     27
16 U.S.C. § 1372     26, 34
16 U.S.C. § 1374     22, 24, 25, 33, 34, 39
16 U.S.C. § 1387     27
16 U.S.C. § 1401     9, 10
42 U.S.C. § 4332     35, 37

**<u>Federal Regulations</u>**

9 C.F.R. § 3.104     9
9 C.F.R. § 3.109     39
9 C.F.R. § 3.112-3.118     9, 39
40 C.F.R. § 1500.1     36
40 C.F.R. § 1501.3     36
40 C.F.R. § 1501.4     34, 35, 36
40 C.F.R. § 1502     35
40 C.F.R. § 1503     35
40 C.F.R. § 1503.1     35, 36
40 C.F.R. § 1508.4     35
40 C.F.R. § 1508.9     35, 36, 40
50 C.F.R. § 216.33     37
50 C.F.R. § 216.34     27, 29, 30, 31
50 C.F.R. § 216.41     18, 20, 21, 23, 24
50 C.F.R. § 229.1     27
50 C.F.R. § 229.2     26
50 C.F.R. § 229.3     27
58 Fed. Reg. 53320 (Oct. 14, 1993)     30
61 Fed. Reg. 21926 (May 10, 1996)     23, 24
66 Fed. Reg. 48663 (Sept. 21, 2001)     27
81 Fed. Reg. 74711 (Oct. 27, 2016)     19
84 Fed. Reg. 52072 (Oct. 1, 2019)     9, 35
84 Fed. Reg. 58694 (Nov. 1, 2019)     10

Defendant-Intervenor Sea Research Foundation, Inc. d/b/a Mystic Aquarium ("Mystic") respectfully submits this memorandum in opposition to the Motion for Summary Judgment filed by Plaintiffs Friends of Animals ("FOA") and Last Chance for Animals ("LCA") and in support of its Cross Motion for Summary Judgment. Mystic is filing a Rule 56 fact statement.

## I.     STATEMENT OF FACTS AND PROCEDURAL HISTORY

Mystic applied to National Marine Fisheries Services ("NMFS") for a permit under the Marine Mammal Protection Act ("MMPA") to import five beluga whales from Marineland in Canada for scientific research. AR 000746.[1] The purpose of the research is to "contribute knowledge and inform management and recovery of beluga whale populations in the wild including the endangered Cook Inlet beluga whale distinct population segment … and the Sakhalin Bay-Nikolaya Bay-Amur River beluga whale stock" ("SNA") which are listed as "depleted." AR 000001. The five belugas are Kharabali, Sahara, Jetta, Havok, and Havana.

NMFS presided over the hotly contested permit application process with diligence, going above and beyond what the law requires in listening to the clashing viewpoints presented. As explained below, NMFS granted the permit in part, and with limiting conditions.

### A.  Mystic's Permit Application and the Agency Permit Proceeding

Beluga whales, nicknamed the canary of the sea, are known for their white color, melon shaped head, and range of vocal sounds. Belugas whales inhabit the cold waters of the Arctic Ocean and subarctic regions such as Alaska, Canada, Greenland, and Russia. Most of what we know today about the physiology, hearing, echolocation, metabolism, and reproduction of these

---

[1]    NMFS physically filed the original Administrative Record ("AR") with the Court (DE 53), so cited pages in it are not attached to this brief. The provisional supplemental administrative record ("SAR") addressed in the parties' stipulation (DE 57) has not been filed, so Mystic attaches cited SAR documents. Each SAR document has a number assigned by NMFS, but is not bate-stamped by page. For example, Mystic cites SAR 0.7.3892.36316, a four-page document. Plaintiffs bate-stamped some SAR documents and cited them under the different format, AR-XXXX-P.

cetaceans, as well as how to diagnose and treat their diseases, is due to research conducted in marine mammal facilities such as Mystic. AR 000896. Wild beluga whales are vulnerable to many stressors and threats such as pollution, habitat degradation, predation, underwater noise, and human impacts, like competition with fisheries, and energy projects. Amend. Cmplt. ¶ 50.

    1.  <u>Mystic's Qualifications and the Specific Scientific Research to be Conducted.</u>

Mystic is a 501(c)(3) nonprofit organization whose mission is to inspire people to care for and protect the ocean and the organisms that reside there through conservation, education, and research. As discussed below, it is a highly-qualified and established beluga research institution.

    a.  *Mystic's Belugas and Beluga Facilities and Marineland's Belugas*

Mystic cares for more than 300 species of animals, including several species of marine mammals. It currently cares for a 16-year-old male beluga whale (Juno) and two 37-year-old female belugas (Kela and Natasha). AR 000567 (permit application). Mystic is one of just a handful of U.S. aquariums that care for belugas. SAR 0.7.3892.36316 at 3. All of those facilities hold exhibitor's licenses under the Animal Welfare Act, 7 U.S.C. § 2131, et seq, ("AWA"). At the time of the MMPA permit application, Mystic was the only aquarium to also hold an AWA license to conduct scientific research, which it has held since 1999. AR 000592.

Mystic cares for belugas in its Arctic Coast Habitat, a 750,000-gallon closed water system. AR 000567. It is the largest beluga habitat at any aquarium in the United States. *Id*. A diagram of the habitat's location in the middle of the Mystic aquarium complex are available at AR 000496. The three pools making up the habitat, which are connected by closable gates, are designed specifically for research, care, and display of belugas. AR 000567. The five belugas coming from Marineland will be housed there with the three belugas already in residence at Mystic – Mystic has no other belugas pools. The habitat was designed to mimic the natural

appearance of a region along the Arctic coast. *Id*. As a beluga swims from one part of the habitat to another, it encounters changes in pool slopes, curves, and varying depths, as well as changing bottom surfaces. *Id*. The main pool (165'L x 69'W x 16.5'Depth; ~590,000 gallons) is connected to the holding pool (40' diameter x 13' Depth; ~120,000 gallons) and medical pool (32'L x 24'W x 7'Depth; ~40,000 gallons) by a series of sliding gates that can be open or closed as desired. AR 000567-68. The main pool is enhanced by "underwater outcroppings, an island with a swim-through arch, and a loose cobble rubbing bed." AR 000567. The habitat also includes "beach" elevations between pools. AR 000567.

Marineland is the only facility in Canada that cares for belugas. It has more belugas (approximately 50) than all the U.S. facilities combined (approximately 30) and is the only facility in North America with surplus belugas. AR 000066 (Marineland beluga count), SAR 0.7.3892.36316 (U.S. beluga count). However, Marineland is not a research institution. It began as an agricultural theme park in the 1960s. After founder and longtime owner John Holer passed away in 2018, his widow Marie Holer became the owner of Marineland. Ms. Holer accepted the recommendation of Marineland's Animal Care Committee that it has too many belugas and should transfer some of its belugas to qualified aquariums, relieving overcrowding and allowing it to provide better care for its remaining belugas. AR 000216; 000500. The consensus is that Marineland is overcrowded. AR 000918; 000940; 000945; 000957; 000989; 001002.

  b. *Mystic's Beluga Research Experience.*

Mystic Aquarium was founded in 1973 as a research organization and has been a research facility since its inception. AR 000680. It has conducted beluga research for decades, both at the aquarium and in the field, and employs a team of researchers whose focus is beluga conservation and health. *Id*. Its internal research team consists of five scientists dedicated to

beluga research and conservation. The team often collaborates with scientists-in-residence, external scientists affiliated with Mystic, and other beluga wildlife biologists, acoustics experts, social scientists and native community members. AR 000200. Mystic's researchers have published dozens of peer-reviewed articles on belugas and contributed greatly to the understanding of beluga health and their response to anthropogenic stressors and other situations, all of which are critical to the conservation of belugas in the wild. AR 000680. Mystic's Rule 56 statement lists papers. Mystic has laboratories located at the University of Connecticut (where its researchers hold faculty appointments) that are equipped for molecular biology, microbiology, immunology, endocrinology and marine mammal health related research. AR 000201.

           c. *The Specific Scientific Research Mystic Proposed*

     Many of the seven studies NMFS authorized in granting this permit continue to build on and expand Mystic's previous studies, which focused on belugas in professional care as well as live capture released cetaceans and subsistence hunted belugas. AR 000143. Increasing the number of whales at Mystic (which is necessary for this research to occur) will increase the study sample size and lead to better, more precise research results. AR 000630-31. While field work is an important part of Mystic's research, research done in a controlled setting, such as at Mystic's facilities, allows for researchers to create a baseline to use in subsequent work in the field. AR 000158. Additionally, performing these studies in a controlled setting often leads to the development of non-invasive techniques that can then be applied to wild belugas in the uncontrolled ocean setting. *Id*. For example, it is more feasible to learn the normal parameters of normal beluga breath, blood, and urine after experiencing particular stimuli in a safe controlled aquarium setting where veterinarians and care equipment are at hand, and the belugas

are with their trainers familiar to them, than when rocking in a boat in the ocean near an untrained, wild beluga unfamiliar with humans.  Ice also curtails access to wild beluga habitat.

*First Study:  Neuroimmunological response to environmental and anthropogenic stressors*

The first study authorized by NMFS will allow Mystic to continue to develop and ground truth biomarkers, reagents, and diagnostics in belugas.  AR 000142. Development of these diagnostic tools under controlled conditions in an aquarium setting is essential to allow scientists to assess and monitor health and interpret findings in wild whales.  *Id.*  Anthropogenic and environmental stressors, such as pollutants, changes in climate, changes in predator/prey relationships, pathogens, and increases in noise due to industry, pose significant threats to marine mammals.  AR 000143.  Mystic's chief scientist Dr. Tracy Romano's laboratory was the first to characterize an anatomical link between the nervous and immune system in cetaceans and, specifically, in belugas.  *Id.*  This link showed that hormones and neurotransmitters released during stress have an effect on the animal's immune system and its ability to fight disease.  *Id.*

Importantly, these tests allow researchers to monitor the health of wild beluga populations, and facilitate the comparison of the health of different beluga populations, such as the Cook Inlet population and SNA depleted stock.  AR 000143-44.  Specifically, this study will contribute to the Cook Inlet Beluga Whale Recovery by increasing efforts to identify and monitor individual Cook Inlet belugas, coordinating photo-identification, stranding data, genetic studies, and body condition assessments, monitoring changes in condition and reproductive success in relation to environmental changes, using currently available information, compare data on diseases from Cook Inlet belugas with other beluga populations.  *Id*.

*Second Study: Development of novel non-invasive techniques to assess health in free-ranging, stranded and endangered beluga whales*

The second study authorized by NMFS would allow Mystic to continue to develop, adapt, and validate assessments for detecting hormones and immune components in tissue matrices such as blood, saliva, breath, feces, and skin.  AR 000145.  Mystic is developing less invasive techniques to collect these samples.  *Id.*  Developing sample collection methods under controlled conditions at Mystic will improve the methodology for collecting samples from wild whales.  *Id.*  Mystic is developing the methodology for breath collection.  *Id.*  Collecting and testing samples at Mystic will help develop the methodology for collecting samples from wild whales by determining things like the number of breaths needed to detect a hormonal or immune signal, and how high the collecting device needs to be from the blowhole.  *Id.*

*Third Study:  Hearing and physiological response to anthropogenic sound*

NMFS authorized the third study which will allow Mystic to study belugas' physiological response to man-made sounds.  AR 000146.  Underwater noise can impact a beluga's hearing, navigational abilities, foraging, and reproduction.  *Id.*  Mystic is interested in studying the whales' physiological response to noise and its impact on immune function, metabolism and growth, and reproduction and health. AR 000146-47.  Mystic has found that exposure to low levels of man-made noise may compromise the whale's vital functions such as foraging for food.  AR 000147.  Previous monitoring data shows these noise levels regularly occur in Cook Inlet, Alaska.  *Id.*  Mystic proposes to continue this study to quantify various sound sources, quantify the directional hearing abilities of belugas, and collect and measure blow samples before and after sound exposure to see the physiological impacts the sound has.  *Id.*

*Fourth Study:  Photogrammetry body condition studies*

NMFS authorized Mystic's fourth proposed study, which will use belugas in controlled conditions in the aquarium to help inform, validate, and interpret photogrammetry of wild

belugas.  AR 000148.  Photogrammetry is a technique that uses photographs to collect measurements such as length, growth, and body conditions.  *Id.*  Researchers need to obtain more photographs and measurements of belugas at various stages of life, and body conditions in controlled aquarium settings.  *Id.*  This, in turn, will help researchers interpret the photographs and measurements of wild belugas in order to better monitor their health.  *Id.*

*Fifth Study:  Diving Physiology*

The fifth study authorized by NMFS allows Mystic to investigate the role of beluga whales' immune systems in their diving physiology and their susceptibility to decompression sickness.  AR 000149.  Mystic is the first laboratory to investigate immune responses in marine mammals in the context of diving.  *Id.*[2]  This study will measure the belugas' immune response when diving to see if it affects their stress levels or alters their dive behavior.  AR 000150.  This study will help researchers whether belugas' altered or interrupted dive patterns due to human activity has on their health.  This information is directly applicable to the future health of the depleted Cook Inlet and SNA (sea of Okhotsk, Russia) populations of belugas.  *See id.*

*Sixth Study: Microbiome*

The sixth study authorized by NMFS allows Mystic to investigate the microbial communities of belugas.  AR 000150.  Microbiomes, or the collection of microorganisms that live in or on a host species, protect belugas from disease, play critical roles in nutrition, and can even affect brain development.  *Id.*  Disruptions in a microbiome can affect the health of the host animal.  AR 000150-51.  To date, relatively little research has been done on belugas' microbiomes.  *Id.*  This study, under controlled conditions at Mystic, will allow researchers to further characterize the microbiome found in and on belugas and the role it plays on their health.

---

[2]   The effects of shallow dives can be directly tested.  To simulate deeper dives, Mystic can take blood samples in the aquarium and then put the cells in a pressure chamber that recreates the water pressure at greater depths.

*Id.* By better understanding the role microbiomes play, researchers can better determine the types and sources of diseases in the wild, such as in the SNA or Cook Inlet populations. *Id.*

   *Seventh Study: Beluga Reproduction.* NMFS did not approve this study. AR 000101.

   *Eighth Study: Test prototype telemetry / imaging devices before deployment in wild.*

   The last study authorized by NMFS concerns the development of safe and effective testing equipment. AR 000153. It allows Mystic to test new telemetry and imaging devices on belugas under controlled conditions at Mystic. AR 000154. The goal of this research is to develop a camera that will adhere to belugas with suction cups. *Id.* Once the procedures are developed and the equipment refined working with belugas at the aquarium, this camera can be used in the wild to help track and monitor wild belugas. *Id.* The study will help researchers determine the ideal size and configuration of the suction cups and optimal placement. *Id.* As discussed above, this will aid in using this equipment on belugas in the wild. Tracking and monitoring wild belugas is critical to conservation and management.

   2.   The Permit Proceeding, Public Comments, and the Public Hearing.

   During 2018, Mystic previewed the scientific permit application to NMFS officials as a concept, and uploaded a draft permit application during the summer of 2019. SAR 0.7.3892.35852, after earlier uploading informal draft applications, SAR 0.7.2244.27823. Mystic fulfilled NMFS staff's requests for more information, clarifications, and changes. *E.g.*, SAR 0.7.3892.30518. Mystic explained that Georgia Aquarium would be involved in financing the acquisition of the belugas from Marineland, and that the belugas would be at Mystic, except in unlikely circumstances. AR 000631. NMFS found the application to be complete.

   On October 1, 2019, as required by the MMPA, NMFS published a notice in the Federal Register that described the permit application, explained how to download it from NMFS's

website, and invited the filing of public comments by December 2, 2019. 84 Fed. Reg. 52072 (Oct. 1, 2019). Although not required, in an extra effort to solicit public input, NMFS sent emails noting that the comment period was open to various persons who had already written to NMFS, either supporting or opposing the application. SAR 0.7.3892.36148, 36153.

NMFS received 9,500 public comments, from government agencies and private parties. Plaintiff FOA filed comments. AR 000979. Co-Plaintiff LCA did not file comments.

The U.S. Department of Agriculture's Animal & Plant Health Inspection Service ("APHIS"), which is the primary regulator of zoos and aquariums in the United States, filed comments noting that Mystic was well-qualified to care for the belugas being imported and that Mystic's pools had ample space. AR 001020. Mystic's pools surpassed the space requirements that APHIS established under the AWA. 9 C.F.R. § 3.104. APHIS also approved the physical transport arrangements, subject to final arrangements being made just before transport, as is customary. AR 001020. This was critical because Congress, in 1994, amended the MMPA to leave transport and most zoo care regulation to APHIS, Pub. L. No. 103-238, § 5(b), 108 Stat. 532, 537, and APHIS regulations cover, in minute detail, the requirements for transport of belugas between aquariums. 9 C.F.R §§ 3.112-3.118. Plaintiffs' challenge to the transport overlooks the APHIS rules.

The State of Alaska (home of the depleted Cook Inlet belugas) biology department filed supporting comments. AR 000896. Later, when NMFS asked Mystic to respond to comments, Mystic supplied letters from Russian beluga scientists noting that the research would benefit the SNA (Sea of Okhotsk) population. SAR 0.7.3892.30733, 30729 (specific to SNA).

The Marine Mammal Commission ("MMC") also provided significant public comments. AR 001010. The MMPA established the MMC as a statutory public advocate, entitled to

participate in NMFS proceedings, but not to be a regulator or make decisions. 16 U.S.C. § 1401 et seq. The MMC comments supported grant of the permit, with some adjustments to the research details, which are not in controversy. AR 001010. The MMC requested a no-breeding condition, which NMFS imposed. AR 001018. The university community, the accreditors of zoos and aquariums, and the veterinarian community all filed comments supporting the permit application. AR 000894-3602. Groups opposed to the keeping of cetaceans (whales and dolphins) in captivity filed comments opposing the application.[3]

NMFS scheduled a public hearing for November 18, 2019, publishing notice in the Federal Register. 84 Fed.Reg. 58694 (Nov. 1, 2019). Twenty-eight speakers testified at the hearing, including speakers from AWI, PETA, Mystic, zoo accreditor Association of Zoos and Aquariums ("AZA") and universities. AR 000753 (transcript). Neither Plaintiff participated.

3. Post-Comment Period Submissions Addressing the Pandemic and Financial Issues.

After the close of the public comment period on December 2, 2019. NMFS's permit staff compiled various points in the public comments and asked Mystic to respond to them point by point, which Mystic did, on a wide variety of permit issues. AR 000602 -96. Mystic provided additional information about its finances in response to one question. AR 000652. The back and forth demonstrates the diligent work of NMFS staff in identifying and studying the issues. *E.g.,* AR 000602-96. After the full impact of the pandemic hit in March, 2020, AWI and another permit opponent, the International Marine Mammal Project ("IMMP"), launched two new lines

---

[3]  Permit opponents contended that Mystic was purportedly enabling a market in the wild capture of belugas off the coast of Russia (Marineland obtained a number of these Russian-caught belugas between 1990 and 2010, and those whales gave birth to offspring   at Marineland, including five coming to Mystic). Marineland stopped imports to Canada around 2010 and Canadian law was amended in 2019 to prohibit the import of belugas into Canada (and to sharply limit export from Canada to transfers for scientific research and those in the "best interests" of the animals involved). Thus, Marineland cannot obtain more wild-caught Russian belugas to replace those going to Mystic, and no market is being enabled. *See* AR 0000500-501 (declaration from Marineland's owner confirming it will not be obtaining belugas to replace those going to Mystic, and is trying to reduce its population).

of attack on the permit application.  In a series of *ex parte* letters submitted to NMFS in April

and June 2020, AWI and IMMP separately contended that transport of the belugas risked

infecting them with Covid-19 and that pandemic-related closures made Mystic financially

unstable.  SAR 0.7.4504.10097, 10098, 10113, 20511.  Mystic was not served with these

communications, but learned its finances were being challenged, and submitted a rebuttal to

NMFS on August 7, 2020.  SAR 0.7.4504.10120 and 10131 (NMFS acknowledges receipt).

       4.   <u>NMFS Grants the Permit in Part, While Imposing an Anti-Breeding Condition</u>.

On August 27, 2020, NMFS granted Mystic's permit application in part.  NMFS issued a

detailed memorandum recommending grant of the permit with conditions.  AR 000092.  That

memorandum is the agency's opinion explaining the partial grant of the permit with conditions.

NMFS granted Mystic authority to import the five belugas from Marineland and to

conduct seven of the eight scientific research programs.  AR 000004.  NMFS denied authority to

conduct the reproductive aspect of the scientific research and imposed the condition that Mystic

affirmatively use contraception or physical separation of genders during ovulation to prevent

pregnancy.  AR 000008.  To ensure compliance with this no-breeding condition, NMFS required

Mystic to submit a breeding prevention plan for review and approval by NMFS.  AR 000008.

NMFS also imposed, as a second condition, that any further transfers of the belugas to any other

institution would require NMFS review and approval.  AR 000009.  Additionally, NMFS

imposed several conditions to ensure that public display of the belugas arising from the scientific

research was truly incidental.  AR 000008-09.  Specifically, NMFS forbade Mystic from training

the belugas for performance or allowing the public to interact with the belugas (as opposed to

just see them), and required that Mystic develop an educational program explaining the research

to visitors, including the benefits the research would have for wild beluga whales. *Id.* Mystic had never proposed performance or interaction, and had planned for education.

NMFS's Permit Recommendation Memo dealt comprehensively with the many objections raised to grant of the permit. AR 000092. Also, on August 27, 2020, NMFS released an EA combined with a FONSI, in which it analyzed environmental consequences under NEPA and concluded that the import and movement of five belugas between aquariums would not have a significant impact on the human environment, and so did not require preparing an Environmental Impact Statement. AR 000030. Although not required to do so, the day after granting the permit, NMFS wrote to AWI and IMMP on August 28, 2020 to explain that NMFS had considered their post-comment-period arguments about the impact of Covid-19 on Mystic's finances, but disagreed with their conclusions. SAR 0.7.4504.10128, 20512. NFMS also explained to AWI that it had considered and rejected the argument that transport posed an undue risk of belugas contracting Covid. SAR 0.7.4504.10128 at 2.

NMFS's partial grant of the permit with conditions resulted in most but not all participants in the proceeding more-or-less declaring victory. AWI lauded NMFS: "This latest decision is remarkable because it is the first time that the federal government has placed restrictions on breeding captive cetaceans under the MMPA...."[4] IMMP had a similar reaction.[5]

**B. The Filing of this Lawsuit and Developments During Permit Implementation.**

---

[4] "NOAA Imposes Strong Restrictions on Aquariums' Import of Captive Belugas for Research". https://awionline.org/press-releases/noaa-imposes-strong-restrictions-aquariums-import-captive-belugas-research "AWI and its allies were prepared to go to court had the permit been issued without these conditions [the breeding condition, the prohibition of "interaction" and "shows," and the requirement that NMFS approve subsequent transfers]." https://awionline.org/awi-quarterly/winter-2020/aquariums-beluga-acquisition-comes-restrictions

[5] http://savedolphins.eii.org/news/entry/mystic-permit-issued-but-no-breeding-of-beluga-whales

FOA filed this judicial review lawsuit on September 3, 2020. On September 22, 2020 the State of Connecticut announced grant of substantial financial relief to Mystic. *Infra* n. 23. Mystic filed a final breeding prevention plan under the Permit. AR 000750 (Dec. 1, 2020).

During December 2020, Plaintiff FOA filed a motion for preliminary injunction seeking to enjoin import from occurring. Mystic intervened as a defendant, and the parties resolved the preliminary injunction motion through agreement on a schedule for expedited briefing of cross motions for summary judgment on the administrative record, and Mystic agreed to hold off on import through March 31, 2021. *See* DE 17, 33, 42 (and associated orders).

Meanwhile, three of the five belugas at Marineland slated for import (Frankie, Mira, and Qila) had become sick during October and November, 2020, and Mystic so advised NMFS. AR 000712. Mystic, on December 1, 2020 applied for a minor permit amendment to substitute three healthy Marineland belugas (Havok, Jetta, and Sahara) of the same genders and approximate ages for the three sick belugas. AR 000712. On December 23, 2020 NMFS approved the breeding prevention plan and minor amendment. AR 000737, 744, 750 (NMFS memorandum).

On January 13, 2021, Mystic notified NMFS that its financial agreement with Georgia Aquarium had terminated and that Mystic had found another source to help finance the acquisition from Marineland. SAR 0.7.4504.15510. Georgia Aquarium remains available to help Mystic with care and research in case such a need develops. *Id.* NMFS did not object.

## II. ARGUMENT

### A. Plaintiffs Lack Standing to Sue

The case is at the summary judgment stage, so mere allegations are no longer sufficient, and Plaintiffs must provide evidence of their standing to sue. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Both FOA and LCA assert associational standing, i.e. both seek to sue on

behalf of one of their members or staff, seeking redress for that person's own injuries. Pltf.Op.Br. at 14-15. FOA submitted the declaration of its member, Ms. Rivard (DE 61-3). LOA submitted the declaration of its staffer, Ms. Logan (DE 61-4).

FOA's member Ms. Rivard does not claim to have ever been to Marineland. She does not claim to have seen or met the belugas who are the subject of this case. Rivard Dec.¶¶ 1-24. Thus, she does not claim injury caused by losing the ability to see these five belugas at Marineland, or from knowing that belugas she has established a relationship with will be harmed. A plaintiff claiming injury through observing harm to animals must establish that she came to be proximate to the injured animals, and that this "special interest" continues. *See Lujan*, 504 U.S. at 563-64, 566 (finding travel well in the past to see wildlife in Sri Lanka insufficient).

Ms. Rivard instead claims that she will be injured *if* she chooses to visit Mystic after the transfer is completed, and sees the imported whales suffering at Mystic. Rivard Dec. ¶ 22. There are several flaws with her assertions. First, the injury she fears would be an entirely self-inflicted injury, resulting from Ms. Rivard's personal choice to go to a place she rarely goes (Mystic Aquarium), *id.* ¶¶ 8, 11, where there are already things she does not want to see, *id.* ¶¶ 11-18, in order to see belugas arriving from Marineland – none of whom she has ever seen -- and has never established a "special interest" in. *Lujan*, 504 U.S. at 563-64. Second, standing must exist at the commencement of an action, i.e., Plaintiffs must establish standing as of the date of the filing of the lawsuit, *Lujan*, 504 U.S. at 569, n. 4. Thus, an entirely speculative *future* personal connection with the Marineland belugas that Ms. Rivard claims she *intends* to establish after they arrive at Mystic cannot establish standing. Rivard Dec., ¶ 22.

FOA may have cited the landmark standing case, *Friends of Earth, Inc. v. Laidlaw Envt. Serv. (TOC), Inc.,* 528 U.S. 167, 180-81 (2000) ("*Laidlaw*"), but Ms. Rivard's assertion of

standing is not supported by the holding of that case. In *Laidlaw*, persons who enjoyed swimming, walking, camping, and fishing in or along a river obtained standing when the defendant's discharge of pollution into the river caused them to cease conducting those recreational activities they enjoyed. 528 U.S. at 181-82. By contrast, Ms. Rivard's declaration shows that she rarely goes to Mystic and already dislikes going, even before the Marineland belugas arrive, meaning that the arrival of the Marineland belugas as allowed by NMFS's permit will not cause her to stop enjoying an activity she now enjoys. Rivard Dec. ¶¶ 8, 11 (she visited Mystic in 2013 and claims no more recent visit other than one token visit on August 31, 2020, three days before FOA filed suit on her behalf), ¶¶ 11-18.

Perhaps sensing a lack of standing, FOA recently brought in LCA as a co-plaintiff by way of filing an Amended Complaint (DE 54). LCA's standing witness Ms. Logan does claim a connection with the belugas at Marineland, however, LCA also lacks standing, for two reasons.

First, LCA's claim of injury is unsupported. Ms. Logan asserts that she somehow established close personnel connections with named belugas at Marineland and so will miss them when they leave for Mystic. Logan Dec., ¶¶ 9, 12. While she does claim to visit Marineland, she does not explain how she could distinguish the five belugas coming to Mystic from the other 50 or so belugas in Marineland's pools. *See id.* Mr. Carmen Grimaldi, Marineland's Head of Operations, has supplied a detailed declaration that in a non-conclusory fashion puts into question Ms. Logan's unexplained and inexplicable assertion that she has established such extensive connections with specific individual Marineland belugas that they are now "family" to her. Mr. Grimaldi goes over the difficulty of telling the belugas apart in the crowded Marineland pools, explains how even he cannot do so after working 14 years at Marineland, as well as the park's policy of not using the beluga's names in front of patrons. Grimaldi Dec, ¶ 4 and n. 2.

Second, even if there is a cognizable injury, Ms. Logan (and LCA) do not show that it unlikely the Court can redress their injury. *See Lujan*, 504 U.S. at 561-62 (discussing the redressability element of standing). Ms. Logan's Declaration and other statements and actions of LCA establish that the injury LCA seeks to remedy is not the transfer of the belugas from Marineland to Mystic, but rather the belugas being anywhere other than a "sanctuary." Logan Dec., ¶ 13 ("I further believe that when whales cannot be returned to their natural habitat, they should be freed to a sanctuary where they can live out their days from discomfort, captive breeding, and research"); LCA Website, supplied as Schedule A to Grimaldi Dec. (explaining why LCA joined this lawsuit, stating that "[t]he best, most humane, course of action would be for the whales to have one final transfer to a sanctuary…."). Obviously, the Court cannot redress this injury by ordering a non-party Canadian aquarium to transfer whales to a sanctuary.

The real question is whether the Court can redress LCA's alleged injury, in part. One might have expected LCA to claim that the whales would be better off remaining at Marineland than being transferred to Mystic, even if they would not as well off as they would be at a sanctuary. If that were the case, the Court could partially redress LCA's claimed injury by overturning the permit, resulting in the belugas staying at Marineland. However, LCA has a demonstrable history of attacking the care provided at Marineland, while it has not criticized the care Mystic will provide. Indeed, LCA's website details its undercover investigation of Marineland, and describes how it found purportedly horrible beluga injuries and filed complaints against Marineland with the Canadian authorities. Grimaldi Dec., ¶¶ 5-6 (reviewing LCA website and his knowledge of LCA's complaints), Sched. B (supplying copy); Logan Dec., ¶ 3 (explaining how she filed complaints against Marineland). To be sure, there is one sentence in the Logan Declaration that worries about transfer causing family separation. Logan Dec., ¶ 17.

Overall, as a whole, all of the evidence points to just one conclusion: LCA wants the whales to go to a sanctuary, and has no real desire that the whales remain at Marineland.

This gets to the last part of the standing analysis. LCA has not established that it is "likely" rather than "speculative" that overturning the permit would create sufficient pressure on Marineland such that Marineland would then decide, on its own, to put the belugas in a sanctuary. *Lujan*, 504 U.S. at 561-62 (it must be "likely" rather than "speculative" that the court can relieve the injury, and if relief depends on the "unfettered" actions of third parties, redressability is very hard to establish). Mr. Grimaldi explains that no sanctuaries presently exist in the United States or in Canada, that even sanctuary proponents have informed Marineland that the experimental sanctuary in Iceland is ill-equipped to care for belugas, and that transfer to a sanctuary, even if possible, poses multiple animal welfare concerns. Grimaldi Dec., ¶¶ 7-8. He notes that Marineland is grandfathered under Canada law and so can continue to display the belugas, thereby earning revenue. *Id*. ¶ 7; *see* Amend. Cmplt. ¶ 74 (Plaintiffs acknowledge the grandfathering). He affirms that if the Court overturns the permit, Marineland will look for another aquarium to receive the belugas or will continue to display them., but Marineland will not transfer them to a sanctuary. Grimaldi Dec., ¶ 8. Therefore, with transfer to a sanctuary not a possibility, LCA cannot establish that it has injury the Court can redress.

Thus, neither Plaintiff has standing to sue and the Court must dismiss this lawsuit.

**B.**    **Standard of Review and Judicial Review on the Administrative Record.**

Should the Court find Plaintiffs have standing to sue, it should affirm the agency's decision to grant the permit and grant summary judgment to NMFS and Mystic on the merits. NMFS's opening summary judgment brief discusses the standard for judicial review of agency legal, policy, and fact determinations. 5 U.S.C. § 706(2). NMFS's brief also discusses the rule

that judicial review of agency action is limited to the administrative record before the agency. Mystic joins NMFS's request to exclude those extra-record materials submitted by Plaintiffs that are not allowed by that rule, and Mystic has complied with the rule in its submissions.[6]

## C. NMFS Reasonably Rejected Demands Mystic Conduct Research Differently.

To implement the MMPA, NMFS adopted a rule requiring that applicants for a scientific research permit involving members of a depleted species or stock of marine mammals show that the "proposed research cannot be accomplished using a species or stock that is not designated or proposed to be designated as depleted, or listed or proposed to be listed as threatened or endangered." 50 C.F.R. § 216.41(b)(5)(i). In its decision, NMFS reasonably credited Mystic's showing that non-depleted belugas are not available for Mystic's research and that belugas from Marineland are necessary achieve Mystic's research goal. AR 00098-99, 000126-27. NMFS also reasonably declined to require that Mystic construct a study design encumbered with the delays, risks, and limitations on scientific rigor of travelling to and shipping samples between other aquariums to conduct research on belugas trained by non-Mystic personnel. *Id.*

By way of background, until late 2016, aquariums within a reasonable distance of Mystic[7] housed mostly non-depleted belugas. The only depleted belugas, at that time, were those from the small Cook Inlet, Alaska population. Belugas from anywhere else were not deemed "depleted." Thus, Marineland's 55+ belugas, which originated from collection in

---

[6]  Mystic submits the declaration of Carmen Grimaldi of Marineland to address Plaintiffs' standing to sue (¶¶ 4-8) and, if the Court needs to consider remedies, matters such as the terms of any remand and injunctive relief (issues to which the present concerning conditions at Marineland are relevant) (¶¶ 9-13). Both standing and remedy matters are recognized exceptions to the record rule. *U.S. Magnesium, LLC v. U.S. E.P.A.*, 690 F.3d 1157, 1164-65 (10th Circ. 2012) (exception for subject matter jurisdiction); *Eco Tour Adventures, Inc. v. Zinke*, 249 F.Supp.3d 360, 370, n. 7 (D.D.C. 2017) (exception for remedy). Plaintiffs may seek to invoke a very narrow additional exception for some types of NEPA claims, and if the Court allows that, it should also consider Grimaldi Dec. ¶¶ 9-13 for the same purpose. *See National Audubon Society v. Hoffman*, 132 F3d 7, 15 (2nd Cir. 1997) (overviewing record rule).

[7]  Due to transportation issues, a "reasonable distance" would be limited to aquariums in Canada and the U.S.

Russian waters in the 1990s to early 2000s, had non-depleted status. Then, in 2016, NMFS listed

Russian belugas in the Sea of Okhotsk as depleted (the "SNA listing"). 81 Fed.Reg. 74711 (Oct.

27, 2016). NMFS interpreted the SNA depleted listing to extend to belugas from SNA waters

who were already at Marineland at the time of the listing, as well as their captive-born progeny.[8]

Through NMFS's regulatory decision, Marineland belugas became "depleted."

There were two separate reasons why NMFS found that Mystic satisfied the requirement

of showing it could not accomplish the researching using non-depleted belugas. First, NMFS

credited Mystic's explanation that none of the U.S. aquariums, all of which had a relatively small

number of belugas, had enough excess non-depleted belugas to meet the sample size

requirements for the research. AR 00098-99 ("Mystic further stated that the five imported

whales are needed to reach an appropriate sample size … and that Marineland has the only

population of whales where transport of that number of whales to Mystic is possible") (citing AR

000661). Mystic, itself, only owned one beluga, so it needed five more belugas to achieve a

workable sample size of six (not large, but enough).[9] SeaWorld had only three (3) belugas in

California, ten (10) in Texas, and two (2) in Florida, while Shedd Aquarium in Chicago had eight

(8) and Georgia Aquarium had only five (5). SAR 0.7.3892.36316 (scroll to interior page).

Each of these U.S. aquariums needed all of its own modest number of belugas. AR 000661.[10]

---

[8]   See 81 Fed.Reg. at 74714 (discussing captive belugas and "progeny"). During this permit application, NMFS
went even further and "treated" belugas born at Marineland to one SNA parent and one non-SNA parent as
provisionally depleted, subject to developing an agency-wide policy on "hybrid progeny." AR 00096, 000120.
Originally, four of the five belugas Mystic is importing fell into this "hybrid-progeny" category, and the fifth was
full-SNA progeny. AR 000096. When three belugas later got sick and were replaced through the minor
amendment, Mystic (knowing the provisional ruling that hybrid-progeny are deemed depleted) did not conduct
genetic testing of the substitutes to distinguish hybrid from full progeny. AR 000745.

[9]   The other two belugas at Mystic are owned by other aquariums, and are subject to recall by their owners during
the middle of the planned research project. AR 000156 (Mystic application).

[10]    While each of the other aquariums had to make its own decision, the small number of belugas at each aquarium
were needed for public display and research activities, and to provide optimal social groups.

Second, NMFS stated that conducting research on depleted captive SNA belugas would provide scientific results that could accurately be applied to conserving the wild depleted SNA belugas because the research subjects shared the same genes as wild SNA belugas. AR 000117-18 (further discussing need to use depleted belugas, finding that "use of beluga whales from the depleted [SNA] beluga whale stock is necessary to provide information specific to this stock (e.g. phenotypic variation in susceptibility to diseases specific to this stock) …").[11]

Plaintiffs take umbrage at NMFS's conclusion that Mystic had conducted an "adequate" search for non-depleted belugas and contend that "adequate" is too lenient a standard to be applied. Pltf.Op.Br. at 22 (citing permit recommendation memo, AR 00098-99). Plaintiffs address the first reason NMFS concluded that Mystic could not accomplish its research using non-depleted belugas, i.e., there were no non-depleted belugas available, but fail to address the second independent reason noted above for NMFS's decision, i.e., that conducting research on SNA belugas would assist in garnering information that will benefit wild SNA belugas. Plaintiffs fail to identify any pathway for obtaining non-depleted belugas that Mystic failed to pursue. NMFS has ample discretion to construe its own rule, which does not specify any particular evidentiary standard. 50 C.F.R. § 216.41(a)(5)(i). NMFS's conclusions that Mystic conducted an adequate search for non-depleted belugas, and that researching depleted SNA belugas would generate beneficial results, were reasonable.

Plaintiffs also advance the alternative argument that Mystic scientists should travel to the other U.S. aquariums to conduct the research non-depleted whales there. Pltf.Op.Br. at 23-24. However, NMFS thoroughly analyzed and rejected this argument in the permit recommendation memo. AR 00098-99 and 000126-27 (reviewing and crediting the detailed explanation Mystic

---

[11]    NMFS also found that the research would also benefit the depleted wild Cook Inlet, Alaska belugas, who had slightly different genes than the SNAs, but faced similar threats. AR 000118.

provided at AR 000661-673).  NMFS credited Mystic's explanation that it needed a sample size

of five belugas (actually six, counting the one already owned by Mystic) and that they had to be

present, together, in one place for consistent, scientifically valid sampling.  AR 000098-99, AR

000126-27.  NMFS credited Mystic's explanation that the logistical difficulties and added

expense of Mystic personnel traveling to different locations made doing the research at other

aquariums infeasible.  *Id.*  NMFS agreed that Mystic's own personnel (not other aquarium staff)

had to control training of the belugas to ensure priority was given to the research and to

maximize consistency in sampling; that the belugas needed to be in the same place for

consistency, and that it takes time to train belugas in specific research behaviors, all of which

could only be done consistently at Mystic.  *See id.*  Researching non-depleted (and thus non-

SNA) belugas at other aquariums also would have meant forfeiting the benefit NMFS found in

getting research results specific to the SNA.  AR 000118.

Finally, despite objecting to care at Marineland, Plaintiffs contend that Mystic scientists

could travel to Marineland to conduct research on the depleted whales there.  Pltf.Op.Br. at 24.

This argument is not even internally consistent because Marineland houses depleted whales and,

and, as such, this alternative would not avoid conducting research on depleted whales.  *See* 50

C.F.R. § 216.41(b)(5)(i).  In any event, traveling to Marineland is not feasible for all the same

reasons NMFS reasonably rejected requiring Mystic to travel to U.S. aquariums.  *See* AR 00098-

99 and 000126-27 (NMFS expands discussion to add Marineland-specific points).  Further, the

crowded conditions there (50+ whales in three pools) poses additional obstacles to quality

research, e.g. individual training belugas on the needed research behaviors.  AR 000869.

Plaintiffs have not shown grounds for overturning this series of decisions. ]

### D.  NMFS Lawfully Construed and Applied the Term "Incidental Public Display."

Plaintiffs misconstrue the MMPA and NMFS rules in contending that NMFS can allow public display incidental to scientific research for depleted animals only if the public display occurs by accident, and without any planning for display by the aquarium. *See* Pltf.Op.Br. at 18.

Public display is not a purpose of the proposed permit but is an unavoidable consequence of conducting scientific research at a public aquarium in an outdoor setting. The belugas presently housed at Mystic (one owned by Mystic, two on loan to it) are displayed to the public in its Arctic Cove habitat, which is where Mystic's present research occurs and where the proposed research with the Marineland Belugas would occur. The habitat is in the middle of the aquarium, outdoors and visible to the public. AR 000680. There is no other location where this research can be conducted. *Id.* Pools for whales are very large and expensive to construct. Neither the space nor the money would be available to construct walled beluga pools closed to the public, and certainly not for the *sole* purpose of shielding the public's eyes from the belugas.

The MMPA permit provision authorizes NMFS to grant import and wild capture permits for scientific research, including for depleted marine mammals, and does not contain any provisions restricting the terms on which NMFS can allow public display incidental to the scientific research. 16 U.S.C. § 1374(c)(3). By contrast, there is another provision of the MMPA that does place limits on NMFS's discretion in granting permits concerning the public display of marine mammals. § 1374(c)(4)(B). More particularly, for permits to import or wild capture for purposes of enhancing the survival of the species, (the other type of permit that NMFS can grant with respect to depleted marine mammals), the MMPA restricts NMFS's authority to allow public display incidental to enhancement by limiting the circumstance in

which either captivity or display can occur.  *Id.* (captive maintenance and incidental public display of enhancement animal can be allowed "only if ….").[12]

In implementing the MMPA, NMFS chose to adopt regulations that limit the conditions in which public display incidental to scientific research may occur.  The regulations prohibit the public display of mammals held under a research permit unless such activities:

> (A) Are necessary to address scientific research objectives and have been specifically authorized by the Office Director under the scientific research permit; and
> (B) Are conducted incidental to and do not in any way interfere with the permitted scientific research; and
> (C) Are conducted in a manner consistent with provisions applicable to public display, unless exceptions are specifically authorized by the Office Director.

50 C.F.R. § 216.41(c)(1)(vi).  NMFS found that Mystic satisfied these requirements for incidental public display of marine mammals held under scientific research permits.  AR 000095. Display is necessary for research to occur. As stated above, scientific research objectives cannot be addressed at Mystic without public display because Mystic's existing beluga pools are outdoors in the middle of the aquarium's complex and visible to the public.  AR 000496.

Plaintiffs insist that NMFS must accept the definition of the word "incidental" in its scientific research permit regulations to mean only "accidental." Plaintiffs' interpretation is so overly narrow as to be patently incorrect and unworkable.  The meaning of "incidental" as used in Rule 216.41(c)(1)(vi) is apparent from the May 10, 1996 order in which NMFS adopted the rule, 61 Fed. Reg. 21926.  In responding to public comments, NMFS accepted the argument that allowing aquariums to display animals incidental to research would provide opportunities for funding research and also achieve the ancillary or "incidental" benefit of public education:

---

[12]    This reflects the difference between scientific research and enhancement.  Enhancement of the survival of the species typically involves activities in the wild, and only occasionally is captivity involved, often as a temporary measure followed by release to the wild.   By contrast, much scientific research on marine mammals occurs in aquariums open to the public with research animals who will remain in human care.  Few facilities housing cetaceans are closed to the public (the Navy has some).

A number of comments expressed concern over restricting the public display of marine mammals held for scientific research. Some comments identified specific instances in which research facilities display their marine mammals as a means of educating the public about the research and receiving donations for financial support of research projects.

As scientific research and public display are recognized by statute as two separate activities, NMFS has retained this restriction as a necessary distinction between these activities. However, in response to concerns over the public viewing of marine mammals involved with research projects, ***the regulatory exceptions to this restriction clearly provide adequate flexibility to allow such activities, under appropriate conditions, to occur under a scientific research permit.***

61 Fed.Reg. at 21929-30 (explaining adoption of 50 C.F.R. § 216.41(c)(1)(iv)) (emphasis added).

The text of this regulation adopted by NMFS further reflects NMFS's acknowledgement and understanding of incidental public displays at aquariums. The rule requires that incidental public display activities be: "conducted in a manner consistent with provisions applicable to public display." 50 C.F.R. § 216.41(c)(1)(iv)(C). This incorporates by reference the public display rules, which require that the aquarium provide an educational program and be inspected by APHIS under the same rules applicable to all exhibitors of animals to the public. 16 U.S.C. § 1374(c)(2) (list of requirements). Here, NMFS applied the understood that any incidental public display would be "necessary" to the research, evidenced by the fact that NMFS added conditions to the permit that expressly prohibit training the Belugas for performance or otherwise allowing public encounters with the whales, such as a "swim with a whale" exhibit. AR 000008. Thus, only *passive* public viewing, i.e., viewing incidental to Mystic's important research is allowed.

NMFS has clearly chosen, both in its 1996 rulemaking order and as applied in the instant permit proceeding, not to apply the "incidental public display" language to limit public displays only to "accidental" public display, as Plaintiffs suggest. In order to meet NMFS's exacting requirements, aquariums must plan mandatory educational activities, and must comply with the animal exhibition rules promulgated by APHIS. They are allowed to use the money generated

from display of marine mammals to fund research and those studies directly benefit the long-term health of the species.  Plaintiffs' overly narrow definition of "incidental" is clearly unworkable because mandatory educational activities, by definition, could never occur accidentally.  Plaintiffs' self-serving and narrow conflation of the terms incidental" and "accidental" would necessarily preclude aquariums with skilled research and veterinary teams from ever conducting important scientific research involving depleted marine mammals.

NMFS's 1996 rule, and the rationale articulated by NMFS when it adopted the rule, constitute a reasonable application of the MMPA.[13]  As noted above, the MMPA does not define "incidental," does not define "incidental public display," and while it does impose restrictions on "incidental public display" with respect to ***enhancement*** permits, it does not provide a similar restriction concerning ***scientific research*** permits.  16 U.S.C. §§ 1362, 1374(c)(3) and (c)(4). Aquariums that cannot meet the standards for obtaining a scientific research permit involving depleted marine mammals cannot import them, because public display permits to import for purposes of public display are unavailable.  Conversely those aquariums which do meet that high bar can actually conduct research, without being blocked from conducting research by the prohibitory cost of building special facilities for the research animals closed to the public.

NMFS's resolution fully respects Congress's value judgment that the benefits of public display without scientific research or enhancement is not a good enough reason to import a marine mammal "taken" from a depleted population.  16 U.S.C. § 1372(b) and (b)(3).  Contrary to Plaintiffs' arguments, NMFS has granted scientific research permits with incidental public

---

[13]    NMFS's interpretations are due deference under the well-established principles that, while agencies must follow unambiguous statutes and rules, they have substantial discretion in interpreting law that is subject to more than one interpretation and in making related policy judgments.  See, e.g. *Chevron v. Natural Resources Defense Council*, 467 U.S. 837 (1984).  Because there are several types of deference that NMFS might properly assert under the caselaw (*Chevron* describes one type), Mystic refers the Court to NMFS's brief, which is being filed today.

display involving depleted marine mammals, including one granted just last year under which SeaWorld cares for Tyonek, a stranded Cook Inlet (and thus depleted) Alaskan beluga.[14]

Plaintiffs mistakenly dwell on the communications between Mystic and NMFS in the 2016-2017 era, well before Mystic applied for the permit in mid-2019, to support their narrow definition of "incidental public display". However, under the correct interpretation of "incidental public display," as reflected in the 1996 rulemaking order, it was entirely appropriate for Mystic to engage in preliminary communications with NMFS about what permits might be available. NMFS's 1996 rule encouraged aquariums intending to conduct scientific research to also allow incidental public display, which in turn *necessarily* requires preparation, and provides benefits, such as education.

Finally, Plaintiffs incorrectly rely on the definition of "incidental" found in other, inapplicable portions of the NMFS regulations governing the "incidental take" of marine mammals by commercial fishermen. Pltf.Op.Br. at 25. In this regard, "incidental taking" is a sanitized term for "incidental killing" of animals that accidentally occurs, from time to time, as a result of an otherwise lawful action. In those regulations, "incidental" is defined as a "non-intentional or accidental act that results from, but is not the purpose of carrying out an otherwise lawful action." 50 C.F.R. § 229.2. That definition of "incidental" in this rule prohibits the "taking" of marine mammals "incidental to" commercial fishing, but carves exceptions for some types of "incidental" take, recognizing that fisherman will sometimes catch marine mammals despite their best efforts to avoid doing so. 50 C.F.R. §229.3(a). The definition applies only to

---

[14]    SAR 0.7.3892.30439 (SeaWorld permit). If, as Plaintiffs argue, incidental display must truly be accidental, SeaWorld not have been able to care for this stranded, non-releasable calf, nor could any aquarium with beluga pools viewable to the public. There have been many scientific research permits allowing incidental public display, and they are collected in the supplemental administrative record as NMFS reviewed them in issuing Mystic's permit. *See* 66 Fed. Reg. 48663-02 (Sept. 21, 2001); SAR 0.7.3892.30430; SAR 0.7.3892.30437; SAR 0.7.3892.30435; SAR 0.7.3892.30433.

rules under the commercial fisheries section of the MMPA, 50 C.F.R. § 229.1(a) (scope of rules, explaining they apply to 16 U.S.C. §§ 1371(a)(5)(E) and 1387), which makes sense because the incident public display of well-cared for mammals cannot be equated with the unfortunate, but unavoidable, accidental killing or capture (sometimes resulting in death) of wild animals.

Thus, "incidental take" and "incidental public display" could not be more dissimilar. Incidental take involves killing, harming, or at least capturing an animal (in a fishermen's net, capture may very well end in death or injury). By contrast, incidental public display involves caring for an animal in a humane, planned fashion. The 1996 NMFS rulemaking order quoted above reflects a more appropriate definition of the word "incidental" in the context of incidental public display attendant to marine mammal research.

E. **NMFS Reasonably Rejected Dire Predictions by Permit Opponents That Financial Disaster was Impending for Mystic.**

The MMPA permitting rules call for consideration of an applicant's resources by requiring NMFS to consider whether "the applicant's expertise, facilities, and resources are adequate to successfully accomplish the objectives stated in the application." 50 C.F.R. § 216.34(a)(5). Here, NMFS considered Mystic's resources and determined Mystic's resources more than sufficient to accomplish Mystic's proposal. Furthermore, as explained more fully below, late-arising concerns about Mystic's financial condition resulting from restrictions on patron attendance due to the coronavirus pandemic were mooted by a large donation, debt forgiveness agreements and loans entered into between Mystic and the State of Connecticut in August 2020 and publicly announced by the State on September 22, 2020. Therefore, Plaintiffs' arguments regarding Mystic's financial condition pre-August 2020 are stale and irrelevant.

In its public comments to Mystic's permit application, Plaintiff FOA stated that Mystic's IRS Form 990 showed a $2.5 million loss in 2017, and then falsely concluded that this showed

Mystic's true intent in acquiring belugas was simply to sell more tickets to the public, thus

implying that scientific research was a subterfuge. *See* AR 000983. Of note, even FOA did not

contend, at that time, that Mystic lacked adequate resources to carry out the project and care for

the belugas. *See id.* Now, however, Plaintiff FOA (joined by LCA) has asserted that NMFS

failed to consider Mystic's financial resources. Pltf.Op.Br. at 18. Plaintiff FOA even went so far

as to suggest Mystic hid adverse financial information from NMFS.[15] Plaintiffs are wrong.

After reviewing the public comments, NMFS asked Mystic for more information

concerning its financial resources. AR 000652. Mystic responded on March 26, 2020 by

directing NMFS to its publicly filed IRS Form 990 annual returns, which included the 2017

return. *Id.*[16] Mystic's Form 990s for the last three years reported as follows:

> **2017** - $2.5 million loss.     Assets: $33.7 million.   Liabilities: $18.7 million.[17]
> **2018** - $2.7 million net income.   Assets: $36.9 million.   Liabilities: $18.6 million.[18]
> **2019** - $289,000 net income.   Assets: $36.6 million.   Liabilities: $18.6 million.[19]

The 2018 Form 990, which reported a $2.7 million surplus, was filed on October 24, 2019 and

was available to NMFS before it granted the permit.[20] NMFS presumably read Mystic's Form

990s because, in the permit recommendation memo explaining the permit grant, NMFS cited the

page in "Mystic Aquarium's response to comments" where Mystic referred NMFS to its Form

990s. AR 000122-123. Following that, NMFS explained that Mystic submitted evidence it was

---

[15]    According to Plaintiffs, "Mystic failed to provide this information [the 2017 Form 990] to NMFS, and it
appears nowhere in the administrative record, meaning NMFS did not even consider it." *See* AR 000983.
[16]    Mystics Form 990s (filed as Sea Research Foundation, Inc.) are available on the IRS and Mystic websites.
[17]    https://apps.irs.gov/pub/epostcard/cor/061480300_201712_990_2018121416002913.pdf.
[18]    https://apps.irs.gov/pub/epostcard/cor/061480300_201812_990_2020011017013639.pdf.
[19]    https://www.mysticaquarium.org/wp-content/uploads/2021/01/2019-SEA-RESEARCH-FOUNDATION-INC.-
990-PUBLIC-INSPECTION-COPY.pdf.
[20]    The 2019 Form 990, which also showed an operating surplus was filed in October 2020 and is available to
NMFS as it administers the permit. To the extent earlier years are relevant, the 2016 Form 990 showed a small loss
($550,000) and the 2015 Form 990 showed a larger loss ($4.6 million). Assets (about $36 million) and liabilities
(about $18 million) stayed nearly constant from 2015 (earliest filing in the IRS website) through 2019 (last filing).

"financially viable" and NMFS then found that Mystic satisfied the section 216.34(a)(5) requirement of adequate expertise, facilities, and resources. *Id.* Mystic's auditors never opined that Mystic's status as a going concern was in doubt, and Plaintiffs have not suggested otherwise.

Additionally, Mystic has successfully served as a research-orientated aquarium open to the public for over 30 years, and there is no evidence that it ever failed to properly care for its animals. Furthermore, it had successfully completed performance under multiple NMFS MMPA research permits. *See* AR 000141. Further, evidence of Mystic's income from scientific grants not only demonstrates that Mystic has diverse sources of revenue, but also undermines Plaintiffs' argument that Mystic's only real interest in importing the Belugas is in increasing ticket sales. AR 000480-81. NMFS specifically credited Mystic's history of obtaining scientific grants in its memorandum finding Mystic's expertise, facility, and resources adequate. AR 000115.

After the coronavirus pandemic hit in mid-to-late March 2020, two permit opponents (AWI and IMMP) submitted post-comment-period letters in April and June, 2020, in which they contended that the Covid-lockdowns sharply curtailed Mystic's ticket revenues and placed Mystic (and other zoos and aquariums) under financial stress. SAR 0.7.4504.10097, 10098, 101113, 20511. In June 2020, IMMP also submitted (also *ex parte*) a report by a purported economist related to Mystic's pre-Covid financial information going back as far as the year 2000. SAR 0.7.4504.20511 (attachment).[21] This information could have, and should have, been submitted during the public comment period ending December 2, 2019 and, so, was untimely. NMFS was not required to consider this untimely submission or to respond to it in granting the permit, let alone credit this "report" with more weight than Mystic's evidence of its finances.

---

[21] The report failed to provide any information concerning the author's education or relevant work experience. Furthermore, although IMMP's memo was in the nature of an expert report, it contained none of the indicia of reliability (prior disclosure to the adversary, a list of data considered by the expert, a list of qualifications) that generally accompany such reports, even in more relaxed agency adjudications.

Mystic wrote NMFS on August 7, 2020 to note that rumored attacks on Mystic's finances were incorrect, and supplied citations to the rulemaking in which NMFS adopted Rule 216.34 and decided against requiring applicants to definitively establish financing. SAR 0.7.4504.10120.[22]

In its August 27, 2020 memo supporting the permit grant, NMFS recounted Mystic's responses to NMFS's questions regarding financial information (which included the Form 990s) and found that Mystic had adequate resources. AR 000123. NMFS further explained:

> NMFS collectively evaluates a permit applicant's expertise, existing infrastructure, facilities, and resources including their history of securing funding and successfully carrying out research. NMFS considers the totality of the circumstances when evaluating these criteria have been met, and has never interpreted the term "resources" to include exclusively "financial resources."

AR 000114. Continuing this important discussion, NMFS explained that applicants often need to get the permit *before* they can obtain financing, such as research grants, and that, consequently, "NMFS does not require permit applicants to provide definitive documentation of funding or financial resources prior to permit issuance." AR 000114. NMFS's reasoning serves to rebut Plaintiffs' additional argument that Mystic was overly dependent on allegedly insufficiently disclosed financing from Georgia Aquarium to acquire the belugas; Mystic was free to firm up its financing after obtaining the permit, or get new financing from another source, which is what Mystic did a few months later. SAR 0.7.4504.1551 (Mystic reports to NMFS on January 13, 2021 that it has secured alternative financing to replace Georgia Aquarium).

The day after granting the permit, NMFS wrote AWI and IMMP to say it had considered and rejected their financial arguments – meaning Plaintiffs are wrong in saying NMFS ignored legitimate arguments about the Pandemic's financial impact. SAR 0.7.4504.10128, 20512.

---

[22]     Mystic cited the proposed rule at for the quote that "Funding is Not a Prerequisite for Issuance of a Scientific Research Permit …." 58 Fed.Reg. 53320, 53335 (Oct. 14, 1993). *See* SAR 0.7.4504.10131. Mystic also cited the May 10, 1996 final rule which adopted Rule 216.34(a)(5) in a manner consistent with the proposed rule. *Id.*

NMFS's confidence in Mystic was well-placed. The financial stress from the pandemic was relieved almost contemporaneously with the grant of the permit when the State of Connecticut granted Mystic financial relief) in late August, 2020 and publicly announced the relief package (including a $7 million line of credit associated with $10 million in private donations and $14.5 million in debt reduction) on September 22, 2020.[23] More particularly, in August 2020, Mystic entered into debt forgiveness agreements and loans with the State of Connecticut, including and $7,000,000.00 in funding was provided to Mystic by the State of Connecticut, acting by and through its Department of Economic and Community Development).

In short, NMFS thoughtfully explained its well-supported decision that Mystic had adequate expertise, facilities, and resources, and so satisfied the criteria of section 216.34(a)(5).

### F. **NMFS Diligently Addressed the Late-Arising Covid-19 Transmission Claim**.

Plaintiffs' contention that NMFS failed to adequately consider the risk of the Belugas contracting Covid-19 during transport cannot be reconciled with documented communications between NMFS and at least one permit opponent, AWI. During April and June, 2020, AWI raised Covid-transmission concerns in post-comment period submissions. SAR 0.7.4504.10097, 10098. NMFS responded in an email to AWI, dated August 28, 2020 (a day after issuing the permit), in which NMFS acknowledged AWI's Covid-transmission concerns and explained:

---

[23] The State's grant of relief including the information stated above s detailed on its official website and is a fact that cannot reasonably be disputed and so is subject to judicial notice under Fed.R.Evid. 201. https://portal.ct.gov/Office-of-the-Governor/News/Press-Releases/2020/09-2020/Governor-Lamont-and-Mystic-Aquarium-Leadership-Unveil-Long-Term-Restructure-Plan (Sept. 22, 2020); copy supplied as Lister Dec, Sched. 1. For the reason stated above, this development is not necessary to affirm NMFS's finding that Mystic has the expertise, facilities, and resources needed to carry out is research proposal, but does confirm the correctness of that agency conclusion and moots (or renders futile) Plaintiffs' arguments. There is authority for taking judicial notice of official government action outside the administrative record that post-dates (or is contemporaneous with) the agency's decision. *See Clifford v. U.S. Coast Guard*, 915 F.Supp.2d 299, 311, n. 8 (E.D. N.Y. 2013). This avoids the unnecessary step of a temporary remand to add a document to the administrative record that serves only to bolster a finding the agency made without the additional information. If the Court decides the record needs to be supplemented to consider the State's grant of relief, the caselaw allows that. *Hoffman*, 132 F.3d at 14*; Brodsky v. U.S. Nuclear Reg. Comm*., 704 F.3d 113, 124 (2nd Cir. 2013) (agency order remains in place).

> There is currently no evidence to support claims that whales, sea lions, or other marine mammals are infected with COVID-19. However, we are providing guidance to remind Permit Holders that personnel who work with live or dead wildlife should follow appropriate procedures to minimize the risk of disease transmission. This information is reflected in the cover letter for the issued permit.

SAR 0.7.4504.10128. See AR 000002 (permit cover letter referring to veterinary webpage).

No statute requires transport delay. NMFS's handling of the Covid-19 transmission issue was not arbitrary and capricious. 5 U.S.C. § 706(2)(A). Deference to an agency in judicial review is at its highest when the agency makes a "prediction" on a technical issue where limited data is available. 5 U.S.C. § 706(2); *Natural Resources Defense Council v. U.S.E.P.A.*, 808 F.3d 556, 576 (2d Cir. 2015) (internal quotation omitted). Here, NMFS made a predictive judgment that the lack of any record of marine mammals contacting Covid-19 was an indication that it is unlikely these belugas would contact the disease during transport. SAR 0.7.4504.10128.[24]

In a supplemental witness declaration prepared for this case and not included within the administrative record, Plaintiffs cited two academic papers as support for their purported concerns about Covid-19. DE 61-6. One paper (which Plaintiffs could have but did not provide to NMFS after the pandemic began but before it issued the permit) is 12 years old, and reports on a single captive beluga that contracted a disease from the family of coronaviruses, not from Covid-19 and not (as far as one can tell) from transport between aquariums. DE 61-6, Ex. 1. The other paper discusses risk of Covid-19 transmission in the ocean from sewage. DE 61-6, Ex. 2. Plaintiffs cite nothing that even suggests that belugas are at any greater risk of contracting Covid-19 during transport than they are now, when they swim in pools at Marineland, where they interact with trainers and attendants, and are near the patrons. The belugas will travel in the

---

[24] Although the permit issued during the summer of 2020, NMFS's statement that there is no record of a whale or other marine mammal contracting Covid-19 (at least in a captive setting) remains unchallenged.

safest manner possible.  They will travel by chartered truck and by air in APHIS-approved

containers and will interact only with a handful of skilled attendants.  *See* AR 000163-165.

### G.  Plaintiffs' "Delay" Arguments Misunderstand the Law.

Plaintiffs incorrectly claim that NMFS injured them as permit opponents by granting

Mystic a permit on August 27, 2020, rather than by December 18, 2019, which was 30 days after

the November 18, 2020 public hearing.  16 U.S.C. § 1374(d)(5) (directing NMFS to decide

permit applications within 30 days after the hearing).  Plaintiffs also fail to realize that the

remedy provided by the APA for agency delay is to obtain a judicial order directing the agency

to make a decision, not invalidation of a decision tardily made.  5 U.S.C. § 706(1).

As recounted in the Procedural History above: (a) 28 witnesses testified at the public

hearing, (b) 9500 public comments were filed by the close of the related comment period, which

was December 2, 2019, (c) NMFS solicited and obtained detailed written responses from Mystic

to the public comments, and (d) several parties opposed to the permit submitted detailed post-

comment-period advocacy materials to NMFS in April and June, 2020.  NMFS worked

diligently through this mountain of paper and issued the permit on August 27, 2020.

As a threshold matter, Plaintiffs, as permit opponents, were not injured by any delay in

issuing the permit they opposed and so lack standing to bring this delay claim.[25]

Even if the Plaintiff did have standing to bring a delay claim, the law does not provide for

the draconian remedy that Plaintiffs seek: invalidation of the agency decision on account of it

being tardily made.  The law in this area is well-settled.  The MMPA does not confer a private

---

[25]  "[S]tanding is not dispensed in gross" and must be established on a claim-by-claim "for each claim he seeks to
press" and "for each form of relief sought."  *DaimlerCrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (internal
quotations omitted).  Standing requires a "concrete and particularized" injury suffered by the "plaintiff."  *Lujan,*
504 U.S. at 560.  NMFS's delay in issuing the permit did not impose on Plaintiffs "a concrete and particularized
injury" because they had a full and fair opportunity to submit an objection to issuance of the permit (an opportunity
Plaintiff FOA utilized and Plaintiff LCA did not utilize).  Therefore, Plaintiffs lack standing to bring this claim.

right of action. *See* 16 U.S.C. § 1372, *et seq.* The APA, which provides the only available private right of action, 5 U.S.C. § 702, deals with agency delay by authorizing a reviewing court to "***compel agency action*** unlawfully withheld or ***unreasonably delayed***." 5 U.S.C. § 706(1) (emphasis added). This is strictly a prospective remedy and strictly a procedural remedy – the court may compel the agency to make a decision, but it cannot tell the agency what decision to make. *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64, 65 (2004). The remedy Plaintiff seeks would violate these principles. Plaintiffs seek a retrospective substantive remedy (permit vacatur) that would force even greater delay (the agency would have to start over).

In any event, as the Supreme Court has held, tardy agency action is still valid agency action unless the statute in question expressly imposes the consequence of invalidation of the tardy action, which the MMPA scheduling provision cited by Plaintiffs does not do:

> It misses the point simply to argue that the October 1, 1993 [statutory deadline] was 'mandatory" …. [T]he failure to act on a schedule merely raises the real question, which is what the consequence of tardiness should be …. Nor, since *Brock,* have we ever construed a provision that the Government 'shall' act within a specified time, without more, as a jurisdictional limit precluding action later …. We have summed up this way: if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction.

*Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 157-160 and n. 7 (2003) (quotations omitted); 16 U.S.C. § 1374(d)(5) (assigning no particular consequence if decision on application made after due date).

### H.  Plaintiffs' NEPA Claims Lack Merit

A NEPA analysis may consist of three levels of review. First, if the agency determines that the proposed actions falls within a pre-set category of actions unlikely to "significantly impact the human environment" and no "extraordinary circumstances" are present, it can invoke a *Categorical Exclusion* ("CE") and conclude its NEPA analysis. 40 C.F.R. § 1501.4(a)(2) and

(b).  Second, if no CE applies, or extraordinary circumstances override the possibility of a CE, the agency prepares a "concise" *Environmental Assessment* ("EA") that should contain only "brief discussion."  *Id.* at § 1508.9.  The purpose of the EA is to determine if the proposed federal action is a "major action" that would "significantly impact the human environment," which would require preparation of a much more in-depth review; an *Environmental Impact Statement* ("EIS").  42 U.S.C. § 4332(C); 40 C.F.R. §§ 1503.1, 1501.4, 1508.4, 1508.9.  If no EIS is required, the agency can release a *Finding of No Significant Impact* ("FONSI").  § 1501.4  The third, and highest level of NEPA analysis, preparation of an EIS, generally requires a year or more of agency work, and hundreds of pages of writing.  *See* 40 C.F.R. Parts 1502 and 1503.

NMFS initially started to draft an EA, but then decided to instead invoke its established CE for marine mammal permit applications.  SAR 0.7.3892.41843.  This is where things stood when NMFS sought public comment on the permit application.  84 Fed. Reg. 52072 (Oct. 1, 2019).  In January 2020, after reading the public comments, NMFS decided to prepare an EA, after all.  To accomplish this, NMFS's permit staff provided a public comments summary to the NMFS staff preparing the EA, and NMFS staff held an internal conference call entitled: "Regroup to go over substantive public comments pertaining to NEPA analyst for Mystic Aquarium application …."  SAR 0.7.3892.36427 (see note several pages into document).  NMFS ultimately decided an EIS was not needed, and issued the EA/FONSI.  AR 00032.[26]

---

[26]     Arguing "foregone conclusion," Plaintiffs point to an email dated June 20, 2019 in which a NMFS outside contractor hired to assist NMFS on NEPA matters told Ms. Sloan of the NMFS permit staff that she was working on preparing an EA and FONSI.  Pltf.Op.Br. at 32 (citing AR 027541-P).  Plaintiffs claim that this email, sent before NMFS sought public comment on the permit application, shows that it was a "foregone conclusion NMFS would be issuing a FONSI, no matter what the facts showed."  *Id.*  Plaintiffs' fundamental premise, however, is flawed because an email from a contractor saying she was preparing a draft FONSI is not the same as a NMFS official with decision-making authority committing to issue a FONSI.  If there is any doubt, NMFS as noted above changed course at least twice in its NEPA analysis, after the contractor's email early-stage email, first by deciding to invoke a CE (meaning no EA or FONSI), then by reverting to drafting an EA after getting public comment.  NMFS staff then huddled to consider the public comments when drafting the NEPA analysis.  SAR 0.7.3892.36427.  NMFS then only partially granted the permit, further establishing that there was no forgone conclusion.

1. <u>When an Agency Receives Public Comment on the Issues Raised by a Permit Application, It Does Not Also Have to Seek Additional Comment on an EA.</u>

Plaintiffs mistakenly argue that NMFS had an obligation to seek *additional* public comment specific to the EA, beyond those public comments NMFS received on the MMPA permit application. However, NMFS had no such obligation according to the Council of Environmental Quality ("CEQ"), whose regulations state when an agency must offer the public the opportunity to comment on an agency's NEPA activities. 40 C.F.R. § 1500.1, et seq. These rules do not require the agency to provide a public comment opportunity on an EA, although they do require the agency to provide an opportunity for public comment when it prepares an EIS. *Compare* 40 C.F.R. § 1503.1(a)(4) (requiring public comment opportunity for EISs) *with* 40 C.F.R. §§ 1501.3 and 1508.9 (discussing preparation of EAs, without requiring a public comment opportunity). The rules, instead, only call for the agency to obtain public input "to the extent practicable," to aid it in drafting an EA. 40 C.F.R. § 1501.4(b). Indeed, in a case Plaintiffs cite, Pltf.Op.Br. at 38, the Second Circuit analyzed these CEQ rules and held that these rules did not require agencies to solicit public comment on an EA. *Brodsky v. U.S. Nuclear Reg. Comm*, 704 F.3d 113, 121-22 (2nd Cir. 2013). Instead, the Second Circuit held the agency has "significant discretion" over how it goes about obtaining public input "to the extent practicable." *Id*.

The Second Circuit in *Brodsky* cited its earlier decision, *Pogliani v. U.S. Army Corps of Engineers*, 306 F.3d 1235, 1238 (2nd Cir. 2002), as an example of a case in which it affirmed the practice of an agency that had not sought public comment on the EA and FONSI, specifically, but had "afforded other opportunities for public input." *Brodsky,* 704 F.3d at 121. *Pogliani* concerned the decision of the Corps of Engineers regarding an application by an electric utility

for a permit to build a power plant in wetlands. 306 F.3d at 1237. The Corps "held multiple public hearings" on the permit application and then, without seeking further public input, prepared an EA and FONSI and released them on the say day it granted the permit. *Id* at 1238.

The situation here is identical to that presented in *Pogliani.* As discussed above, NMFS sought and obtained public comment and testimony on the permit application, and then used that input in preparing an EA, without seeking additional comment. SAR 0.7.3892.36427 (using public comments in drafting EA). Thus, NMFS complied with the public input rule.[27]

NMFS also complied with its own procedures. Its NEPA Companion Manual states that providing a public comment opportunity on an EA is "encouraged" but "not required," and goes on to note that providing an opportunity for comment or public hearing on a "permit application" (NMFS here did both) constitutes sufficient "alternative public involvement."[28] Getting public input to use in drafting an EA this way is logical as well as lawful. The MMPA is an environmental statute. Public input on a permit application is environmental input. *E.g.*, AR 000753 (hearing), AR 000979 (FOA comments).[29]

### 2. NMFS Was Not Required to Prepare an EIS.

NMFS concluded in the EA / FONSI that the transfer of five captive-born beluga whales from one aquarium to another is not a "major action" that "significant[ly] impacts the human environment" and so requires production of a full-blown EIS rather than an EA. AR 00030; 42

---

[27] In *Brodsk*y, 704 F.3d at 121, the Court distinguished between the facts presented in that case and *Pogliani.* In so doing, the Second Circuit noted that in *Brodsky*, the Nuclear Regulatory Commission, without obtaining public input of any sort, simultaneously issued an EA / FONSI and granted a utility an exemption from a safety rule.

[28] NEPA Companion Manual, Sec. 7.B https://www.nepa.noaa.gov/docs/NOAA-NAO-216-6A-Companion-Manual-01132017.pdf.

[29] Finally, NMFS's permit processing rule allows the path taken by NMFS. Rule 216.33 specifically discusses what happens if NMFS, in seeking public comment on a permit application, states it does not intend to prepare an EA, but then, after receiving public comment, decides to prepare an EA. 50 C.F.R. § 216.33(d)(7). The rule allows NMFS to grant the permit if, based on the EA, it reaches the conclusion that there is no significant impact on the human environment and, noticeably, does not require the agency to seek a second round of comments on the EA. *Id.* The rule facilitates NMFS conducting an upgraded NEPA analysis considering the comments received.

U.S.C. § 4332(C). Plaintiffs challenge this conclusion. The starting point for this analysis is NMFS CE B2, which defines MMPA permit applications, as a class, as being the type of matter that are so unlikely to significantly impact the human environment that they are excluded from the normal duty to prepare even an EA. NEPA Companion Manual, *supra* n. 28, p. E-3. NMFS on its own accord cautiously overrode the CE and prepared an EA.

Plaintiffs fail to show an EIS was required. The case involving a marine mammal permit cited by Plaintiffs in support of their argument that an EIS was required presented totally different set of facts, i.e., a large-scale capture from the wild in U.S. waters. *See Jones v. Gordon*, 792 F.2d 821 (9th Cir. 1986). Even under that set of facts, the appellate court did not require NMFS to prepare an EIS. *Id*. at 829. In that case, SeaWorld proposed to capture "up to 100 orcas" from the wild in U.S. waters and convert 10 of them to permanent captive status at its parks while conducting three weeks of scientific research on the other 90 and then releasing them back to the wild. *Id*. at 823. NMFS invoked the established CE for marine mammal permits and did not prepare an EA. *Id.* at 828. Plaintiffs in that case then persuaded the district court that factors involving capturing animals from the wild made SeaWorld's application extraordinary enough to require production of an EIS. *Jones v. Gordon*, 621 F.Supp. 7-9, 12 (D. Alaska 1985) ("The total resident orca population of Southeast Alaska is estimated at 300, although scientists are unsure of the exact number since no comprehensive census has ever been taken. The permit allows Sea World to temporarily capture 100 orcas …" and keep ten permanently).

On NMFS's appeal, the Ninth Circuit "affirmed in part and reversed in part." 792 F.2d at 829. The Ninth Circuit agreed that various extraordinary factors involving capture from the wild prevented NMFS from invoking the marine mammal permit CE, and agreed NMFS had not yet justified its decision to decline to prepare an EIS, but reversed the District Court's judgment that

NMFS had an absolute obligation to prepare an EIS. 792 F.2d at 828-29. It directed NMFS to conduct further NEPA work, leaving NMFS with the option of preparing an EA to decide if an EIS was needed. *Id*. Thus, the Court left open the possibility that NMFS might lawfully conclude that capturing 100 orcas out of an estimated Alaskan population of 300 would not significantly impact the human environment and, thus, would not require drafting an EIS.

Any environmental impact here pales in comparison to capture of wild animals. Not only is no capture from the wild is involved, but NMFS actually prepared an EA for this five animal aquarium-to-aquarium transfer, rather than merely relying on the CE it did in the orca case.

Plaintiffs claim that the remaining belugas at Marineland and/or the belugas being transferred to Mystic will lose family and/or social connections as a result of the transfer and that the transport itself will be physically dangerous because belugas in airplanes allegedly suffer from, among other things, changes in air pressure. Pltf.Op.Br. at 8, 33-34. Plaintiffs claim that, in light of these and other issues, NMFS's EA failed to adequately support the conclusion it was not necessary to produce an EIS. The MMPA deals with the issue of family connections among animals by specifying that pregnant females and nursing calves cannot be imported, unless NMFS makes special findings. 16 U.S.C. § 1374(b). Otherwise, the statute imposes no further restrictions regarding maintaining family (or social) connections. Plaintiffs attempt to project onto a species of wild animals the assumption they have a human-like family and social structure that the law has never endorsed, and indeed, has implicitly rejected, by allowing the import of juvenile marine mammals as soon as they are weaned. *See id*. The controlling regulation on social companionship for marine mammals is an APHIS rule that each marine mammal be afforded companionship with at least "one compatible animal of the same or [a] biologically-related species," with an exception where the veterinarian authorizes another arrangement. 9

C.F.R. § 3.109. APHIS prescribes, in detail, the safety requirements for aquarium-to-aquarium transport of belugas and other marine mammals, 9 C.F.R. §§ 3.112-3.118, and specifically authorize air travel, without requiring below-normal flight altitude, § 3.114. Mystic fully complies. The belugas are all well past weaning age, each will have seven beluga companions at Mystic, and NMFS and APHIS approved the detailed transport plan. AR 000120, and AR 000651.

Plaintiffs are free to seek legislation or petition for a change in applicable regulations. But Plaintiffs cannot force NMFS to turn a NEPA analysis regarding a permit application filed under existing laws into a vehicle for requiring NMFS permitting staff to evaluate in an EA the possibility of imposing, via permit denial or permit conditions, a non-existent law Plaintiffs would advocate, e.g. tightening the APHIS one-companion rule to require provision of companionship with family members. Existing laws must, and do, set the proper parameters for NEPA analysis. *See also*, 40 C.F.R. § 1508.9 (EA must be "concise" and "brief" discussion").

## I. <u>Response to Other Arguments of Plaintiffs.</u>

Mystic relies on NMFS for a rebuttal of Plaintiffs' other arguments.

## III. CONCLUSION

For the reasons stated above and in NMFS's summary judgment briefing, this Court should affirm NFMS's decision to grant Mystic a scientific research permit. The Court should grant Mystic's and NMFS's summary judgment motions and deny Plaintiffs' motion.

Dated March 3, 2021     Respectfully submitted,

            DEFENDANT-INTERVENOR
            THE SEA RESEARCH FOUNDATION, INC.
            d/b/a MYSTIC AQUARIUM

By:

   /s/ James H. Lister        /s/ Lawrence S. Grossman
  James H. Lister (DC 447878) and   Jeffrey M. Sklarz (ct20938) and
  Nicole M. Bayne (CA 328392)    Lawrence S. Grossman (ct15790)
  Birch Horton Bittner & Cherot, P.C.  Green & Sklarz, LLC
  1100 Connecticut Ave., NW,    One Audubon Street, Third Floor
  Suite 825          New Haven, CT 06511
  Washington, D.C. 20036     (203) 285-8545
  (202) 659-5800       Fax: (203) 823-4546
  jlister@dc.bhb.com      lgrossman@gs-lawfirm.com
  nbayne@dc.bhb.com

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below a copy of the foregoing was served by CM/ECF and/or mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Date: March 3, 2021      /s/ Lawrence S. Grossman
             Lawrence S. Grossman